**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. **CR-17-839-TUC-CKJ-EJM** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | December 11, 2017 |
| **Janice Ann McCowan,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE ERIC J. MARKOVICH, MAGISTRATE JUDGE**


**TRANSCRIPT OF PROCEEDINGS**

**MOTION HEARING**

**APPEARANCES:**
For the Plaintiff:
    U.S. Attorney's Office
    By:  **Stefani Kae Hepford,** Esq.
        **Sarah Elizabeth Maloney,** Esq.
    405 West Congress Street, Suite 4800
    Tucson, Arizona 85701

For the Defendant:
    Federal Public Defender's Office
    By:  **Walter Ivan Goncalves, Jr.**, Esq.
    407 West Congress Street, Suite 501
    Tucson, Arizona 85701

Transcriptionist:
Candy L. Potter
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

CR-17-839-TUC-CKJ-EJM – December 11, 2017

1

2                              **I N D E X**

3    **WITNESS:**          **DIRECT**   **CROSS**      **REDIRECT**  **RECROSS**

4    RALEIGH LEONARD
     By Ms. Maloney        7

5
     PAUL DU BOIS
6    By Ms. Maloney        52
     By Mr. Goncalves               84
7    By the Court                   87

8    CHRIS BREWER
     By Ms. Maloney        88
9    By Mr. Goncalves               101

10   MARK METHENY
     By Ms. Maloney        113
11   By Mr. Goncalves               126
     By Ms. Maloney                              139
12   By the Court                   140
     By Ms. Maloney                              142

13
     JOHN MCLAUGHLIN
14   By Ms. Hepford                 144

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2                    **INDEX OF EXHIBITS**

3      **EXHIBIT**                              **IDENT**   **RECEIVED**

4      NO.      DESCRIPTION

5      1        Seizure Photo                    99         100

6      2        Photo of center of checkpoint    95         96

7      3        Photo – south side of 15         95         97

8      4        Photo – south side of 15         93         96

9      5        Chart of checkpoint statistics   28         30

10     6        Map:  Tucson Sector              11         12

11     7        Map:  Apprehensions              36         38

12     8        Canine Certification             70         73

13     9        Canine "Green Sheets"            62         63

14     10       Recording of 5-1-17 interview    150        151

15     11       Transcript of 5-1-17 interview   150        151

16     13       CV of Raleigh Leonard            8          9

17     14       CV of Paul Du Bois               68

18

19

20

21

22

23

24

25

1          THE CLERK:  In criminal case 17-839, USA versus

2    Janice Ann McCowan, on for motion hearing.

3          Counsel, please state your appearances.

4          MS. HEPFORD:  Good morning, Your Honor, Stefani

5    Hepford and Sarah Maloney for the United States.  And also with

6    us at counsel table is Case Agent Justin Edgecombe with

7    Homeland Security Investigation.

8          THE COURT:  Good morning everybody.

9          MR. GONCALVES:  Good morning, Your Honor, Walter

10   Goncalves for Janice McCowan, present to my left in custody.

11         THE COURT:  Okay.  Good morning.

12         Good morning, Miss McCowan.

13         THE DEFENDANT:  Good morning.

14         THE COURT:  Okay.  So we're on for the motions

15   hearing.

16         Mr. Goncalves, do you want to invoke the evidentiary

17   Rule of Exclusion of Witnesses?

18         MR. GONCALVES:  Yes, Your Honor.

19         THE COURT:  Okay.  So are all your witnesses in the

20   courtroom?  It doesn't look like it, I guess.

21         MS. HEPFORD:  No.  In fact, none of our witnesses are

22   in the courtroom.  Several of them are waiting in the side

23   room, Your Honor.

24         THE COURT:  Okay.  So who are you going to call first?

25         MS. HEPFORD:  Raleigh Leonard.

1          THE COURT:  Okay.  So when you go to get Mr. Leonard,

2    why don't you just let the other witnesses know, as I'm sure

3    you probably have already, that they're excluded.  And as each

4    witness testifies I'll go over that with them as well.  Okay?

5          MS. HEPFORD:  Yes, Your Honor.  I have advised them

6    that that would likely happen.

7          THE COURT:  All right.  So are we ready to go?

8          MS. HEPFORD:  Yes, Your Honor.

9          THE COURT:  Okay.  Why don't we grab Mr. Leonard -- or

10   Agent Leonard.

11         MS. HEPFORD:  And, Your Honor, just for the Court's

12   information, we expect to call the witnesses in the order that

13   they're listed on the witness list.

14         So the first two will be testifying basically as

15   subject matter experts on checkpoints and Border Patrol

16   canines.  The other two agents, Chris Brewer and Mark Metheny,

17   are -- were involved in the seizure itself.  And then Agent

18   John McLaughlin was the one who took the defendant's

19   statements.

20         THE COURT:  Okay.  Thanks.

21         Agent Leonard, come on up to the witness stand and

22   you'll get sworn in.  Come on up here and then the clerk will

23   swear you in.  Just raise your right hand.

24     (RALEIGH LEONARD, GOVERNMENT WITNESS, SWORN.)

25         THE CLERK:  Thank you.

1          THE COURT:  Please have a seat.

2          THE WITNESS:  Thank you, sir.

3          THE COURT:  So, Mr. Goncalves, I just want to let you

4    know, I probably know a lot of agents from my time at the

5    U.S. Attorney's Office.  I do know Agent Leonard.  I don't

6    believe I had cases with him.  But when I was in a supervisory

7    role I dealt with Mr. Leonard on many -- well, on supervisory

8    issues involving the Border Patrol, given his position.

9          So I just wanted to let you know that.  I don't really

10   see that as an issue, but if you had an issue with it,

11   that's -- you know, that's --

12         MR. GONCALVES:  Well, Judge, I don't have an issue.  I

13   appreciate you letting me know.  And obviously, you know, it's

14   up to the Court to decide whether it has an issue.  So I'll

15   defer that to you, Your Honor.

16         THE COURT:  Yeah, again, Mr. Leonard and I, it was

17   mostly just managerial and policy type issues.  Nothing that I

18   remember on the subject matter that is -- that we're focusing

19   on today on these motions.  And frankly, it's been almost four

20   years, so --

21         MR. GONCALVES:  Okay.

22         THE COURT:  -- anyway.

23         Okay.  So if anything comes up where I think that it

24   may present an issue for me, I'll let you know.  But based on

25   the pleadings, my recollection of dealings with Mr. Leonard, I

Raleigh Leonard – Direct Examination

1    don't see an issue.

2            Okay.  All right.  Thank you.

3            MR. GONCALVES:  Thank you.

4                       DIRECT EXAMINATION

5    BY MS. MALONEY:

6    Q.  Good morning.

7    A.  Good morning.

8    Q.  For the record, would you please spell your name?

9    A.  My last name is Leonard, L-E-O-N-A-R-D.  First name

10   Raleigh, R-A-L-E-I-G-H.

11   Q.  And who are you employed by?

12   A.  The Department of Homeland Security Customs & Border

13   Protection, United States Border Patrol.

14   Q.  What is your current title or position?

15   A.  Currently I'm serving as the Acting Deputy Chief Patrol

16   Agent of the El Centro Sector in El Centro, California.

17   Q.  Were you at one time working in the Tucson Sector?

18   A.  I have been assigned to the Tucson Sector since August of

19   2008.  And that is my duty location of record, I'm just

20   temporarily in El Centro.

21   Q.  How long have you worked at Border Patrol throughout your

22   career?

23   A.  I began my career with the United States Border Patrol in

24   February of 1991 at the Imperial Beach Station in San Diego,

25   California.  So this February will be 27 years as a Border

Raleigh Leonard – Direct Examination

1   Patrol Agent.

2   Q.  Okay.  And can you give us a broad overview of your time

3   with Border Patrol and positions you've held?

4   A.  Sure.  So I joined the Border Patrol in February of 1991.

5   My first duty location was the Imperial Beach Station in

6   San Diego, California.  I served that sector doing

7   miscellaneous things.  I was the Public Information Officer,

8   different types of tactical groups.  I held the position of a

9   Border Patrol Agent, Senior Patrol Agent, Supervisor Border

10  Patrol Agent.  Every position that you could hold, I held.

11          I transferred to the Yuma Sector in 2007 as an

12  Assistant Chief Patrol Agent.

13          And then in August of 2008 I transferred to the Tucson

14  Sector, and I have been here every since, absent one year that

15  I traveled to Iraq.

16          MS. MALONEY:  Your Honor, may I approach?

17          THE COURT:  Yes.

18  BY MS. MALONEY:

19  Q.  I've handed you a copy of what's been marked as

20  Government's Exhibit 13.  And what is that document?

21  A.  I refer to this document as my one-page bio sheet.  Each of

22  the leadership of my sector has one of these on file.

23  Q.  And so that document contains a summary of all the

24  positions you have held?

25  A.  That is correct.

---

**Raleigh Leonard – Direct Examination**

---

1      MS. MALONEY:  So the Government moves to exhibit this

2  bio sheet, Government's Exhibit 13, into evidence.

3      THE COURT:  Any objection?

4      MR. GONCALVES:  No objection, Your Honor.

5      THE COURT:  Okay.  So Exhibit 13 will be admitted.

6    (Exhibit No. 13 admitted into evidence.)

7  BY MS. MALONEY:

8  Q.  So you said that you came to the Tucson Sector in 2002.

9  And you have been Division Chief here in the Tucson Sector

10  since 2008; is that correct?

11  A.  I came to Tucson Sector actually in 2008.  I started out

12  here as an Associate Chief, later promoted to Division Chief

13  roughly 2010 or 2011.  But 2008 is when I hit the ground here

14  in Tucson.

15  Q.  And what are the responsibilities of the -- of the Division

16  Chief of the Tucson Sector?

17  A.  So in my organization you have a Chief Patrol Agent, he's

18  responsible for the entire sector.  You have a Deputy Chief

19  Patrol Agent, he is the second person in charge.  And then you

20  have four Division Chiefs.  Because the area of responsibility

21  is so broad, they had to break it up into sections so that it

22  would be better -- better manageable.

23      So in my current role I oversee tactical

24  infrastructure, which is the fencing.  I oversee technology,

25  all of the integrated fixed towers, sensors, remote video

Raleigh Leonard – Direct Examination

1    surveillance systems, all of that falls under my purview.  I

2    oversee the prosecutions department.  I oversee processing.

3    About 21 different subcomponents that directly support the men

4    and women who are deployed to the immediate border.

5    Q.  This hearing deals -- is going to deal specifically with

6    the Federal Route 15 checkpoint near North Komelik, Arizona.

7    But before we talk about that checkpoint I want to ask you some

8    more general questions.

9    A.  Sure.

10   Q.  What is Border Patrol's purpose or mission as an agency?

11   A.  The United States Border Patrol, since its inception in May

12   of 1924, has been to patrol the land borders and the coastal

13   ways, the coastal land of the United States, to prevent the

14   unlawful entry of people and contraband.

15          After 9/11 it changed a little bit and it began

16   involving the prevention of terrorists and terrorist weapons,

17   preventing the entry of them into the United States as well.

18          But by and large we patrol the border between the

19   ports of entry and the roads leading away from the ports -- or

20   leading away from the border.

21          MS. MALONEY:  Your Honor, may I approach again?

22          THE COURT:  Yes.

23          MS. MALONEY:  Thank you.

24          And we also have the maps, Exhibit 6 and -- I was

25   going to mark them as Government's Exhibit 6 and 7 on poster

─── **Raleigh Leonard – Direct Examination** ───

1    board.

2          May I display those?

3          THE COURT:  Sure.  Yep.

4    BY MS. MALONEY:

5    Q.  So I wanted to direct you to what's been marked as

6    Government's Exhibit 6.  What is that?

7    A.  It's a map of the Tucson Sector's area of responsibility.

8    So Tucson Sector is responsible for 262 linear miles of border,

9    90,000 square miles of surrounding territory.

10         Within that 262 linear miles of border are nine Border

11   Patrol check -- or nine Border Patrol stations, 11 Border

12   Patrol checkpoints, and five forward operating bases, that

13   comprise -- all of those things together is the Tucson Sector.

14   Q.  Okay.  So this Government's Exhibit 6, it's a large map of

15   Southern Arizona, the Tucson Sector.  And does it accurately

16   depict these locations of the Border Patrol checkpoints, the

17   relation to the border, the roads, the communities in Southern

18   Arizona that you just mentioned?  It accurately depicts those?

19   A.  It does.

20         And also I'd like to point out that the rust-colored

21   circles are actually view sheds from our integrated fixed

22   towers and our remote video surveillance systems.

23         MS. MALONEY:  Okay.  Your Honor, we'd like to admit

24   Exhibit 6 into evidence.

25         THE COURT:  Any objection?

12

1      MR. GONCALVES:  No objection, Your Honor.

2      THE COURT:  Okay.  So Exhibit 6 will be admitted.

3      (Exhibit No. 6 admitted into evidence.)

4   BY MS. MALONEY:

5   Q.  You described some of the things that we were looking at on

6   this map.  And you mentioned the -- that there are 11

7   checkpoints located on this map; correct?

8   A.  That is correct.

9   Q.  And how are they noted on that map?

10  A.  Everywhere that you see a red stop sign is the GPS location

11  of a Border Patrol checkpoint.

12  Q.  Did you say that -- where the stop signs are?

13  A.  That is correct.

14  Q.  And they're located on the major -- or the egress routes

15  from the border between the United States and Mexico; is that

16  correct?

17  A.  Every checkpoint is located, all 11 of them, on major

18  routes of egress leading away from the borer.  There's one

19  that's missing that we're still working on getting a permit

20  for, and it's Highway 80 leading into the state of New Mexico.

21  That will be our 12th checkpoint if we're able to secure a

22  permit for that.

23  Q.  And are all these 11 checkpoints, are they within 100 miles

24  of the international border?

25  A.  They are.  We -- on the map is denoted the actual 100 air

UNITED STATES DISTRICT COURT

1    miles as stipulated in, I believe it's 287.1 of the INA says

2    that -- or defines reasonable distance as 100 air miles.

3    Q.  You mentioned briefly some other assets the Border Patrol

4    has.  For example, you mentioned that the orange areas depict

5    the view shed of cameras and forward operating bases.

6           I guess first, is there a plan or a network approach

7    to enforcement in Tucson Sector as a whole?

8    A.  There is.  So we're battling it out against the Sinaloa

9    Cartel and other cartels that operate south of the border.  So

10   we are looking at our vulnerabilities and looking at their

11   capabilities, and we're trying to plug up our vulnerabilities

12   so they no longer have the capability to operate in that

13   particular area.

14          Every year we put together what's called a campaign

15   plan.  It takes into consideration all of our personnel, the

16   strategic placement of technology, to include aboveground

17   sensors, underground sensors, ultra -- or our aircraft, our

18   manned aerial aircraft and our unmanned aerial aircraft, our

19   integrated fixed towers.

20          There are a multitude of -- we call them forcible

21   deployers or tools that we utilize to secure the border to --

22   more specifically to prevent the unlawful entry of people and

23   contraband.  That's the ultimate goal, is to deter people from

24   entering the United States.

25   Q.  And are the Border Patrol's 11 checkpoints, they're one

Raleigh Leonard – Direct Examination

1    part of this larger network, larger plan?

2    A.  Yes.  If I were to draw a band along the map there, I'd say

3    the immediate border, there's agents there, complemented by

4    vast amounts of technology that detect people after they effect

5    entry.  We have no way to know when somebody's going to effect

6    an entry.  We can't predict it.  We don't have technology south

7    of the border, so we have to draw the line in the sand

8    immediately north of the border.

9         And then behind them we have tactical units that are

10   operating.  And they're picking up people through technology or

11   observations or aerial observations.  They're picking up people

12   that made it through the first line of deployment of personnel

13   and technology.

14        And then when you get up around the technology -- or

15   the checkpoints, that would be more or less the third line.

16   You have the checkpoints, and out of the checkpoints are Border

17   Patrol agents, tactical units that work traffic or work

18   potential illicit activity adjacent to each of the three

19   checkpoints.

20        So three bands is my point.

21   Q.  So as a general matter in evaluating the Border Patrol's

22   checkpoints, is it appropriate to look at -- I guess the Border

23   Patrol's checkpoints and its other network of enforcement

24   capabilities here, is it appropriate to look at a single

25   checkpoint in isolation rather than the entire network as a

1  whole?

2  A.  So all the checkpoints, they just didn't all happen

3  overnight simultaneously.  They were built over a period of

4  time.  As the transnational criminal organizations moved, we

5  moved to counteract whatever their movement was.  So we

6  established -- or we erected checkpoints, deployed technology,

7  people, fencing, whatever we could do to deter that type of

8  activity.

9       But if you were to take one of the checkpoints down,

10  say the FR15 checkpoint, that route would become the preferred

11  route of egress for alien smuggling organizations operating in

12  and around the Tohono O'odham Nation.

13       So they're all connected.  They have an interdependent

14  relationship with one another.

15  Q.  This map depicts some of the ports of entry -- the ports of

16  entry in the Tucson Sector down on the border.  Is there

17  anything unique about the entryway, the gates, on the tribal

18  land?

19  A.  On -- the Tohono O'odham Nation is a -- it's a very -- it's

20  a sensitive situation for the Border Patrol.  We recognize

21  there's a lot of cultural sensitivities there.  There's a lot

22  of sacred sites.  They don't really recognize the U.S./Mexico

23  border because their land goes all the way down to the Sea of

24  Cortez.  So you have Tohono O'odham tribal members living north

25  of what we know at the U.S. border, and you have Tohono O'odham

Raleigh Leonard - Direct Examination

1   tribal members living south of the border, and they go back and

2   forth.  If there's some sort of a ceremonial event that they

3   need to attend down south, then they'll travel down south.  If

4   they need to go up north and go to Sells, which serves as their

5   hub of social services.  It's like their capital.  And then

6   they will travel to Sells and take care of shopping, social

7   security needs, whatever they need to do.

8        So there's three gates; there's the San Miguel gate,

9   there's the Papago gate.  And the one that's not depicted is

10  the Serapo gate, because it's traditionally -- the Serapo

11  family uses that to go back and forth for ranching needs.  But

12  the other two gates are heavily trafficked by United States

13  citizen tribal members and also non U.S. citizen tribal

14  members.

15  Q.  Who decides where these checkpoints are located?

16  A.  Well, fundamentally they're located at a strategic location

17  that benefits the Border Patrol.  We look for a road that's

18  straight, no curves, no hills.  Something -- an area that

19  wouldn't place the community public at risk.  We look for an

20  area that isn't in the middle of a major metropolitan city that

21  would inconvenience or disturb people on their daily duties or

22  daily assignments.

23       And then we work with the communities that -- where

24  the checkpoints are going to be placed to make sure that it's

25  conducive to whatever the present situation is.  Maybe they

Raleigh Leonard – Direct Examination

1    have some plans for sometime in the near future for some

2    construction or for some infrastructure improvements.

3            So I would say that it's a -- it's -- strategically we

4    have an idea where we want to place them, but ultimately it is

5    largely influenced by the communities in which they're located.

6    Q.  And you mentioned main roads.  I guess without the

7    checkpoints those roads would provide fast, easy egress away

8    from the border.

9    A.  Historically that's been our experience.  In the past

10   before these checkpoints were erected you can -- it's public

11   knowledge, you can look on the internet and you could see there

12   were many, many catastrophic vehicle accidents with vehicles

13   that were loaded up with ten, 12, 13 people.  And you'll see

14   where people are loaded up in the back of 18-wheel tractor

15   trailers in the middle of the summer.  You'll see where

16   innocent people lost their lives because somebody from another

17   country wasn't able to manage a heavily-laden vehicle.  You'll

18   see where there's extensive damage to private property.

19           So using a conveyance to expedite your egress away

20   from the border at one time was a preferred tactic.  It's no

21   longer the case with the construction of our 11 checkpoints.

22   Q.  Can you describe or point out where the Federal Route 15

23   checkpoint is on this map?

24   A.  I can.

25           So the tan area on the map in the center, it sticks

1    out, that's the -- that's actually the Tohono O'odham Nation or

2    Indian land.  The Federal Route 15 checkpoint is at the very

3    northern, almost the northern tip of the tribal land, just

4    south of the City of Casa Grande.

5    Q.  And can you explain the strategic placement of Federal

6    Route 15 checkpoint in this location?

7    A.  I believe when it was -- when it was placed at that spot it

8    was 2010, there were a couple of other locations that we were

9    looking at.  But the Village of -- I think it was North Komelik

10   and Cocklebur thought that this might be the better place for

11   it.

12        But the intent was to block off traffic that's coming

13   across the border within -- so, the Tohono O'odham Nation, it

14   depends on who you ask, is either 62 linear miles of border or

15   75 linear miles of border.  They say 75, we say 62, so it's

16   somewhere in the middle.

17        But that area is lacking tactical and structural

18   fencing, walls, and it's also lacking technology.  So we

19   constructed the 86 checkpoint, the FR15 checkpoint, and also to

20   the west you have the 85 northern checkpoint.  These

21   checkpoints serve as a second line of defense for traffic that

22   makes it across the border on the Tohono O'odham Nation and

23   then makes it past our four deployed defenses, past our

24   secondary defenses, and traveling northbound.  That was the

25   thought process of putting a checkpoint there.

1   Q.  And when Border Patrol put that checkpoint there, was that

2   decision made with the agreement of the Tohono O'odham Nation?

3   A.  It was.  Nothing happens with the Tohono O'odham Nation

4   quickly.  It's through a series of meetings.

5           So they broke it down in, I believe, 11 districts.

6   Each one of their districts is equivalent to one of our states.

7   And within those districts there are numerous villages.

8           So you have to appeal to the villages to get them to

9   sign off on it, then you have to appeal to the districts.  And

10  then ultimately you have to appeal to the Tohono O'odham

11  Legislative Committee for the ultimate signing of the

12  resolution.  But it takes a resolution to do anything on tribal

13  land.

14          So that's the process.

15  Q.  And are you familiar with the general layout of the Federal

16  Route 15 checkpoint?

17  A.  I am.

18  Q.  Can you describe it for us?

19  A.  So it's -- it's a rudimentary checkpoint.  It's still a

20  tactical checkpoint.  It's not anywhere near being an interim

21  or permanent.  There are no utilities.  We have hard power now,

22  but we don't have water, we don't have sewage.  We recently

23  built a canopy -- it's a two-lane highway, one road is going

24  south, one road is coming north.  We don't check southbound

25  traffic, we only check northbound traffic.  It has a canopy

Raleigh Leonard – Direct Examination

1    over both lanes.

2          There is a metal box known as a Conex box off to the

3    east side of the road that has an air conditioner in it and

4    that the agents use to keep them out of the weather.

5          There's smaller canopies there where people can sit,

6    keep out of the sun or -- while the Border Patrol agents are

7    secondary-ing the vehicle that they can sit there while the

8    Border Patrol agents talk to them or look through their

9    vehicle.

10         There's light generators around there that provide

11   light for the agents.  It's a 24-7 checkpoint, so it's lit up

12   at night.

13         Leading up to the checkpoint there's slow down signs,

14   speed signs.  There's also signs saying "Border Patrol

15   checkpoint," "immigration checkpoint."  And then ultimately

16   stop right when you get under the canopy and you -- where the

17   primary agent is standing.

18   Q.  Can you describe the general volume of traffic that flows

19   through that checkpoint?

20   A.  We -- a few years ago the Arizona Department of

21   Transportation conducted a survey and there was roughly 200

22   vehicles -- I think the year was 2012, 2011.  It's on the

23   internet, I looked it up recently.  And it was roughly 200

24   vehicles, I don't know how many occupants.

25         But recently the agents who operate the FR15

Raleigh Leonard – Direct Examination

1  checkpoint took a polls check of the number of people traveling

2  through there; not vehicles, but people.  And it was roughly

3  400 people, that's a mean average, per 24-hour period travel

4  through the FR15 checkpoint going northbound.

5  Q.  So just to make sure I understand, the Arizona Department

6  of Transportation figure that you referenced, was that about

7  200 vehicles per day?

8  A.  Correct.

9  Q.  And the 400 figure, could you state that again?

10  A.  That was people, not vehicles.

11  Q.  Okay.  Per day.

12  A.  Right.

13  Q.  You mentioned that this checkpoint is open 24 -- 24 hours

14  seven days a week.  Is there any time that the checkpoint might

15  possibly close?

16  A.  Each one of the -- so there's nine Border Patrol stations

17  in Tucson Sector.  So each one of the Border Patrol stations

18  has a commander.  The commander that oversees the FR15

19  checkpoint runs the Casa Grande Station, and he works very hard

20  to keep the FR15 checkpoint open and operational.  It is rare,

21  from my understanding, having been here since 2008, that that

22  checkpoint will ever go down.  And if it is, it would be due to

23  increment weather, such as one of those dust storms that comes

24  through here every once in a while that they call a haboob,

25  that would force the closure of that checkpoint in the interest

1    of public safety.

2    Q.   Okay.  Can you walk us through what happens when a vehicle

3    approaches the Federal Route 15 checkpoint?

4    A.   Coming from the south traveling north they would begin

5    seeing signs saying "slow down."  They would see signs –– the

6    operator of a vehicle would see signs saying that there's a

7    Border Patrol checkpoint ahead.  They would see the canopy that

8    goes over the road.  They would see that from at least a mile

9    away.

10         As they get closer to the checkpoint there's more slow

11   down signs taking them from 55 to 45, 45, 35, and on down,

12   until they enter the –– the actual operational area of the

13   checkpoint.

14         There may be vehicles in line ahead of them where a

15   Border Patrol Agent who is an Immigration Officer is conducting

16   immigration inspections of the occupants of the vehicle.  As

17   that vehicle moves forward, the next vehicle moves forward.

18   And there's usually, frequently, Border Patrol canines

19   operating in and around the vehicles as they're moving forward

20   to have a immigration inspection performed on them by the

21   Border Patrol Agent at primary.

22         And then at primary one of two things can happen.  The

23   inspection could result in further suspicion or further

24   questioning necessary –– needed, and the vehicle would be

25   referred to secondary for further examination.  Or the

Raleigh Leonard – Direct Examination

1    immigration inspection ends there and the vehicle is sent on

2    its way.

3    Q.  And this immigration inspection that you speak of, is that

4    performed at all the checkpoints, not just the Federal Route 15

5    checkpoint?

6    A.  Just to make it clear, the purpose, intent and objective of

7    our Border Patrol immigration checkpoints is to perform

8    immigration inspections of travelers and vehicles, occupants,

9    traveling northbound away from the border.  So that's the

10   purpose of them.  And that's what's happening at all of the

11   checkpoints.

12           Anything that happens at a checkpoint other than the

13   immigration inspections is secondary.

14   Q.  Are the agents expected to make this immigration or

15   citizenship determination of all the vehicles?

16   A.  They are.  That's the expectation.

17   Q.  So most if not all of the vehicles are stopped?

18   A.  We push to have them stop all vehicles.  They could get to

19   the point -- I'll share with you that if there's some sort of

20   traffic -- if the traffic's backed up for a mile and the people

21   at the end of the traffic are being placed in harm's way, or

22   there's a public safety issue, because there's a curve a mile

23   back from the checkpoint, then they will waive through traffic

24   in the interest of public safety.

25           But they are mandated, from supervisory Border Patrol

Raleigh Leonard – Direct Examination

1    agents, to perform immigration inspections on all vehicles

2    traveling north through those checkpoints.

3    Q.  This Federal Route 15 checkpoint is located on tribal land.

4    Are you aware -- are there times when folks who live in the

5    nearby villages might travel through the checkpoint frequently

6    and the Immigration Officers, the Border Patrol officers, would

7    become familiar with these folks and waive them through?

8    A.  I think it's safe to say that relationships have developed

9    between members of the Tohono O'odham Nation and Border Patrol

10   agents, especially the leadership of the Nation, and some of

11   the leadership of the district who routinely interact with us.

12       So I think it's safe to say that there's relationships

13   there.  I don't know to what degree of frequency though.

14   Q.  Are there canines regularly deployed at the Federal Route

15   15 checkpoint?

16   A.  There are.

17       One of the programs I oversee for Tucson Sector is

18   also the canine program, and we have approximately 14 canines

19   that are assigned to the Casa Grande Station that operate at

20   the FR15 checkpoint.

21   Q.  And what odors are the canines trained to detect?

22   A.  They're trained to detect the odors of concealed human, and

23   several narcotics and their derivatives.

24   Q.  And why are these canines cross trained to detect both

25   humans and controlled substances?

Raleigh Leonard – Direct Examination

1   A.  They're actually multidisciplined.  Those aren't the only

2   two things that they can do.  Some of our canines, 30 percent

3   of them, are also tracking and trailing canines, they can track

4   human beings out in the middle of remote locations.  We have

5   canines that are search and rescue certified.  We have canines

6   that are specific patrol canines, they're the canines that

7   would be utilized to subdue an aggressive or armed subject.

8        But the purpose is, it's the economy of purpose.  We

9   only have so many canines, and it's the same canines who are at

10  the checkpoint that are working out in the desert that are

11  sometimes deployed to the ports of entry, it's all the same

12  dog.

13  Q.  Do alien smuggling organizations still try to get illegal

14  aliens through the Border Patrol checkpoints like Federal Route

15  15, even though there are canines deployed and immigration

16  agents deployed?

17  A.  At least two to three times a week.  We call them trunk

18  loads.  They load them in the trunk of a vehicle, or they'll

19  put them in the back seat and give them false documents or

20  they'll have counterfeit documents.

21       But the other map that is on the ground there shows

22  the volume of actual alien smuggling activity that exists south

23  of our checkpoints.  And it is significant.

24       So quite a few alien smuggling organizations will

25  attempt to push people through our checkpoints.

Raleigh Leonard – Direct Examination

1    Q.  And the primary agent who makes the first contact with the

2    driver or the passenger, you mentioned their primary focus is

3    alienage or citizenship; correct?

4    A.  That's the focus of the agent, that's correct.

5    Q.  You've been with the Border Patrol for about 26, 27 years?

6    A.  Almost 27.

7    Q.  Have you ever manned a primary duty station before?

8    A.  Many times.

9    Q.  And you've supervised those officers in those positions as

10   well; correct?

11   A.  Many times.

12   Q.  And have you conducted training of those agents who are

13   stationed at the checkpoints?

14   A.  Maybe taken corrective action on-site.  I never have been a

15   training officer, but I've ensured that Border Patrol agents

16   partake in mandatory training, for sure.

17   Q.  So when the primary agent initiates contact and is looking

18   for -- is performing an immigration inspection, once an

19   occupant of the car or the driver responds, depending upon that

20   response it may lead to further questioning; correct?

21   A.  Yes.  So the agent initially is going to ask the person as

22   to his right to be in and remain in the United States.  The

23   agent may not discern any other suspicious activity or may not

24   have any further questioning.  But it's based upon that initial

25   interaction if the agent is going to send the vehicle to

1   secondary.  And that requires no level of suspicion, just needs

2   to be selected.  And if it's for any other criminal activity,

3   suspicion of any other criminal activity, that would require,

4   of course, a higher level of suspicion, amounting to reasonable

5   suspicion.

6           But it all happens right there at that primary.

7   Q.  So there has to be some sort of indicia, I guess, to

8   continue the inquiry once the -- once the immigration

9   inspection begins.  And indeed, the Immigration Officer may not

10  even need to begin speaking if a driver hands an identification

11  card; is that correct?

12  A.  It happens, they'll pull up to the checkpoint and all the

13  occupants of the car will give the driver all of whatever their

14  immigration documents are.  The Border Patrol Agent will look

15  at the photo, the information, and he'll ask them questions

16  about what's on the card, speak to them briefly, elicit a

17  response, hand them back their cards individually.  And if he

18  has any concerns, he finds a counterfeit card or believes

19  there's an imposter in the vehicle, then he can refer the

20  vehicle to secondary.

21          But ideally he would handle all those documents and

22  really give them close scrutiny.

23  Q.  Close scrutiny, he would inspect the documents to try to

24  determine whether the documents are fake to make sure that the

25  documents match the driver, so the driver isn't an imposter?

Raleigh Leonard – Direct Examination

1    A.  All the occupants of the vehicle, not just the driver.

2    Every occupant of the vehicle is subject to the same

3    examination.

4    Q.  And other forms of -- other types of indicia, I suppose, a

5    primary agent might be looking for, in addition to the response

6    of the respondent, might be body language; correct?

7    A.  That is correct.

8    Q.  Okay.  So an agent will watch the demeanor of the occupants

9    of the car.  And do some become very astute at detecting the

10   nuances of human behavior?

11   A.  It's a science, it's an art.  Yes, absolutely.

12   Q.  So I would like to discuss some of the statistics Border

13   Patrol has provided regarding the six months before and the six

14   months after the defendant's stop at the checkpoint on May 1st,

15   2017.

16          And you're familiar with these statistics; correct?

17   A.  I am.  So just these statistics were requested in this

18   format from the Office of Chief Counsel.

19   Q.  Yes.

20   A.  And then I would send the request to Washington, D.C. to

21   our Data Management Branch in D.C. for them to complete.

22   Q.  Okay.  So I want to turn your attention to Government's

23   Exhibit 5, or what's been marked as that.  And what does this

24   document show?

25   A.  This document shows all of the activity that occurred at

Raleigh Leonard – Direct Examination

1    the FR15 checkpoint six months prior to the event that we're

2    here testifying to today, and six months immediately after the

3    event.

4          You have -- you have six rows and you have two

5    columns, sake of argument.  So the first column says "11-1-2016

6    through 5-1 of 2017."  And then I'll start going down the rows,

7    if I may.

8    Q.  Okay.  Well, before we move on to that, how does Border

9    Patrol track these type of statistics we're looking at here?

10   A.  So all of the statistics that are on this document are

11   generated from a system that we refer to as E3.  And it's just

12   a record-keeping database that we use.  It's the same as a

13   police officer taking a report or sheriff deputy taking a

14   report and then going back to their home office and then

15   inputting that report into some sort of an archival database.

16   That's what this is.

17         So E3, Border Patrol agent goes back, inputs

18   information into a database, the database absorbs the

19   information and stores the information.  Certain people, data

20   management personnel, they can actually go into this database,

21   and they have -- they have queries that they use that can

22   actually pull out data if the data was input into the database.

23   It's morphed into that over the years.

24         But the original purpose of this database was simply

25   to be a record-keeping database that is now being used to

─────────── **Raleigh Leonard – Direct Examination** ───────────

1   produce statistics.

2          MS. MALONEY:  Okay.  Your Honor, the Government moves

3   to admit this Exhibit 5, this statistical summary sheet, into

4   evidence.

5          THE COURT:  Any objection?

6          MR. GONCALVES:  No objection, Your Honor.

7          THE COURT:  Okay.  So Exhibit 5 will be admitted.

8      (Exhibit No. 5 admitted into evidence.)

9   BY MS. MALONEY:

10  Q.  Okay.  So the -- can you explain this chart a bit for us --

11  A.  Sure.

12  Q.  (Inaudible.)

13  A.  Sure.  So once again you have -- it's the FR15 checkpoint.

14  This is just the FR15 checkpoint.  Not any information here is

15  around the checkpoint or at any other ten checkpoints.

16  Specific to FR15.

17         The first column, 11-1-2016 through 5-1-2017, the

18  first row you see it says, immigration-related events.  So at

19  this checkpoint during this time frame for that six-month

20  period there were four immigration-related offenses that

21  occurred.

22         The second row says, immigration-related arrests.  Of

23  those four immigration-related events, there were 14

24  immigration-related arrests that occurred as a result of those

25  enforcement events.

Raleigh Leonard – Direct Examination

1           And the way an event becomes an event, it's -- the
2   agent will take the case back to the Casa Grande Station, he'll
3   input information into the database E3, and it gives him a
4   number.  And it says, this enforcement event is assigned this
5   number.  And all of the people, vehicles, narcotics, whatever,
6   is now associated to that enforcement event.
7           So that's how the enforcement event is created.
8           Then if I may, I'll go down to the third row where it
9   says, narcotic-related events.  There were nine
10  narcotic-related events at this checkpoint during this same
11  time period, of which there were 13 arrests.  So 13 people were
12  arrested as a result of those nine enforcement events.
13          Then you go to narcotic-related
14  non-immigration-related arrests.  That's what it would say if
15  it went all the way out.  So all 13 people that were arrested
16  as a result of the narcotic-related events were either a LAPR
17  or a U.S.C., But they were not illegal aliens.
18          And when I say "U.S.C.," that would encompass our
19  tribal members as well.
20          And then the last row where it says, other arrests all
21  non-Immigration, those aren't 19 separate arrests.  Those 19
22  arrests also include the 13 arrests right up above that.  Where
23  it says "narcotic-related non-immigration-related arrests,"
24  those 13 are imbedded in that 19.
25  Q.  Okay.  So the 19 total here at the bottom, other arrests,

UNITED STATES DISTRICT COURT

1    include 13 narcotics arrests and six others.

2    A.   Six others.

3    Q.   What type of other -- other crimes might that include?

4    A.   We run into weapon violations from time to time.  We run

5    into people who are under the influence and we'll call for the

6    TOPD to respond and they'll take them into custody.  It could

7    be a warrant out for somebody's arrest that we're aware of, if

8    there's a BOLO out for the person, a be on the lookout for the

9    person.

10          But that's typically what it is.  It wouldn't be

11   immigration, it wouldn't be narcotic, it would be other.

12   Q.   So you just explained the left side of the chart, which are

13   the six months before the May 1st, 2017 event in this

14   particular case.

15          And I guess a similar analysis would be done on the

16   right side of the chart, the six months after.

17   A.   Precisely.  I'll just go through it a little quicker,

18   because we've already discussed it in the first row in the

19   first column.

20          So the six months after, there were four

21   immigration-related events that were input into E3, which

22   resulted in eight immigration-related arrests.  So four events,

23   eight arrests.

24          And then there were three narcotic-related events that

25   resulted in six narcotic-related arrests.  So events and

1  arrests.  Of those six arrests, all of them were

2  non-immigration-related.  So they were either a LAPR or a

3  U.S.C.  Once again, "U.S.C." encompasses our tribal members.

4         And then down below the number 13, where it says,

5  other arrests, all non-Immigration, that number 13 would

6  include the six that were related for narcotic-related

7  arrests -- or narcotic-related enforcement actions.

8  Q.  Okay.  So if I'm reading this chart correctly, for the six

9  months before the defendant's stop at the checkpoint on May

10  1st, 2017, there were 14 immigration-related arrests and 13

11  narcotics-related arrests.  And six months after there were

12  eight immigration-related arrests and six narcotics-related

13  arrests.

14         So the total there would be 22 immigration-related

15  arrests for the year, and 19 narcotics-related arrests for the

16  year at the FR15 checkpoint; correct?

17  A.  Yes.  If you total them out to the right; that is correct.

18  Q.  Okay.  Now in looking at the events, it looks -- it looks

19  like there were more drug events than immigration events in the

20  first six months.  The immigration-related events were four,

21  the narcotics-related events were nine.  But then in the latter

22  six months it's just the opposite, there were more

23  immigration-related events than narcotics-related events.

24         Does the number of drug events relative to

25  immigration-related events, does it change Border Patrol's

Raleigh Leonard – Direct Examination

1    purpose of the checkpoint?

2    A.  We are immigration officers.  We're Border Patrol agents.

3    We are assigned to immigration checkpoints and we are

4    conducting immigration inspections.  Anything that happens

5    after that immigration inspection is incidental to the primary

6    purpose, intent and objective of the checkpoint.

7            So from our perspective it is the purpose, intent and

8    objective of the checkpoint, not necessarily the stats

9    resulting from the checkpoint, that denotes the purpose of the

10   checkpoint.

11   Q.  Okay.  So Border Patrol doesn't determine the purpose of

12   the FR15 checkpoint based on arrest statistics; correct?

13   A.  No, it's there to deter people from crossing the border.

14   Q.  Okay.  And it's fair to say that these particular

15   statistics don't tell the full story of the checkpoint.

16   A.  It's -- no.  The overall traffic within the area, intel

17   reports, all of that, is the bigger -- the bigger picture of

18   what's going on out there.

19   Q.  So you testified to this earlier, but is there more to the

20   checkpoint in terms of deterrence and enforcement than just

21   arrests made at the checkpoint?

22   A.  When -- if we look at the one -- it hasn't been entered

23   into evidence yet, but I point it out, because if you look at

24   the traffic that's coming across that border, potentially each

25   one of the red dots is an apprehension or arrest of more than

Raleigh Leonard – Direct Examination

1    one subject or -- or a subject that just denotes an enforcement

2    that a Border Patrol Agent GPS'd into our mapping database.

3    Each one of those subjects could potentially, absent the

4    checkpoints, loaded into a vehicle and gone north into the

5    interior of the United States.

6         The border checkpoints have an interdependent

7    relationship with our technology, our tactical infrastructure,

8    and the immediate border.  We simply do not have enough

9    resources to -- and we can't predict people who are going to

10   commit a crime by entering the United States.  We simply do not

11   have enough resources to keep everybody out from entering the

12   United States.  So we have to have layers of enforcement

13   activities to intercept or interdict people that have effected

14   that entry.

15        So the checkpoints are related to traffic that's

16   occurring at the immediate border.

17   Q.  Okay.  And we'll take a look at that exhibit --

18   A.  Sure.

19   Q.  -- in just one moment.

20        But if I'm understanding you correctly, you're saying

21   checkpoints deter, and they also push alien smuggling and

22   illegal entry into other areas where it can be more easily

23   detected by Border Patrol than, for example, walking around the

24   checkpoint; is that correct?

25   A.  We have statistics where those are some of the things that

Raleigh Leonard – Direct Examination

1    we do look at, is deflection and displacement, deflection and

2    displacement of people from a specific preferred entry

3    corridor.  We would look at that as a success; that is correct.

4    Q.  Okay.  And, of course, as you testified earlier, if I have

5    it correct, the Federal Route 15 checkpoint works in

6    conjunction with the other checkpoints, with roving patrols,

7    mobile camera operators, fixed camera operators, agents

8    tracking in the field, canines tracking in the field,

9    airplanes, sensors, and other assets; correct?

10   A.  It is very much a system of systems, yes, that's correct.

11   Q.  Okay.  I'm going to display this -- the other map that you

12   just referenced, what's been marked as Government's Exhibit 7.

13          So this Government's Exhibit 7, or what's been marked

14   as that, looks like a visual depiction of the incidents in the

15   Tucson area of responsibility for the time period six months

16   before May 1st, 2017, and six months after; is that correct?

17   A.  That is correct.

18   Q.  This is an accurate depiction of the area around the

19   Federal Route 15 checkpoint?

20   A.  That is correct.

21   Q.  And this map shows the apprehensions at the checkpoint and

22   around the area during that time period.

23          Is the data pulled from the same system documenting

24   arrests -- arrests, the E3 and data mark system, I believe,

25   that you mentioned earlier?

1   A.  You are correct, it's all from E3.

2          MS. MALONEY:  Your Honor, the Government would like to

3   move Government's Exhibit 7 into evidence.

4          MR. GONCALVES:  Judge, my only objection is relevance.

5   I don't see the relevance of it here.

6          These are apprehensions that are not related to the

7   checkpoint.  And if they do relate to the checkpoint, then I

8   don't think there's been a foundation established.  Even if

9   there is a connection, I don't see how -- what the relevance

10  would be to the issue at question, which is the primary purpose

11  of the checkpoint.

12         THE COURT:  Mrs. Maloney, do you want to address the

13  relevance issue?

14         MS. MALONEY:  Well, the witness has testified that the

15  checkpoint is part of a broader network of -- and system of

16  enforcement efforts, and that the checkpoints deters and pushes

17  alien smuggling and aliens around the checkpoint.

18         So it's relevant to show that the primary purpose

19  continues to be for immigration purposes.  It's the effect of

20  the checkpoint.

21         THE COURT:  Okay.  Well, I'll admit it and then I'll

22  give it whatever weight I think it should be given.  I'm not

23  sure I have heard testimony about how that's the case, but

24  we'll admit it, and if you want to present some testimony --

25         MS. MALONEY:  Well, perhaps we'll get into that, how

1    the immigration checkpoint does deter and deflect --

2          THE COURT:  So Exhibit 7 will be admitted.

3       (Exhibit No. 7 admitted into evidence.)

4    BY MS. MALONEY:

5    Q.  Well, could you describe this map for us and what it

6    depicts?

7    A.  So it's for the same time frames as the other statistics

8    which were shown on Exhibit 5.  It gives you a broad

9    perspective.  It shows that during that same time frame where

10   there were negligible levels of activity occurring at the FR15

11   checkpoint, there really was a high volume of activity that's

12   working its way north to get away from the border region.

13         The activity that occurs on the border isn't staying

14   on the border, the objective is to get away from the border and

15   get into the interior of the United States.  So if you -- if

16   you look at the maps, you can see the Border Patrol agents are

17   effecting a tremendous lot of enforcement activities just

18   adjacent to the border.  That's that first band that I

19   referenced.

20         And then subsequently a few of those people made it

21   through that first band and they're traveling north and Border

22   Patrol agents are able to interdict them away from the border.

23   This is probably days after they effected an entry.

24         And then when you get up to the checkpoint, there are

25   even fewer people.

Raleigh Leonard – Direct Examination

1          But the objective is to get past that checkpoint and

2     to load into vehicles or to get through the checkpoint and go

3     north into the United States.  But what happens at the border

4     is reflective of what happens at the checkpoint.  That's the

5     point.

6     Q.   Okay.  And can you describe what these items show?  It

7     looks like the circles are for immigration arrests and the

8     diamonds are for drug arrests.

9     A.   The red dots are -- everywhere that a Border Patrol agent

10    effected an immigration -- or the arrest of a deportable

11    subject, they carry around GPS's, and they would GPS locate,

12    mark where that arrest took place.

13         The green triangles -- or the diamonds, I'm sorry,

14    they are everywhere that a Border Patrol Agent effected a

15    narcotic-related arrest, and they've GPS'd that onto the map.

16         And then you'll see in certain locations there's

17    weapons.  That's where they arrested an individual, a

18    prohibited possessor or someone who's in possession of a

19    firearm that shouldn't be.

20         And then you'll see where there's cars, and that's

21    where Border Patrol agents have effected arrests that have

22    resulted in the seizure of the vehicle.

23         Once again, the rust-colored circles are Border Patrol

24    view sheds coming from our integrated fixed towers or remote

25    video surveillance systems.  And you'll notice that there's an

1    absence of that technology where there's a high level of cross

2    border transnational criminal activity.

3    Q.  Okay.  So it appears that a lot of your enforcement is

4    happening -- or the apprehensions are happening very close to

5    the border; correct?

6    A.  Yes.

7    Q.  But some illegal aliens get through to the -- you know, the

8    area north of that immediate border area; correct?

9    A.  The second and third band.

10   Q.  So Border Patrol would still need the checkpoints to

11   discover or deter or push illegal aliens into the desert areas

12   around the checkpoint where it's more easily to discover these

13   potential groups; is that correct?

14   A.  The reason that they're walking in those remote locations

15   is because they can't load in a vehicle and simply go north up

16   into Phoenix or into Tucson.

17   Q.  And there's other technology and infrastructure in the

18   desert to help locate and apprehend these aliens; is that

19   correct?

20   A.  With -- yes.

21   Q.  Is there anything else you would like to note about this

22   exhibit?

23   A.  The stats down below, they demonstrate what actually

24   happened the six months before and six months after across the

25   entire southwest border.  You can see the volume of

Raleigh Leonard – Direct Examination

1    transnational criminal activity.

2            So the intent of the map was to bring it from the

3    macro to the micro, isolate it to the FR15 checkpoint and to

4    within a half mile of the FR15 checkpoint.

5            The point being is that the reality is is the

6    checkpoints are serving as a deterrent, they're slowing traffic

7    down from seconds to minutes, minutes to hours, hours to days,

8    which gives Border Patrol agents on foot, on horses, ATVs, in

9    aircraft, time to go and effect that arrest.  Because there are

10   more people engaged in illicit activities than we have Border

11   Patrol agents deployed to a target of interest per se.  So we

12   need time to get over there and effect that arrest.

13   Q.  I want to circle back, I guess, to the strategic nature of

14   the checkpoint again and just touch upon this again.

15           How does having this checkpoint on Federal Route 15 --

16   interacting with the other checkpoints in Southern Arizona, how

17   does having the Federal Route 15 checkpoint stop the flow of

18   illegal entrants going north?

19           MR. GONCALVES:  Objection, Your Honor, relevance.

20           THE COURT:  Overruled.

21           THE WITNESS:  The people down south who are attempting

22   to effect an entry into the United States know that the Border

23   Patrol have layered enforcement posture.  They know that there

24   are checkpoints leading away on every major route of egress.

25   They know that they need to get around those checkpoints and

Raleigh Leonard – Direct Examination

1    get around the Border Patrol agents that are deployed

2    throughout the border region in order for them to be -- to

3    effect a successful entry into the United States.  It serves as

4    a deterrent to them psychologically.

5    BY MS. MALONEY:

6    Q.  If the Federal Route 15 checkpoint didn't exist, what kinds

7    of problems would you have in stopping the flow of illegal

8    aliens northbound?

9           MR. GONCALVES:  Objection, speculation, Your Honor.

10          THE COURT:  Miss Maloney?

11          MS. MALONEY:  He's an expert and he can provide his

12   opinion.

13          THE COURT:  Well, I think it's speculation if it

14   didn't exist.  Maybe he can testify about some issues that

15   existed prior to checkpoints existing in certain areas.

16          So the objection is sustained as to that question.  If

17   you want to ask him about how things -- how traffic and so

18   forth existed prior to the checkpoints to provide some context

19   of how the checkpoints have helped, that would be fine.

20   BY MS. MALONEY:

21   Q.  Can you describe what kinds of problems existed in stopping

22   the flow of illegal aliens northbound before the north

23   checkpoints were established?

24          MR. GONCALVES:  Objection, relevance.

25          THE COURT:  Overruled.

UNITED STATES DISTRICT COURT

Raleigh Leonard – Direct Examination

1          THE WITNESS:  I have worked three different sectors,

2     all the way from the Pacific Ocean to the New Mexico state

3     line.  I was in the Border Patrol before many, many of these

4     checkpoints were even established.  I'm familiar with the

5     catastrophic vehicle accidents that have occurred as a result

6     of people being loaded in vehicles that are meant to carry four

7     people and it's carrying 12, 15 people.  You just can't

8     maneuver those vehicles.

9          I have responded to many incidents where there have

10    been wrong-way drivers, vehicles driving the wrong way on a

11    freeway, where innocent lives have been lost, both United

12    States citizens and foreign nationals.

13         I have responded to incidents where people have been

14    locked in the trunks of cars and they cannot breathe, and in

15    the heat of the weather.

16         All of those things, the loss of innocent life, the

17    catastrophic vehicle accidents, the chaos that used to go on

18    along our border -- even though these maps would show you that

19    generally there's a lot of activity, a lot of that activity has

20    been thwarted by the placement of these checkpoints.

21    BY MS. MALONEY:

22    Q.  Are Border Patrol agents trained in other areas other than

23    just immigration?

24         MR. GONCALVES:  Objection, relevance, Your Honor.

25         THE COURT:  Well, okay.  Miss Maloney, do you want to

─ **Raleigh Leonard – Direct Examination** ─

1    respond?

2        (Discussion held off the record)

3            MS. MALONEY:  I will -- I will get back to that.

4            THE COURT:  So just for the record you're going to

5    withdraw that question for the time being?

6            MS. MALONEY:  Yes, I'm just going to reword this.

7    BY MS. MALONEY:

8    Q.  Does Border Patrol have any control over what other

9    criminal activity -- sophisticated criminal organizations may

10   try to push through the Tucson area of responsibility,

11   including the checkpoints?

12           MR. GONCALVES:  Objection, Your Honor, relevance and

13   foundation.

14           THE COURT:  Okay.  So, Miss Maloney, if you want to

15   try to help me explain -- help me where you're going with this.

16           MS. MALONEY:  Well, immigration agents are working on

17   this -- on the checkpoints, and with lots of criminal activity

18   in the area.  I'm trying to get -- to describe what their job

19   is and what the big picture is.  And --

20           THE COURT:  You mean besides immigration-related

21   duties?

22           MS. MALONEY:  How it's -- yes.

23           THE COURT:  Doesn't that kind of go to your point,

24   Mr. Goncalves?

25           MR. GONCALVES:  Yes, Judge.  I mean, I don't see the

Raleigh Leonard – Direct Examination

1    relevance of it.

2           THE COURT:  No, I mean, doesn't it go to your motion

3    that they're looking for drugs, not aliens?

4           MR. GONCALVES:  Right, that's correct as well.

5           But I don't see -- I mean, the issue is, she's trying

6    to elicit evidence regarding the primary purpose -- the primary

7    purpose of the checkpoint.  I don't see how this line of

8    questioning has anything to do with the specific checkpoint in

9    question.

10          And then my foundation question has to do with --

11   something having to do with -- I believe the question referred

12   to criminal activity or cartel -- I don't think the word

13   "cartel" was used, but another word was used.

14          So I think we're going beyond what the point is with

15   this particular witness, from what I see, Your Honor.

16          THE COURT:  Okay.  Well, I'm going to sustain it as

17   to -- the objection, also as to form.  I'm really not sure.

18   But you can rephrase it.

19          MS. MALONEY:  Okay.

20          I'd like to go back and have the witness answer the

21   question as to whether Border Patrol agents are trained in

22   areas other than immigration.

23          THE COURT:  And that's -- you object to that?

24          MR. GONCALVES:  Yeah, I've already objected to that.

25          MS. MALONEY:  On relevance grounds.  And it's relevant

Raleigh Leonard – Direct Examination

1    because the defendant is challenging the purpose of the

2    checkpoint.  And the question addresses the training of the

3    agents who are deployed to execute that purpose, to work at the

4    checkpoints.

5            THE COURT:  And again, I'm just -- are you get -- are

6    you ultimately getting at, are they trained in drug offenses or

7    drug -- I'm not sure what you're getting at.

8            MS. MALONEY:  Yes, that would be one relevant area for

9    the purposes of this checkpoint challenge today.

10           THE COURT:  So if your question was --

11           Mr. Goncalves, weigh in.

12           But if your question is, are Border Patrol agents

13   trained to investigate drug violations --

14           MS. MALONEY:  Are they trained --

15           THE COURT:  Do you have an objection to that?

16           MR. GONCALVES:  Well, Judge, I think this is a

17   different question.  So if the question is going to be, are you

18   trained -- are they trained in areas other than immigration,

19   then I think that's okay.  However -- if it's just going to be

20   that, then that's fine.  But that's a different question than

21   what was originally asked.

22           THE COURT:  Okay.

23           MR. GONCALVES:  I mean, the wording of it is very

24   different and it seems like a totally different question from

25   what was originally asked, which had to do with -- and I don't

UNITED STATES DISTRICT COURT

Raleigh Leonard – Direct Examination

1    remember the exact wording but, again, it was eliciting

2    information about drug cartels -- the word "cartel" wasn't

3    used.

4           So I have a foundation -- objection as to foundation

5    with respect to that.  But if the question now is going to

6    be -- or is, is there training other than immigration, then I

7    don't specifically have an objection just to that simple

8    question.

9           THE COURT:  Okay.  So that's the question.

10          Miss Maloney, do you want to ask that?

11   BY MS. MALONEY:

12   Q.  Are Border Patrol agents trained in areas other than

13   immigration?

14   A.  Yes, we are.  And it's in line with our authorities,

15   Title 8, Title 18, Title 19, Title 21.  But most of our

16   authority is derived from 8 U.S.C. 1357 Section 287.

17   Q.  And are they trained in narcotics recognition and general

18   narcotics investigation?

19   A.  When we go through the academy we are -- we do receive

20   Title 21 training and also cross-designated authority; that is

21   correct.

22   Q.  Are Border Patrol agents federal agents authorized to

23   address -- to arrest for violations of federal laws?

24   A.  Section 287(a)(4) and (a)(5) stipulates that Border Patrol

25   agents are authorized to enforce laws related to any crime

Raleigh Leonard – Direct Examination

1  against the United States.  And 287(a)(5), I believe, is any

2  felony against the United States, yes.

3  Q.  And can Border Patrol agents call DEA to do investigations

4  whenever they find drugs in a checkpoint?

5  A.  Every narcotic load that we interdict is referred to the

6  Drug Enforcement Agency, that's their wheelhouse, that's their

7  responsibility.

8  Q.  But do the agents call in Border Patrol to do the

9  investigation upon finding it?

10  A.  We call in DEA, yes, that's correct.

11  Q.  Okay.  If the Federal Route 15 checkpoint was shut down,

12  how would that impact the Tucson Sector's overall ability to

13  enforce immigration laws and secure the border?

14  A.  We would have to come up with some sort of an operational

15  plan to control FR15 that would result in -- we'd go back to

16  what we used to do and it would be roving patrols.

17       So I would influence the deployment of Border Patrol

18  agents and Border Patrol vehicles to patrol FR15, keep it hot,

19  and make sure that people aren't smuggling people up FR15.

20  Q.  So the primary purpose of the Federal Route 15 checkpoint

21  is -- and Border Patrol checkpoints are for immigration

22  detection and enforcement.  But do you want your agents

23  ignoring violations of federal drug laws that are occurring in

24  their presence at a checkpoint?

25  A.  Just to kind of give it some context, we don't get rated on

UNITED STATES DISTRICT COURT

Raleigh Leonard – Direct Examination

1    how much narcotics are seized every year, or anything to do

2    with narcotics, we get rated on effectiveness.  How many people

3    cross the border?  Of those that cross the boarder how many did

4    we arrest?  We get rated on recidivism.  Of the people that we

5    interdicted, how many were interdicted before and are operating

6    AOR?  We get rated on deflection.  We get rated on

7    displacement.

8              All of those things pertain to people, illegal aliens.

9              Narcotics are for the -- it's intermingled with alien

10   smuggling.  But that is not what we focus on, that's not our

11   focus.

12             MS. MALONEY:  May I have a moment, Your Honor?

13             THE COURT:  Sure.

14        (Discussion held off the record.)

15   BY MS. MALONEY:

16   Q.  We talked a bit about Border Patrol officers' training.

17   When Border Patrol officers are deployed, can they turn a blind

18   eye to criminal activity?

19   A.  No, absolutely not.

20   Q.  So why are Border Patrol agents trained in areas other than

21   immigration?

22   A.  So if you look at the border dynamic -- and just to give

23   you a broad perspective, typically you have people and

24   narcotics coming north and you have guns and money going south.

25   All of those things somewhere reside within our authorities,

─── Raleigh Leonard – Direct Examination ───

1   Title 18, 19 and Title 21.

2          So the -- our authorities are conducive with the

3   activity that is within our realm of responsibility.  That's

4   why we receive the training that we receive.

5   Q.  Is there anything unique to the Tucson Sector with activity

6   that goes on south of the border and moves upwards?

7   A.  Tucson Sector across the southwest border has long served

8   as the preferred entry corridor for both illegal alien

9   smuggling and also narcotic trafficking.

10          And to isolate it even further, if you were to take

11   the 62 to 75 miles of border known as the Tohono O'odham Indian

12   Nation, that is the area which is the most problematic for us

13   because of its location to Phoenix.  It's a straight shot into

14   Phoenix, straight shot into Tucson.  And also the absence of

15   technology and tactical infrastructure.

16          So across the 1,962 linear miles of southwest border,

17   the Tohono O'odham Nation is a problem, and it's known

18   nationally.

19          MS. MALONEY:  Okay.  I have no more questions at this

20   time.

21          THE COURT:  Okay.  Thank you, Miss Maloney.

22          Let's take a five-minute comfort break and come back

23   at 11:30 and we'll get started with cross-examination.

24          Thank you.

25      (Recess taken.)

Raleigh Leonard – Direct Examination

1        THE CLERK:  Back on the record, USA versus Janice Ann

2    McCowan.

3        THE COURT:  Okay.  All right.  So, Mr. Goncalves,

4    cross-examination.

5        MR. GONCALVES:  I don't have any questions,

6    Your Honor.

7        THE COURT:  No questions?

8        MR. GONCALVES:  No questions.

9        THE COURT:  Okay.  Agent Leonard, thank you.  You're

10   free to step down.

11       Do you want to have Mr. -- Agent Leonard excused from

12   the Rule or what's your --

13       MR. GONCALVES:  Well, I don't, Your Honor.

14       THE COURT:  You want the rule to remain in effect?

15       MR. GONCALVES:  Yes, I do.

16       THE COURT:  So, Agent Leonard, you cannot discuss your

17   testimony with other witnesses, or anyone other than the

18   attorneys involved in the case.  And you also can't stay and

19   watch.  I don't know if you were planning on staying.  But you

20   can't stay to watch court proceedings.

21       THE WITNESS:  Understood, Your Honor.  Thank you.

22       THE COURT:  Thank you.

23       THE WITNESS:  Thank you, sir.

24       THE COURT:  Okay.  Miss Hepford?

25       MS. HEPFORD:  The Government will call Paul Du Bois.

UNITED STATES DISTRICT COURT

Paul Du Bois — Direct Examination

1          THE COURT:  Okay.

2          Come on forward, sir.  You can come on up to the

3   witness stand here.

4          Good morning.  You can just come on in here and remain

5   standing and then raise your right hand.

6      (PAUL DU BOIS, GOVERNMENT WITNESS, SWORN.)

7          THE CLERK:  Thank you.  Be seated.

8          THE COURT:  Okay.  Miss Maloney.  Thank you.  Whenever

9   you're ready.

10                    DIRECT EXAMINATION

11  BY MS. MALONEY:

12  Q.  Good morning.

13         Can you please go ahead and spell your last name for

14  the record?

15  A.  D-U, space, capital B-O-I-S.

16  Q.  And can you tell the Court what you -- what you do for

17  Border Patrol?

18  A.  Yes, ma'am.  I'm a Border Patrol Agent, I'm a Border Patrol

19  Supervisor, and I'm the Canine Coordinator here in Tucson

20  Sector.

21  Q.  And how long have you acted in the supervisory capacity of

22  the canine program?

23  A.  For the canine program, since December of 2009.

24  Q.  And prior to doing that can you just describe your

25  experience with the Border Patrol?

UNITED STATES DISTRICT COURT

─── **Paul Du Bois – Direct Examination** ───

1   A.  Yes, ma'am.  I was hired in 1999 here in Tucson Sector for

2   Tucson Station.  I was assigned line watch duties and performed

3   all the functions of a Border Patrol Agent.

4           In 2002 I was selected for and completed training for

5   the Border Patrol Search Trauma and Rescue Team.  And then I

6   was working full-time on that unit.

7           In 2008 I was promoted to a supervisor on that unit.

8           And in 2009 I was promoted to the Special Operations

9   Supervisor Canine Coordinator for the sector.

10  Q.  So in total how many years have you been a canine agent or

11  dealing with canines in a law enforcement capacity?

12  A.  For the Border Patrol I became -- I came into the canine

13  program in 2004, first as a search and rescue handler.  Then in

14  2007 I went through the training and became a search and rescue

15  tracking and trailing canine instructor.  In 2008 I became a

16  human remains detection, also known as cadaver, instructor for

17  the United States Border Patrol.  2010 I became a detection

18  certified instructor for the United States Border Patrol.

19  Q.  Have you taught canine training programs to instructors as

20  well as to handlers?

21  A.  Yes, ma'am, I have.

22  Q.  And you've received a number of different certifications

23  relating to canine training over the years; correct?

24  A.  Both handler and instructor, yes.

25  Q.  And while you are a supervisor in the Tucson Sector, do you

Paul Du Bois – Direct Examination

1    still have your own canine?

2    A.  I do.

3    Q.  So you're still working as a canine team in addition to

4    supervising?

5    A.  That's correct.

6    Q.  As a supervisor for the Tucson Sector, what do you do?

7    A.  Well, day-to-day program management, essentially.  I have

8    oversight of all the teams operating within the Tucson Sector

9    of United States Border Patrol.  So I have oversight of all the

10   training that is going on.

11           To put it in its simplest terms, I have administrative

12   control over all teams within this geographical area.  And I'd

13   like to say I probably set the left and right margins of

14   tactical control, what searches are go, no go.

15   Q.  How many canine teams are in your Tucson Sector?

16   A.  Well over 100.

17   Q.  And are they divided up among the nine Border Patrol

18   stations?

19   A.  Those as well as the specialty units -- so that's BORSTAR

20   and BORTAC -- the Search and Rescue Unit and essentially the

21   SWAT Unit.

22   Q.  And those are canine units within those units?

23   A.  That's correct, there's specific canines to those units as

24   well.

25   Q.  With regard to how an agent becomes a canine handler, can

Paul Du Bois – Direct Examination

1   you briefly describe the sort of significant steps that are

2   taken for an agent to become a canine handler?

3   A.   Certainly.  Within Tucson Sector it generally falls like

4   this:  First of all our sector is made aware from the National

5   Program Manager the level or number of training opportunities

6   that will be presented to the sector.  From there the chief of

7   the sector puts out an announcement, a solicitation

8   announcement, by where any interested Border Patrol Agent in

9   good standing can put in a memorandum of interest.

10          From there it progresses into station-level

11  interviews.  And from there on to sector-level interviews.

12          Post sector-level interviews the chief makes the

13  determination of which candidates are to be selected for the

14  training.  At that time those candidates are offered a seat at

15  one of the two production venues for the Office of Training and

16  Development, which is really a subagency under Customs and

17  Border Protection.  And the student will go back and commence

18  training.

19  Q.   So I guess it's fair to say that it's a rather rigorous

20  process for an agent to even be selected to attempt to become a

21  canine agent.

22  A.   Most definitely.  Especially considering it's a two-tiered

23  interview process.

24  Q.   After an agent is selected to engage in training to become

25  a canine agent, generally what happens then?

UNITED STATES DISTRICT COURT

1   A.  So as they commence their training back at the center?

2   Q.  Yeah, do they go to a national training?

3   A.  It would be national training.  Basically the Office of

4   Training Development has two production venues, one is in

5   Front Royal, Virginia and the other one is in El Paso, Texas.

6   Q.  And can you tell us about the training?

7   A.  For a handler it's a seven-week course.  It's extremely

8   comprehensive.  There is both a academic portion that comprises

9   approximately 40 individual lecture blocks, anywhere from a

10  half hour to an hour long at a minimum, for which there will be

11  one final examination that the handler has to pass with an 80

12  percentile or better score.

13          There is also the psychomotor aspect where the -- on a

14  daily basis the handler is performing exercises with the canine

15  and is being evaluated.

16          This training is documented on what we call a

17  Performance Data Score Sheet, also known as a Green Sheet.

18          So there is a seven-week course.  There's one week of

19  academics.  One week of psychomotor where the scores are not

20  calculated, it's kind of a freebee week, if you will.  And then

21  the remaining weeks are comprised of the Performance Standard

22  Score Sheet.  And the last week is the certification itself.

23  Q.  And that certification, does it -- does the process occur

24  at the national training center?

25  A.  Yes, it does.

Paul Du Bois – Direct Examination

1   Q.  Okay.  And can you just describe briefly what the

2   certification process looks like?

3   A.  Well, so just to kind of circle back, I mentioned that the

4   student has to first pass that academic piece.  Then the

5   student has to also pass those Performance Standard Score

6   Sheets that I talked about with a 3.5 or better average.  The

7   lower the score, the better in our calculus.

8        It's only at that point is a student

9   invited -- provided the opportunity to basically attempt

10  certification.

11       The certification itself is 17 individual searches,

12  and it's in a host of different environments that the team is

13  likely to encounter when it gets back to the field.

14  Q.  Okay.  Can you describe these 17 searches or the testing,

15  briefly?

16  A.  Yes, ma'am.

17       For instance, there's four vehicle screens.  So we're

18  talking about running the canine on a sniff on the exterior of

19  the vehicle.  I believe it would require a minimum of four

20  vehicles in either one of those exercises.

21       There's also four vehicle -- we call them searches

22  because it's an exterior and interior of the vehicle is

23  predetermined.  I believe there's no less than three vehicles.

24  In those there's also two luggage or parcel lineups.

25       There's two occupied building searches.  There's one

Paul Du Bois – Direct Examination

1     livestock.  There's two open areas.  There's two warehouse.

2           Again, it all circles back to the type of environments

3     the team would likely have to perform in out in the field.

4     Q.  And are the searches broken down between concealed humans

5     and trained odors of narcotics?

6     A.  Yes, ma'am.  There's a minimum of -- if memory serves me

7     correct -- three concealed human finds, as well as the others

8     are equally divided -- the remaining searches are basically

9     equally divided among the different controlled substances that

10    the dog is trained on.

11    Q.  And what are the standards?  What does the canine team have

12    to achieve in order to be certified?

13    A.  Okay.  So again, just speaking in the entire process, for a

14    handler and a team to be certified or not in the field and 80

15    percent academically, Performance Standard Score Sheets require

16    a 3.50 or better.  And same with the certification, 3.500 or

17    better.

18          Something to be crystal clear on is both the -- in

19    both the PSSS, Performance Standard Score Sheets, as well as

20    the certification, both the handler and the canine are scored

21    separately among a number of different categories, and they

22    have to be passing in all aspects.

23    Q.  So based on that numerical scoring system, if any portion

24    of this certification process -- if the handler's score is in

25    excess of 3.5, does the team fail?

1    A.   If the handler's score is above 3.5, that's correct.

2    Q.   And have you completed this type of handler certification

3    process that you just described?

4    A.   I've completed it for myself as well as provided it to

5    others; correct.

6    Q.   So you've completed it -- you have completed it both as a

7    handler and in an instructor capacity; correct?

8    A.   Correct.

9    Q.   In an instructor capacity, have you failed teams before?

10   A.   I have.

11   Q.   And so those teams that you failed I guess they had scores

12   more than 3.5?

13   A.   That would be correct, yes.

14   Q.   What happens when a team fails certification?

15   A.   Well, if we're talking about the initial certification

16   which takes place at one of the centers, the team is

17   immediately given another attempt at the certification.  If at

18   that point the team fails again they're given 40 hours of

19   remedial training and then another attempt.

20        At that point a determination needs to be made for

21   what reason is the team not passing.  Is it a problem with the

22   dog or is it a problem with the handler?  Circling back again

23   to, that both of graded and scored individually, a

24   determination would need to be made there on what to do.

25   Q.   Okay.  So there's an initial training at one of the

1   national centers, either in Texas or Virginia.  If I have this

2   correct, you've got, one, the initial classroom training for

3   the canine handler.  Two, you have canine handler -- and you

4   have the handler and the canine actually working together doing

5   the training, doing the exercises.  And then three, you have

6   the canine team certification.

7         Does that summarize the initial training?

8   A.  It summarizes the initial training, yes.

9   Q.  Okay.  So once the team successfully graduates from all

10  three of these steps, do they come back to their assigned

11  station?

12  A.  They do.

13  Q.  And when they're back to their assigned Border Patrol

14  station, are they still required to engage in regular training?

15  A.  They are.

16  Q.  And can you describe that regular or maintenance training?

17  A.  Sure.  It follows all the training leading up to it.  To

18  begin, it's required 16 hours a month.  Ideal situation would

19  be eight hours per pay period, but 16 per month, never to

20  exceed 45 days in between any training.

21        This maintenance training is -- again, exercises are

22  set up to best represent and challenge the team in the

23  environments that they're facing on a regular basis out in the

24  field.  Same scoring system applies.

25  Q.  So that might include stretching the team?

Paul Du Bois - Direct Examination

1   A.  Absolutely.  The concept of stretching the team is no more

2   than understanding that, you know, we want teams to continually

3   progress and just get better.  So stretching the team is a term

4   we use for making the exercises more challenging as we go

5   forward in time.

6   Q.  So during these biweekly trainings, can you describe what

7   it looks like, what the curriculum might be, how long it might

8   last?

9   A.  Well, the training for any training day is eight hours.

10          So the number of exercises is going to be dependent on

11  a number of things.  And it really has mostly to do with what

12  are the specific objectives of the day for the teams that are

13  there.  It's rarely ever just one team and one instructor, it's

14  usually several instructors and several handler teams, if you

15  will.

16          And so it just runs the gamut on what the design is of

17  the day.  There's never, by policy, less than three.  A minimum

18  of three exercises must be conducted.

19  Q.  So on those biweekly training days, the instructors, they

20  pick a section of the curriculum and they determine that that

21  section will be reviewed, I guess, for that training day

22  essentially; is that correct?

23  A.  We do have -- there's -- if you will, on those maintenance

24  training days in our sector we do have a focus to have the

25  academics continually re-presented as we go through the

UNITED STATES DISTRICT COURT

Paul Du Bois – Direct Examination

1   calendar year.  And then the teams will move outside or

2   outdoors and carry on with the psychomotor aspect of the day.

3   Q.  So part of the day is focused on classroom training and the

4   other part is focused on the canine team in the field working

5   together?

6   A.  Yes, ma'am.

7   Q.  Are you familiar with the term Green Sheets?

8   A.  Yes, ma'am.  That's just another name for those Performance

9   Standard Score Sheets I mentioned.

10  Q.  Okay.  And can you tell us about the performance sheets a

11  bit?

12  A.  Yes, ma'am.  Could I ask you maybe to clarify a little bit

13  more on what you'd like me to discuss?

14          MS. MALONEY:  Well, may I approach, Your Honor?

15          THE COURT:  Sure.

16  BY MS. MALONEY:

17  Q.  I've handed you what's been marked as Government's Exhibit

18  9.  Once you've had an opportunity to take a look at them, can

19  you let us -- can you tell me what they are?

20  A.  Yes, ma'am.  These are the Detection Canine Performance

21  Standard Score Sheets, the PSSS's, or Green Sheets as they're

22  called.  And it looks like it's a representation of this

23  team's -- BPA Metheny and Canine Jessy-A's -- Performance

24  Standard Score Sheets that were from December 13th to

25  May -- I'm sorry, December 13th, '16, through May 2nd of 2017.

Paul Du Bois – Direct Examination

1   Q.  And did you have a chance to review copies of those Green

2   Sheets before today?

3   A.  Yes, ma'am, I did.

4   Q.  Are the copies that you see here in front of you today, are

5   they fair and accurate representations of the copies of what

6   was in Mark Metheny's canine handler file?

7   A.  Yes, ma'am, they are.

8           MS. MALONEY:  Your Honor, the Government would like to

9   admit Government's Exhibit 9.

10          MR. GONCALVES:  No objection, Your Honor.

11          THE COURT:  Okay.  Exhibit 9 --

12          MS. MALONEY:  We would also ask that it be submitted

13  under seal given the sensitive nature of the material.

14          THE COURT:  Okay.  They will be -- none of the

15  exhibits ever become public, but we'll -- you want the

16  reference to them to be sealed or --

17          MS. MALONEY:  They're the canine handler's score

18  sheets.

19          THE COURT:  Yeah.  They'll be admitted and sealed

20  appropriately.

21      (Exhibit No. 9 admitted into evidence.)

22  BY MS. MALONEY:

23  Q.  So let's just talk a little bit in detail about these

24  Green Sheets and the biweekly training session.

25          This is the sheet that's completed every two weeks

1    when the canine handler team completes its eight-hour training;

2    correct?

3    A.   That's correct, ma'am, yes.

4    Q.   Can you describe for the Court what sort of things are

5    being tested and assessed by the instructor?

6    A.   Absolutely.  So again, you can already start to see the way

7    this is broken-down, the columns that there is.  Again falling

8    back to that we grade the handler separate from the canine, and

9    that we look at the average scores of the day in determining

10   how the team is progressing.

11         So the handler, as you can see here, has seven

12   categories in which the instructor is critiquing the handler

13   on, and it's ritual, search skills, leash hand, voice tone,

14   speed, reading the canine, and rewards.

15         While any search is going on then, the instructor is

16   also evaluating the canine and is scoring the canine on

17   control, alert, indication, and competence.

18         The search area of this form really starts to kind of

19   explain what is -- the substance that was placed is, you know,

20   search time, the placement of it, the search type.

21         You see HE predominantly on May 2nd, and I would have

22   to go through here, that's representation of hard/easy

23   placement.

24         Again on May 2nd with a W it's talking about these are

25   warehouse searches.

1          Search time, V -- and that really means the length of

2     the searches were varied.  And, you know, could be anywhere

3     from, you know, 30 seconds, let's say, to several minutes or

4     more in length.

5          And then we put the substance down.

6          On the forms in front of me the amount, height and

7     depth location, as well as the CBP -- the canine's specific

8     identification number appeared to be redacted.

9          Then going down below there are some other categories

10    that are outside the columns.  PIU, which is an acronym for

11    performance indicates understanding, which is really just a

12    fancy way of saying that the handler is demonstrating by his

13    behavior that the instructions that he is being verbally

14    provided by the instructor, that this handler is executing

15    them.  It's kind of an overarching score and often, as it

16    should, coincides with the general scores achieved above in all

17    the categories under handler.

18         Record keeping is simply that the handler is creating

19    accurate records.

20         Grooming is appropriately grooming the canine.

21         Vehicle is how the handler takes care of his assigned

22    vehicle.

23         Feedback is how he takes constructive criticism, in a

24    sense.

25         And then aid prep is anything the handler does to

Paul Du Bois – Direct Examination

1    assist in the preparation of aids.

2           Knowledge, communication skills, presentation, problem

3    solving, you'll see a zero there.  You'll also see zeroes up

4    above.  Zeroes are not a negative score, they're merely that in

5    whatever exercise it was not excess -- assessed.

6           Down below, knowledge, communication skills,

7    presentation, and problem solving.  A handler is never scored

8    on that, that is actually an instructor-level grading

9    mechanism.  And these sheets are used for both handler levels

10   and instructor levels.

11          And then finally we have the comment sections where

12   the instructor will make unique and specific remarks to each

13   exercise as he or she sees fit from above.

14   Q.  Okay.  So these Green Sheets are used to score the team's

15   proficiency in search scenarios.  They also provide a comment

16   section where the instructor can add notes or critiques on what

17   he saw.

18          Do these Green Sheets help the instructors and the

19   supervisors of the canine program, do they help you identify

20   trends among an individual canine team that could be good or

21   bad, something that might need tweaking, those types of thing?

22   A.  I would say that's their fundamental purpose, yes, ma'am.

23          THE COURT:  I'm sorry.  Miss Maloney, I doubt that

24   there's a perfect place to take our lunch break, but given

25   that -- I assume you're going to delve into these Green Sheets

UNITED STATES DISTRICT COURT

Paul Du Bois - Direct Examination

```
1    a good bit, and with this general overview that we have, this
2    may be the best time to just stop and take our lunch break.
3              So let's come back at 1:15.
4              We're going to stay here; right?  I hope we are since
5    they have -- yeah, we'll stay here.
6              There's a chance that they may have a hearing at 1:15,
7    some initial appearances for material witnesses.  I don't think
8    they're going to have them here, but that would be our only
9    delay.
10             Agent Du Bois, as I'm sure the prosecutors have told
11   you, the Rule of Exclusion of Witnesses has been invoked, so
12   you cannot talk about your testimony with anyone other than the
13   attorneys.  So when you go to lunch, if you have lunch with
14   fellow agents, keep the conversations about anything other than
15   your testimony.
16             THE WITNESS:  Yes, sir.
17             THE COURT:  Okay.  So all right.  So counsel -- both
18   counsel, will you all confer, as well as with your witnesses,
19   in the event we don't get done today, try to come up with some
20   options of when we could schedule this.  I'm cautiously
21   optimistic that we will get done, but if we don't, let's just
22   have a date and time in mind when we can all get together
23   instead of trying to look at our calendars at quarter to 5:00.
24   Okay?
25             All right.  I'll see everybody at 1:15.
```

Paul Du Bois – Direct Examination

1              Thank you.

2         (Lunch recess taken.)

3              THE CLERK:  Criminal case 17-839, USA versus Janice

4    Ann McCowan, on for motions hearing.

5              Counsel, please state your appearances.

6              MS. HEPFORD:  Good afternoon, Your Honor, Stefani

7    Hepford and Sarah Maloney for the United States, and with us is

8    Case Agent Justin Edgecombe.

9              THE COURT:  Good afternoon.

10             MR. GONCALVES:  Good afternoon, Walter Goncalves for

11   Janice McCowan who is to my left in custody.

12             THE COURT:  Okay.  Good afternoon to you both again.

13             Okay.  So come on back up to the stand, sir.

14             And, Miss Maloney, you can continue.

15             Sorry we're getting a late start.

16        (PAUL DU BOIS, GOVERNMENT WITNESS, SWORN.)

17             THE CLERK:  Thank you.

18   BY MS. MALONEY:

19   Q.  Agent Du Bois, before we turn back to the maintenance

20   training of canine teams, I wanted to ask you about your CV,

21   which is marked for identification as Government's Exhibit 14.

22             Do you recognize this document?

23   A.  I do, ma'am.

24   Q.  And on this document it lists a supervisory position here

25   as beginning the year 2000.  Is that a typo?

Paul Du Bois – Direct Examination

1    A.  Yes, ma'am.  If you're referring to the Special Operations

2    Supervisor line, that is a typo.  I meant to type in 2009,

3    taking over right after the Front Line Supervisory position.

4    Q.  Okay.  Great.  I just wanted to clear that up.  Thank you.

5         Turning back to the training of canine teams, we

6    already discussed the initial selection and training of the

7    teams, and the initial certification process.  We also

8    identified that the maintenance training includes biweekly

9    eight-hour trainings where the teams have performance

10   evaluations, or these Green Sheets.

11        Are the teams scored on these Green Sheets?

12   A.  Yes, ma'am.

13   Q.  And what's the scoring range?

14   A.  1 through 6, whole scores only.

15   Q.  And is 1 good and up to 6 is bad?

16   A.  Correct.

17   Q.  And are the teams required to get a total score of 3.5 or

18   lower on these Green Sheets?

19   A.  Correct.

20   Q.  And where would the totals appear?

21   A.  At the bottom of each one of those handler categories.

22   And, for instance, I'm looking at May 2nd, so those below row

23   15, that's the average line.

24   Q.  Okay.  And this average line has 2s, 2.5, 2.33.  And

25   they're all under 3.5; correct?

Paul Du Bois – Direct Examination

1    A.   Correct.

2    Q.   So if someone was reviewing your canine team and they were

3    looking at these Green Sheets, if the canine team had some kind

4    of problem, like with reliability, would that be reflected on

5    these Green Sheets?

6    A.   Yes, ma'am.

7    Q.   And do these individual performance Green Sheets, do they

8    get reviewed quarterly?

9    A.   They do, ma'am.

10   Q.   And in reviewing these Green Sheets, these supervisors, if

11   they see any areas that need improvement, would it be addressed

12   with training?

13   A.   It would, ma'am.

14   Q.   Is there an annual recertification of the canine teams?

15   A.   There is at a minimum a once-a-year requirement, yes,

16   ma'am.

17   Q.   Can you tell us about the annual certification?

18   A.   It's exactly similar to the initial certification required

19   to graduate from the academy.

20   Q.   And would you look at what has been marked Government's

21   Exhibit 8?

22   A.   Yes, ma'am.

23   Q.   And can you tell us what this document is?

24   A.   This is a certification letter attesting to that fact, that

25   this team passed that recertification.

Paul Du Bois - Direct Examination

1    Q.  And are you familiar with the canine team of Mark Metheny

2    and his canine Jessy-A?

3    A.  I am.

4    Q.  And did you sign this document?

5    A.  I did, as the canine coordinator.

6    Q.  So this document is a letter that states that the canine

7    team of Agent Metheny and Jessy-A are certified -- a certified

8    canine detection team from October 17th -- they were certified

9    on October 21st, 2016; is that correct?  Am I reading that

10   correct?

11   A.  Yes, ma'am.

12   Q.  And how long is this certification good until?

13   A.  As indicated on the last paragraph or last sentence, it's

14   valid for one year of the date of issuance.

15   Q.  And what is this canine team of Agent Metheny and Jessy-A,

16   what are they certified in detecting?

17   A.  Concealed humans and odors of cocaine, its derivatives;

18   marijuana, its derivatives; heroin, its derivatives;

19   methamphetamine and its derivatives.

20   Q.  Okay.  And Agent Metheny and Jessy-A, they're assigned to

21   the Casa Grande Station which, of course, is in your Tucson

22   Sector; correct?

23   A.  Yes, ma'am.

24   Q.  And in reviewing this canine certification letter and the

25   Green Sheets here, and in your role as a supervisor -- since

Paul Du Bois – Direct Examination

1    they are one of the 100 plus teams that you supervise; correct?

2    A.  Yes, ma'am.

3    Q.  Okay.  So in -- considering all of that, are you able to

4    form a conclusion on the team's reliability?

5    A.  Yes, ma'am.

6    Q.  And what conclusion did you come to?

7    A.  I would consider them credible and reliable.

8    Q.  And as a supervisor of the canine program you have an

9    interest in making sure that you have only reliable teams out

10   in the field; correct?

11   A.  Yes, ma'am.

12   Q.  And why is that?

13   A.  The agency as a whole would have that.  It obviously does

14   the agency no good to have inefficient teams working between

15   the POEs and at the checkpoints.  It doesn't assist us in

16   filling mission objectives for the agency.  And quite frankly,

17   you know, we want to be very careful every time we, you know,

18   go ahead and search anyone's vehicle.

19   Q.  And, in fact, there are checks and balances to make sure

20   that if problems are cropping up with a team that it gets

21   addressed; correct?

22   A.  Yes, ma'am.

23   Q.  So that would include instructor stations where the canine

24   teams are working?

25   A.  Absolutely, ma'am.  It would start by reviewing these

Paul Du Bois – Direct Examination

1    Performance Standard Score Sheets.  As you said, we do that

2    quarterly.  By policy it's a requirement to review them

3    biannually.  And it would be looking at those average numbers

4    and making sure we're not having a deficiency in any one of

5    those categories, and if so issuing remedial training.

6              MS. MALONEY:  Your Honor, we would like to move to

7    admit Exhibit 8 into evidence.

8              THE COURT:  Any objection?

9              MR. GONCALVES:  No objection, Your Honor.

10             THE COURT:  Okay.  Exhibit 8 will be admitted.

11         (Exhibit No. 8 admitted into evidence.)

12   BY MS. MALONEY:

13   Q.  I want to talk a bit about some terminology.

14             The alert, indication, cuing, do all those terms have

15   meanings for you?

16   A.  Yes, ma'am.

17   Q.  Can you describe what an alert is and what an indication is

18   and how they're different?

19   A.  Well, an alert is a change of body posture and increased

20   respirations when the canine first encounters an odor it's been

21   trained to detect.

22             Then the indication is another one you asked for,

23   ma'am?

24   Q.  Yes.

25   A.  Okay.  That's a trained behavior that pinpoints source.

Paul Du Bois - Direct Examination

1    Q.  So the alert is more of a biological response?

2    A.  I would say the alert is more of a reflex response.

3    Q.  And what does an alert look like?

4    A.  Truthfully, it varies from dog to dog.

5    Q.  Can you give an example of what an alert may look like in a

6    dog?

7    A.  Well, like I said, it would vary from dog to dog.  It often

8    involves some of the same things we would look at.  It

9    may -- clearly it's a change of respirations.  Specifically,

10   you know, one dog may have a different change than another when

11   it comes to respirations.  It may be a change in the way the

12   dog carries its tail from a high position or even a scorpion

13   curl position to an elongated and straight position to even

14   pointing down.  It may involve looking at what the ears are

15   doing, are they turning outwards, are they turning inwards?

16        It involves just anything you can physically basically

17   see on that and what you can hear audibly on the canine.

18   Q.  And how is the dog trained?  Is the dog trained to exhibit

19   this reflexive response?

20   A.  Yes.

21   Q.  How?

22   A.  Well, it goes all the way back to the initial training.

23   You know, we start -- essentially for detection workers there's

24   two modules that we're trying to do.

25        We're trying to get the dog introduced to odor, and

Paul Du Bois – Direct Examination

1   equate that odor equals toy.  And what we rely on there in

2   doing that is classical conditioning, if we can recall back to

3   our high school or college education on that.

4           And then the second module is really that we're trying

5   to teach the dog that we need the dog to sit in the presence of

6   odor to indicate source.  And that's really -- we use more

7   operant conditioning to get there.

8   Q.  So with an alert, because it's training classical

9   conditioning, is that something a dog can control?

10  A.  No, ma'am.  I believe I used the term before that it was a

11  reflex response.

12  Q.  And an indication, is that something that's more of a

13  conscious decision by the dog?

14  A.  It would require, yes, I would say brain activity to make

15  that decision to offer the indication, be whatever that

16  indication is.

17  Q.  And what generally is an indication?

18  A.  In our agency we tend to do passive indications.  What we

19  mean by that is sit, down, point, are generally the three major

20  accepted passive indications our agency uses.

21  Q.  And is it your -- well, how are the dogs trained to

22  indicate?

23  A.  Well, again, going back to initial training, we use a

24  number of what we call sit indication drills at the outset of

25  this training.  This is high line -- the one exercise is kind

UNITED STATES DISTRICT COURT

Paul Du Bois – Direct Examination

1    of like a high line, where they reward on a high line.  A lot

2    of keep away ideas, if you will.  There's group keep away.  We

3    use a high line or a wall.

4            So there's several different sit indications that we

5    start conditioning the dog to perform a sit and recognize the

6    command for sit.

7    Q.  What's one circumstance that you would train a dog to

8    indicate or sit?

9    A.  I'm sorry, I don't think I followed the question, ma'am.

10   Q.  That's okay.  I'll get to that in a bit.

11   A.  Okay.

12   Q.  Is it your goal as a supervisor to have the dog both alert

13   and indicate?

14   A.  Well, I think that's the ideal.  But if we just kind of

15   recall back even for the Performance Standard Score Sheets, the

16   handler is being evaluated on his ability to read the canine.

17   And what we're really teaching the handler to do is to read the

18   alert and not await for an indication to occur.

19   Q.  Okay.  So if I understand this correctly, I guess the alert

20   is the visceral response of the dog, where I think the term you

21   used was reactive -- reflexive.

22   A.  Um-hum.

23   Q.  And the dog -- the dog will smell an odor, and he knows

24   every time I smell this I get a toy, I get to play, and he has

25   a physiological response.  Is that what we're talking about

Paul Du Bois – Direct Examination

1   with an alert?

2   A.  Yeah, but I'd like to just back up to how you prefaced the

3   question.

4          Visceral, I may not have the proper understanding of

5   that, so maybe in terms that at least I would understand it,

6   maybe involuntary is a better way to look at the alert, where

7   the indication is a voluntary.

8   Q.  And as you've been describing alert characteristics,

9   if -- would the following characteristics be -- possibly be one

10  of these involuntary alert responses, when the canine's back

11  gets rigid, her ears perk up, her mouth closes, you can't hear

12  her panting anymore because she's breathing through her nose,

13  are these things that would happen?

14  A.  Yes, ma'am.

15  Q.  So I want to shift gears a little bit and talk about

16  specifically a canine's ability to detect concealed humans and

17  narcotics.

18         Can you tell us generally how canines are trained --

19  describe how they're trained to detect concealed humans and

20  narcotics?

21  A.  Sure.  Let's start off with the concealed human aspect of

22  it.  And it might be best to kind of put this in the context, I

23  think we're all kind of familiar with disaster dogs and the

24  events of 9/11 and see disaster dogs working rubble piles,

25  whether we're talking the World Trade Center or at the

Paul Du Bois – Direct Examination

1   Pentagon.  And what those dogs specifically were looking for

2   were concealed people buried underneath the rubble.

3        And our principles and our philosophies are right in

4   line with exactly how all these disaster dogs in the United

5   States have been trained.  In essence, we're using positive

6   reinforcement drills.  They start off with runaways in sight,

7   runaways out of sight, and progress from there.  Over time we

8   have people hiding, and there's no runaway, in sight or out of

9   sight, toward a prestimulation of the dog, if you will.

10       And again, over time we start incorporating conflict

11  into the training.  By that specifically I'm referring to we

12  have visible people.  For instance, we might -- as their

13  training advances and before a team graduates we would have

14  people hiding in all various parts -- let's take an automobile,

15  perhaps in the trunk while there is somebody who is sitting in

16  a driver's seat, or maybe multiple people inside the vehicle,

17  or what have you.  That's just one example.

18       We also would do other things in advanced training.

19  And again, this taking place before the team would graduate,

20  which would be putting conflict human scent articles within

21  these search areas.  So what we're talking about is taking off

22  maybe an article of clothing that's freshly worn, put that in

23  there to see -- and make sure that the canine is not alerting

24  to human scent samples, but is actually alerting to a concealed

25  person.

1   Q.  And what controlled substances or narcotics are the canines

2   trained to detect?

3   A.  So just referring back to the certification right here on

4   the team of BPA Metheny and Jessy-A, it is cocaine and its

5   derivatives, marijuana and its derivatives, heroin and its

6   derivatives, and methamphetamine and its derivatives.  So four

7   primary, and the derivatives or analogs thereof.

8   Q.  So this is a controlled environment training program you've

9   testified about; correct?

10  A.  The training environments are considered controlled

11  environments, yes, ma'am.

12  Q.  Why is this a good way to judge a canine's reliability?

13  A.  Versus an uncontrolled in the field operation, is that what

14  you're asking me, ma'am?

15  Q.  Yes.

16  A.  Well, because only in a controlled training environment can

17  we know that it's free of any odors that we're unaware were

18  present.

19  Q.  So if a canine team has any reliability problems that are

20  going to cause you concern, is that something you would see

21  during its training?

22  A.  Yes, ma'am.

23  Q.  And going back to Agent Metheny and his canine Jessy-A, did

24  you have any indication that they were not a reliable team?

25  A.  No, ma'am.

1   Q.  And I also wanted to -- wanted you to talk a bit about or

2   define cuing, if you could.

3   A.  Well, cuing is -- essentially occurs or can occur if the

4   handler knows the outcome of the scenario, and whether

5   consciously or subconsciously cues the dog into an indication.

6   Or -- you know, by and large most of our dogs are sit.  So

7   cuing the dog to sit.

8   Q.  And are your handlers sensitive to this and they're trained

9   not to do that?

10  A.  Yes.  In everything they do from the very early stages of

11  running a dog, they're aware of that.

12          There's a couple different ways that, you know, we

13  work to avoid that.  You know, when we review these Performance

14  Standard Score Sheets, we're talking about the exercises, the

15  17 searches that comprise any given search, the handlers are

16  completely unaware of if there is a find, and if there is a

17  find where in the search area is the find.  A handler can't cue

18  if he has no knowledge.

19          Now, there's a concept called single blind, double

20  blind that is often talked about, and really that's the

21  scientific terms for -- single blind is what by and large most

22  of these exercises are that are done.  And that just simply

23  means that the handler does not know whether or not there is

24  and if so where is the aid.

25          A double blind would be the instructor who is walking

Paul Du Bois – Direct Examination

1    along with the team doesn't know where it is either.  That

2    would be a double blind.

3    Q.  Okay.  There's another concept, I think it's fairly

4    self-explanatory, but could you just briefly explain what a

5    visible human as a conflict is?

6    A.  Well, it's nothing more than, for instance, the example I

7    gave earlier with, let's take the -- let's take the -- the

8    exercise we have is of a vehicle for a dog team, and we've

9    decided to maybe there's -- let's say there's two vehicles.

10   And we've asked them to -- the team to run the two vehicles.

11   In one vehicle we have a person and no concealed person, or in

12   this case none of the four odors or their derivatives in that

13   vehicle.  And in the next vehicle we have another driver

14   sitting in there, and then maybe we have some sort of trained

15   odor back in the trunk of this vehicle.

16        So what we would see is that the team should run that

17   first vehicle, there should be no alert or indication.  And

18   then move on to the next vehicle.  And that we should see an

19   alert and indication to that trained odor in the back.

20        So in that first -- in both cases we have visible

21   human conflict.  But in one there were no trained odors

22   present, and in another one there was.

23   Q.  So how are you as a supervisor of a canine program, how are

24   you confident that the dogs aren't detecting only concealed

25   humans or narcotics and not visible humans?

UNITED STATES DISTRICT COURT

Paul Du Bois – Direct Examination

1    A.  Well, I mean, we have -- it's both a requirement in the

2    certification that there is a visible human conflict.  So we

3    know firsthand that there is no issue with that, based on this

4    team passing the certification and receiving a certification

5    letter.

6         Day in and day out such searches -- or such unique

7    aspects of a search are often annotated, not required, but

8    annotated when and where they occur in the Performance Standard

9    Score Sheets.

10   Q.  Okay.  The last thing I wanted to talk about is the cross

11   training of canines.  Border Patrol canines are trained in both

12   the detection of concealed humans and the detection of

13   narcotics; is that correct?

14   A.  Well, not all, but yes, many, yes.  We have multiple

15   disciplines within the United States Border Patrol.  So for the

16   detection, what we call the detection canines, they are cross

17   trained in concealed humans and the odors of controlled

18   substances.

19   Q.  So why are those dogs cross trained?

20   A.  Well, really it's efficiency of purpose.  We are, at the

21   end of the day, the stewards of the public funds.  We are

22   charged with securing borders between the ports of entries, so

23   not just at the checkpoints.  This entails a lot of brush work.

24        So we have, you know, different authorities from INA

25   235, 287, Title 19, Title 21 authorities.  We're here to

UNITED STATES DISTRICT COURT

1   enforce federal laws, but first and foremost immigration.

2          So economy of purpose would be my answer to that

3   question.  And it's not unique just to the Border Patrol and

4   the detention canine program.  I mean, our search and rescue

5   program you could say the same thing about.  Many of them are

6   cross trained in human remains cadaver.

7          Broadening our scope out of just U.S. Border Patrol

8   and talking about the CBP canine program and incorporating

9   Customs or the Office of Field Operations.  I mean, they have

10  currency and firearms, not just a currency dog or not just a

11  firearms.

12         Again -- so it's not unique just to have a single

13  purpose.  Most of these dogs run anywhere at the procurement

14  from about 4 to $9,000 for a single purpose.  So we're trying

15  to get the most out of them as possible.

16  Q.  So you discussed how the canines are multidisciplined.  Are

17  any of the Border Patrol's canines trained to detect only

18  narcotics?

19  A.  No, ma'am.

20         MS. MALONEY:  May I have a moment, Your Honor?

21         THE COURT:  Sure.

22         MS. MALONEY:  We have no further questions at this

23  time.

24         THE COURT:  Okay.  Thank you.

25         Do you have any cross-examination?

─ **Paul Du Bois – Cross-Examination** ─

1        MR. GONCALVES:  Yes, Judge, briefly.  Thank you.

2                     CROSS-EXAMINATION

3    BY MR. GONCALVES:

4    Q.  Good afternoon.

5    A.  Good day, sir.

6    Q.  So you're familiar with the canine that was -- that was

7    used in this case at the checkpoint?

8    A.  I am, sir.

9    Q.  That's Jessy-A; is that correct?

10   A.  Correct, sir.

11   Q.  Are you familiar with the specific facts of the specific

12   incident?

13   A.  I've read the agent reports, and that's the extent of it.

14   Q.  Okay.  Let me ask a question about the canine and the

15   alert.  Okay?  In general.

16   A.  Okay.

17   Q.  When a dog is with a handler and the dog is asked to sniff

18   at a vehicle, for example, is the handler able to direct the

19   dog to indicate a particular smell, for instance, only drugs or

20   only humans?  Or is it always going to detect or alert to both?

21   A.  First of all, just kind of want to back up and make sure

22   we're using all the same terminology if you don't mind.

23   Q.  Please, yes.

24   A.  So a handler cannot command a dog to alert to anything.  It

25   can only command a dog into that final position indication.

Paul Du Bois – Cross-Examination

1          So I believe if I understand your question is, can the

2    handler discern a difference in the alert between the concealed

3    human and controlled substances?

4    Q.   No.

5    A.   Or could I ask you to rephrase?

6    Q.   Let me just rephrase the question.

7          So if I have -- say that I'm a handler and I have a

8    dog, you know, Jessy-A, for example, and I ask the dog to go

9    and do its job on a vehicle.

10   A.   Okay.

11   Q.   Is there anything I can do as a handler to command the dog

12   to only alert if the dog smells a particular smell, as opposed

13   to, you know, the dog alerting if its either, you know,

14   marijuana or humans?  Does that make sense?

15   A.   I believe so.  And my response would be, a handler can't

16   command the dog to do anything when it comes to an alert,

17   period.

18   Q.   So just to clarify then, if I'm specifically looking for

19   people in a car, say I'm interested in investigating a vehicle

20   because I would like to know if there's anybody inside the car,

21   if the canine gives me a signal, for example, do I know

22   beforehand what that signal is for?

23   A.   I don't know what a signal means.

24   Q.   Well, not a signal.  I guess, you know, this is where my

25   lack of knowledge is going to come into play.

1          So the dog is going to alert when there's something in

2     the car that it's trained to alert to; correct?

3     A.  It should, yes.

4     Q.  Okay.  As the handler, is there any -- is there any

5     difference between, you know, a smell for marijuana versus a

6     smell for humans and how it alerts?

7     A.  I would have to leave that up to the individual handler --

8     Q.  Okay.

9     A.  -- to be able to tell you that.

10    Q.  And you don't know anything specifically about this handler

11    and its canine to be able to answer that question?

12    A.  No.  My preference would be for the handler to answer that

13    himself.  As a general rule in having -- in running a dog

14    myself in detection, I could not in my individual case tell the

15    difference between the alert of a concealed human or one of the

16    controlled substances, if that's what you're asking.

17    Q.  Okay.  So from your experience you wouldn't know what could

18    be in the car?

19    A.  It would be an odor it is trained to detect.

20    Q.  Yeah.

21    A.  Yeah.

22    Q.  It could be many different odors.

23    A.  Well, it would be an odor it's been trained to detect.  So

24    it's either a concealed human or it's one of the controlled

25    substances it's been trained on, yes.

——— **Paul Du Bois – Cross-Examination** ———

1          MR. GONCALVES:  Okay.  Thank you, Your Honor.  That's

2     all I have.

3          THE COURT:  Okay.

4          Any redirect?

5          MS. MALONEY:  No.

6          THE COURT:  I have a question.

7                        CROSS-EXAMINATION

8     BY THE COURT:

9     Q.  You referred to trained odors.  I mean, obviously drugs, I

10    understand what the trained odor would be for that.  But what

11    would it be for like humans?

12    A.  Well, interestingly enough we're not 100 percent sure how

13    dogs differentiate concealed humans versus a visible human.

14    So -- and I don't think anyone does.

15          You know, I've mentioned earlier the disaster dogs, no

16    one really knows exactly how they differentiate those two.  We

17    just know empirically, from putting the conflict of set

18    articles, human scent samples in there, as well as visible

19    humans, that somehow that they're able to alert to concealed

20    people.

21          THE COURT:  Okay.  All right.  Thank you.  Appreciate

22    it.

23          Oh, and then I guess you're still under the Rule of

24    Exclusion, so if you're leaving it's not an issue.  But if

25    you're staying, you can't watch.  So I don't know why you'd

UNITED STATES DISTRICT COURT

Chris Brewer – Direct Examination

```
1   stay.
2            And also, don't talk about your testimony with anybody
3   else.
4            THE WITNESS:  Yes, sir.
5            THE COURT:  Other than the lawyers.
6            THE WITNESS:  Yes, sir.
7            THE COURT:  Okay.  Who's the next witness?
8            MS. MALONEY:  It is Border Patrol Agent Chris Brewer.
9            THE COURT:  All right.
10           MS. MALONEY:  I'm just going to collect these
11  exhibits.
12           THE COURT:  Sure.
13       (Discussion held off the record.)
14           THE COURT:  Okay.  Good afternoon.
15       (CHRIS BREWER, GOVERNMENT WITNESS, SWORN.)
16           THE CLERK:  Thank you.
17                    DIRECT EXAMINATION
18  BY MS. MALONEY:
19  Q.  Good afternoon, Agent Brewer.
20           Could you tell the Court where you work and what your
21  title is?
22  A.  I work at the Casa Grande Border Patrol Station, and my
23  title is Supervisory Border Patrol Agent.
24  Q.  How long have you worked for Border Patrol?
25  A.  Sixteen-and-a-half years.
```

─── Chris Brewer - Direct Examination ───

1    Q.  And did you start out as a Border Patrol Agent?

2    A.  Yes, ma'am.

3    Q.  Did you -- what did you do before joining the Border

4    Patrol?  Did you go to college?

5    A.  I did.  I graduated in 2000 with a bachelor's in Spanish

6    and a minor in criminal justice.

7    Q.  And did you receive specialized training to become a Border

8    Patrol Agent?  Did you go to the academy?

9    A.  Yes, I did.

10   Q.  What was your first assignment as a Border Patrol Agent

11   back in 2001, I think?

12   A.  Yes, ma'am, 2001.  I was assigned to the Indio Border

13   Patrol Station.

14   Q.  Is that a station along the United States/Mexico border?

15   A.  It's a little bit interior, but it's probably, the station

16   itself, 75 miles from the border.

17   Q.  And what were your duties at that station?

18   A.  My primary duties were checkpoint.

19   Q.  Where was that checkpoint located?

20   A.  There were -- we had two checkpoints, they were located on

21   Highway 111 and Highway 86, on both sides of the Salton Sea in

22   the Imperial Valley in California.

23   Q.  Were both of those checkpoints within 100 miles of the

24   United States/Mexico border?

25   A.  Yes, ma'am, they were.

Chris Brewer – Direct Examination

1   Q.  And so did you work at that checkpoint nearly daily for

2   approximately 12 years?

3   A.  It was three to four days a week for 12 years, yes.

4   Q.  Can you describe what your responsibilities and duties are

5   when you're working at an immigration checkpoint?

6   A.  As an agent your duties are either primary inspection,

7   inspecting vehicles as they approach, or secondary inspection,

8   that are vehicles that are referred to secondary.

9   Q.  And were you promoted to Supervisory Border Patrol Agent

10  while you were still stationed in California?

11  A.  Yes, I was.

12  Q.  And when did you transfer from Indio to Casa Grande?

13  A.  In March of 2013.

14  Q.  And have you been stationed at Casa Grande ever since?

15  A.  Yes, ma'am.

16  Q.  What are your duties as a Supervisory Border Patrol Agent

17  in Casa Grande?

18  A.  It varies.  There's some days that I'm supervising on the

19  border out in the desert, in the brush.  Other days I supervise

20  at the checkpoint.  And I also do a lot of office duties.

21  Q.  And when you say you "supervise at the checkpoint," what

22  checkpoint is that?

23  A.  It's on Federal Route 15 south of the town of Casa Grande.

24  Q.  So as a part of your duties are you ever assigned to the

25  primary inspection at Federal Route 15 checkpoint?

Chris Brewer – Direct Examination

1   A.  Yes, ma'am.

2   Q.  And can you go into a little more detail, I guess, of what

3   you do in that capacity serving as the primary inspector at

4   that checkpoint?

5   A.  Okay.  When you're at primary, you're watching the vehicles

6   as they approach.  As the vehicles approach you interview the

7   driver and occupants of the vehicles and take action if

8   necessary.

9   Q.  And what are you interviewing the driver about?

10  A.  Primarily immigrations.

11  Q.  And when you say "primarily immigration," I guessed based

12  on any other -- what else might you be looking for?

13  A.  Because there are narcotics that are transported through

14  our -- you know, that area on where we work, that's -- if we

15  have reasonable suspicion of narcotics smuggling, that's

16  another thing that we look into.

17  Q.  Is there any reason sort of unique to that area where the

18  15 checkpoint is, both north and south of the border, that

19  would make that area see a lot of drugs trying to be

20  transported north?

21  A.  I mean, it is -- it's a busy area.  That area of the Indian

22  Reservation is -- has always been busy for both alien and

23  narcotics smuggling.

24  Q.  Is the border pretty porous there on the tribal land

25  between -- at the international border?

Chris Brewer - Direct Examination

1   A.  I don't understand by "porous."

2   Q.  Okay.  Strike that.

3        Let's go back to your -- generally speaking what your

4   duties are at primary inspection.

5        So from what I understand you're primarily performing

6   an immigration inspection and you're trying to determine

7   citizenship or alienage.  And I guess based on any other

8   factors or suspicions, based on your observations or answers to

9   questions, you might investigate a bit further, is that it?

10  A.  Yes, ma'am.

11  Q.  And if they hand you a document, the driver, do you read

12  it?  What do you do?

13  A.  Yeah, I have a habit of -- being a long-time checkpoint, I

14  let them hold it there for a couple seconds, two, three

15  seconds, just in case I observe anything suspicious, maybe

16  shaking.  And then when I do look at it I look to see -- most

17  people don't give us any kind of document, they just state

18  their citizenship.  But if they do hand me a document I kind of

19  look to see where they live, you know, to see if they

20  belong -- I mean, it's kind of a unique place too that there's

21  not a lot of people that are on the Indian Reservation that

22  don't either live or work there.

23  Q.  And I guess you're also inspecting that document to try to

24  determine if it's valid and to try to determine whether the

25  person who handed it to you, in fact, matches it?

Chris Brewer – Direct Examination

1   A.  Yes, ma'am.

2   Q.  So that the person may not be an imposter, I suppose.

3          And are canine free air sniffs done simultaneous to

4   these primary immigration inspections at that checkpoint?

5   A.  They are, yes.

6   Q.  And if after, you know, a complete primary inspection and

7   the canine free air sniffs, if everything is clear, is the

8   driver free to go?

9   A.  Yes.

10         MS. MALONEY:  Your Honor, may I approach?

11         THE COURT:  Yes.

12  BY MS. MALONEY:

13  Q.  I've handed you what's been marked as -- let's see, let's

14  first take what's been marked for identification as

15  Government's Exhibit No. 4.

16         Can you describe what you see in this photograph?

17  A.  Yes, ma'am.  That's the entrance to the checkpoint from --

18  coming from the south approaching the checkpoint.

19  Q.  Okay.  So this lane on the right, that's the northbound

20  lane, right, driving from the south --

21  A.  The northbound, yes.

22  Q.  -- in through the checkpoint.

23         And is that stop sign I see there on the right side of

24  the --

25  A.  Right -- primary, yeah, that's a stop sign.

Chris Brewer – Direct Examination

1    Q.  And where that agent is standing in between the cones there

2    in the middle of the -- in the middle of the road, that's the

3    primary inspection station?

4    A.  Yes, ma'am.

5    Q.  Does this photograph fairly and accurately depict the

6    Federal Route 15 checkpoint?

7    A.  Yes, ma'am.

8    Q.  Okay.  And I see it has a sign notifying drivers that a

9    working dog is ahead, and a speed limit of five miles per hour

10   sign, and to slow down?

11   A.  Yes, ma'am.

12   Q.  Can you describe the area where this -- where this

13   checkpoint is located, I guess, in terms of geography or in

14   terms of the population?

15   A.  Not really much population near the checkpoint.  There's

16   little villages, you know, a few miles south.  But for miles

17   south and north of the checkpoint there's really no -- there's

18   no population at all.

19   Q.  It's very rural?

20   A.  It is rural, very rural.

21   Q.  Is the checkpoint only drivers -- or vehicles are only

22   checked going north, correct, not coming south?

23   A.  Yes, ma'am, just north.

24   Q.  Now, on March -- May 1st, 2017, was the Federal Route 15

25   checkpoint located where the -- underneath this canopy?

Chris Brewer – Direct Examination

1   A.   No.  At that time they were working on putting the canopy

2   up, so it was just a couple hundred feet north of there.

3   Q.   And I'll call your attention to Exhibit No. 3 that's been

4   marked as Government's Exhibit 3 for identification.  And does

5   this fairly and accurately depict the Federal Route 15

6   checkpoint?

7   A.   Yes, ma'am.

8   Q.   Is that just a closer view of the same view that we just

9   were looking at in Exhibit 4?

10  A.   Yes, ma'am.

11  Q.   Okay.  And Government's Exhibit 2 for identification, can

12  you identify, I guess, the view in this photograph?

13  A.   That would be the view from where the primary agent would

14  be standing looking south at vehicles that are traveling north

15  towards the checkpoint.

16  Q.   Okay.  So this is the view shed -- the view that the

17  primary inspector and any other agent, for example, a canine

18  agent would see as a car is driving northbound coming into the

19  checkpoint; correct?

20  A.   Yes, ma'am.

21  Q.   And about how far can you see southbound?

22  A.   Probably a mile, three quarters of a mile.

23       MS. MALONEY:  Your Honor, the Government would like to

24  move to admit Exhibits 4, 3 and 2.

25       THE COURT:  Any objection?

─── Chris Brewer ─ Direct Examination ───

1            MR. GONCALVES:  No objection.

2            THE COURT:  I missed what you said about the canopy,

3    it wasn't there on May 1st?

4            THE WITNESS:  No.  It's relatively new.  They were

5    actually constructing it for a couple weeks, so they just had

6    us doing our checkpoint a little further north.

7            THE COURT:  Okay.  Thank you.

8            So Exhibits 2, 3 and 4 are admitted.

9        (Exhibit Nos. 2 through 4 admitted into evidence.)

10   BY MS. MALONEY:

11   Q.  Why did Border Patrol construct this canopy at the

12   checkpoint?

13   A.  Because it's really hot and sunny in the summertime, so it

14   kind of gives us some shade.

15   Q.  Significantly cooler in the shade?

16   A.  Yes, ma'am.

17   Q.  And was your view southbound obstructed at all by the

18   effort to put up this canopy --

19   A.  No, ma'am.

20   Q.  -- back on May 1st, 2017?

21   A.  No, ma'am.

22   Q.  It was early on in the erection process, huh?

23   A.  I think it was the first day and they hadn't even started

24   the process yet.

25   Q.  So the -- strike that.

1    Okay.  I want to turn your attention to May 1st, 2017.

2  Were you supervising the Federal Route 15 checkpoint that day?

3  A.  Yes, ma'am.

4  Q.  And what hours were you working that day?

5  A.  My shift started at noon.  I arrived at the checkpoint at

6  about 1:00 -- 1:00 p.m.

7  Q.  And during the course of your shift did you have occasion

8  to come across a grey or a silver 2002 Kia Optima?

9  A.  Yes, ma'am.

10  Q.  Okay.  Can you tell us about that?  What you were doing as

11  you saw it approaching?

12  A.  I was performing primary inspection duties.

13  Q.  Okay.  Could you see it approaching from, you know,

14  that -- a mile or so away, or a little bit closer away?

15  A.  Yes, ma'am.

16  Q.  So as you watched it approaching, what did you do?

17  A.  I motioned for the driver to stop so I could interview her.

18  Q.  Okay.  And was anybody else working there that day?

19  A.  Yes, ma'am.

20  Q.  Okay.  Was there a canine handler there?

21  A.  There was, yes, ma'am.

22  Q.  Was that Agent Mark Metheny?

23  A.  Yes, ma'am.

24  Q.  And what did he do, if you know, as the Kia Optima was

25  driving north towards the -- towards the checkpoint?

Chris Brewer – Direct Examination

1    A.  He was getting his canine out of the vehicle.

2    Q.  So he was getting his canine out of the vehicle to be

3    prepared to do a canine free air sniff while you were doing the

4    primary inspection; correct?

5    A.  Yes, ma'am.

6    Q.  Okay.  And so as the vehicle rolled through the checkpoint

7    and stopped at the stop sign.  Can you tell us what happened?

8    A.  The driver handed me, it was a Colorado River Indian

9    identification.  And, you know, I asked her about where she was

10   coming from, what she was doing in this area.

11   Q.  Did you recognize her as being a local?

12   A.  No, ma'am, I did not.

13   Q.  Did you observe anything about her demeanor when she handed

14   you her identification card?

15   A.  Yes, ma'am, I did notice her hand was shaking and she was

16   speaking quite rapidly.

17   Q.  Do you see the driver of that vehicle here in the courtroom

18   today?

19   A.  Yes, ma'am.

20   Q.  And can you identify her based on an article of clothing?

21   A.  A red shirt, ma'am.

22          MS. MALONEY:  Your Honor, may the record reflect that

23   the witness has identified the defendant?

24          THE COURT:  Yes, it will.

25   BY MS. MALONEY:

Chris Brewer – Direct Examination

1   Q.  Okay.  So after she handed you the card and you were making

2   your observations, what else happened?

3   A.  That's when -- when -- as I was talking to her,

4   Agent Metheny indicated to me that his dog alerted to the rear

5   part of the vehicle.

6   Q.  And then what happened?

7   A.  I asked her to open the trunk.

8   Q.  And how long did all that take?

9   A.  It was all within a minute or two.

10  Q.  And what happened after you asked her to open her trunk?

11  A.  She had stated that she had been stopped earlier that day,

12  and that they had already inspected her.  But I told her that

13  the dog had alerted to her vehicle and that I needed to open

14  the trunk.  At that point I think Agent Metheny also told her

15  his dog was alerting on her car.  And at that point she handed

16  me the keys to the trunk.

17  Q.  And then what happened?

18  A.  We opened the trunk and observed eight bales of marijuana.

19          MS. MALONEY:  Your Honor, may I approach?

20          THE COURT:  Yes.

21  BY MS. MALONEY:

22  Q.  I handed you what's been marked as Government's Exhibit

23  No. 1.  Can you tell us what's depicted in that photograph?

24  A.  That's the trunk of the vehicle with marijuana in the back

25  and then the canine.

Chris Brewer – Direct Examination

1    Q.  And that photograph was taken on May 1st, 2017?

2    A.  Yes, ma'am.

3    Q.  And it accurately depicts the checkpoint stop; correct?

4    A.  Yes, ma'am.

5           MS. MALONEY:  The Government would like to move to

6    introduce Exhibit 1 into evidence.

7           THE COURT:  Any objection?

8           MR. GONCALVES:  No objection, Your Honor.

9           THE COURT:  Exhibit 1 is admitted.

10       (Exhibit No. 1 admitted into evidence.)

11   BY MS. MALONEY:

12   Q.  What was traffic flow like that day when she pulled up?

13   A.  It was light.

14   Q.  Was there a vehicle behind her car?

15   A.  No, ma'am.

16          MS. MALONEY:  May I have a moment, Your Honor, please?

17          THE COURT:  Yes.

18          MS. MALONEY:  Thank you.

19       (Discussion held off the record.)

20   BY MS. MALONEY:

21   Q.  Agent Brewer, I just want to talk a bit more about when the

22   defendant first rolled up at the checkpoint.

23          She handed you a document.  How did that strike you?

24   And can you comment a bit more on her demeanor and how that

25   struck you?

1   A.  Okay.  Like I said, most of the people that we encounter at

2   that checkpoint are locals, local residents and people that

3   work there.  So the only people required by law to show us

4   documents are aliens, so U.S. citizens usually don't show us,

5   so it's rare that anybody hands us a document at that

6   checkpoint that's not an alien.

7   Q.  So did it peak any suspicion?

8   A.  It did.  It made me aware that the driver wasn't from the

9   area and wasn't used to going through that checkpoint.

10  Q.  And earlier you testified that her hand was shaking as she

11  handed you the identification card and she was talking very

12  fast.  Did you draw any conclusions based on those

13  observations?

14  A.  It definitely made me more suspicious of her.

15          MS. MALONEY:  We have no more questions at this time,

16  Your Honor.

17          THE COURT:  Okay.  Cross-examination?

18                      CROSS-EXAMINATION

19  BY MR. GONCALVES:

20  Q.  Agent Brewer, you had a chance to review your report --

21  A.  Yes, sir.

22  Q.  -- before this hearing?

23  A.  Yes, sir.

24  Q.  And you wrote in your report that as she handed you the

25  card -- and I'm quoting from your report -- that, quote, I

Chris Brewer – Cross-Examination

1  observed that her hand was visibly shaking and she was speaking

2  rapidly.

3          That's what you typed; right?

4  A.  Yes, sir.

5  Q.  And that was something that you --

6          Did you actually type the report?

7  A.  Yes, sir, I did.

8  Q.  That was done after the fact; right?

9  A.  Shortly after, yes, sir.

10  Q.  Shortly after the fact?

11  A.  Yes, sir.

12  Q.  How long after the fact?

13  A.  An hour maybe.  We had a -- the checkpoint's probably a

14  half hour from our station where we do our reports.

15  Q.  Okay.  And were there other vehicles that you encountered

16  before you typed your report?

17  A.  After her vehicle, no.

18  Q.  Okay.  So it took you about an hour to write your report

19  after this incident?

20  A.  Yes, sir.

21  Q.  And can you explain why that was?

22  A.  Our checkpoint's located 30 to 45 minutes from our station,

23  so after we get everything sorted out we have to transport it

24  to our station where we have the computers and everything.

25  Q.  Okay.

1   A.  We don't have anything in our vehicle like laptops or

2   anything like that.

3   Q.  Before you typed your report you had a chance to speak with

4   Agent Metheny about this incident?

5   A.  Yes, sir.

6   Q.  You conferred with him about the facts of the case?

7   A.  Yes, sir.

8   Q.  Okay.  Did you discuss with him your observations of her

9   having her hand shake and speaking rapidly?

10  A.  I don't remember if I discussed that with him.

11  Q.  Okay.  So based on those two things, her hands shaking and

12  her speaking rapidly, that's why you believe -- and still

13  believe that she was nervous at the time; correct?

14  A.  Yes, sir.

15  Q.  Okay.  Were there any other facts that indicate that she

16  was, as you say or wrote, nervous?

17  A.  Not that I recall.

18  Q.  Okay.  So you've been an agent for how many years?

19  A.  Sixteen-and-a-half years.

20  Q.  Sixteen-and-a-half years.

21          And how much of that time has been spent working at a

22  checkpoint?

23  A.  For the first 12 years, three to four days a week, and

24  since then, you know, once -- once a week, once every other

25  week.

1  Q.  Okay.  So a substantial amount of time is spent working at

2  a checkpoint then; right?

3  A.  Yes, sir.

4  Q.  Okay.  Now you agree that when we say that someone's

5  nervous, it's a very broad statement; right?

6  A.  Absolutely.

7  Q.  I mean, you were specific in that you said that her hands

8  was shaking and that she spoke rapidly; right?

9  A.  Yes, sir.

10  Q.  But it's true that you've never -- at least you didn't

11  indicate in your report that you had seen her previously.

12  A.  I had not seen her previously.

13  Q.  So you've never seen this person before in your life;

14  correct?

15  A.  No, sir.

16  Q.  And is it true that sometimes you see people regularly that

17  cross into that checkpoint; right?

18  A.  Yes, sir.

19  Q.  So if you live in that area, it's common that you may cross

20  that checkpoint; correct?

21  A.  Yes, sir.

22  Q.  So you may see someone several times over the course of a

23  month, for example?

24  A.  Yes, sir.

25  Q.  And you get to know what their demeanor is like, more or

1    less; correct?

2    A.  Yes, sir.

3    Q.  Based on those interactions.

4    A.  Yes.

5    Q.  And you would agree that some people get nervous around law

6    enforcement; correct?

7    A.  Sure.

8    Q.  I mean, some people are very familiar with law enforcement;

9    right?

10   A.  Yes, sir.

11   Q.  Maybe because they have a family member who is a law

12   enforcement officer; right?

13   A.  Yes, sir.

14   Q.  And so they may not feel nervous around law enforcement.

15   A.  Okay.

16   Q.  Right?  I mean, would you agree with that?

17   A.  Yes, sir.

18   Q.  But on the other hand, there are some people who may get

19   nervous around law enforcement.

20   A.  Yes, sir.

21   Q.  Would you agree with that?

22           And their hand might shake because they're nervous.

23   A.  Yes, sir.

24   Q.  But it doesn't mean that they're doing anything illegal;

25   correct?

1   A.  Not always, no, sir.

2   Q.  It could be that the person has a medical condition;

3   correct?

4   A.  Could be, yes, sir.

5   Q.  Could be that they're maybe hungry.

6   A.  Yes, sir.

7   Q.  Or thirsty.

8   A.  Yes, sir.

9   Q.  Or something totally unrelated to that person being

10  nervous.

11  A.  Yes, sir.

12  Q.  Okay.  Would you agree that that's the same for speech?

13  A.  I didn't understand that.

14  Q.  Well, like if someone like me, for example, I'm speaking

15  very rapidly right now; right?  I mean, my words are coming out

16  at a very quick pace; correct?

17  A.  Yes, sir.

18  Q.  Does it mean that I'm nervous?

19  A.  I don't know, sir.

20  Q.  You don't know.  Okay.

21          So you would agree that if someone speaks slowly, does

22  that mean that they're nervous as well?

23  A.  It could.

24  Q.  Okay.  It could.  But it also could not; correct?

25  A.  Yes, sir.

1   Q.  So you would agree that those two things are very

2   subjective.

3   A.  In themselves, yes.  Other -- you know, from working at the

4   checkpoint, the fact that I'd never seen her before, then those

5   two things all -- you know, it seemed nervous to me.

6   Q.  Okay.  It seemed nervous to you, but you would agree that

7   those two things in and of themselves may not say that a person

8   is nervous; correct?

9   A.  Yes, sir.

10  Q.  So you made those conclusions because to you at the time it

11  seemed like she was nervous.

12  A.  Yes, sir.

13  Q.  But you would agree that those things may also mean that

14  they're not.

15  A.  It could.

16  Q.  Okay.  In your report you specifically said or wrote that

17  as you were speaking with McCowan, Border Patrol Agent canine

18  handler Mark Metheny was performing a primary sniff on the

19  vehicle; correct?

20  A.  Yes, sir.

21  Q.  With his service canine partner Jessy-A; right?

22  A.  Yes, sir.

23  Q.  And then you wrote, Agent Metheny advised that Jessy-A had

24  alerted on the vehicle and I instructed McCowan to open the

25  trunk; correct?

Chris Brewer - Cross-Examination

1    A.  Yes, sir.

2    Q.  Okay.  It's true that your report doesn't specifically

3    indicate when exactly the canine alerted; correct?

4    A.  It was while I was talking to her at primary that -- I

5    don't know what you're asking.

6    Q.  Well, let me ask you this:  Your report doesn't

7    specifically indicate when the canine handler began his

8    inspection; right?

9    A.  It does not.

10   Q.  Just that it was as you were talking to her.

11   A.  Yes, sir.

12   Q.  Are you saying that the -- that his inspection finished

13   before you were finished?

14   A.  That his inspection finished before --

15   Q.  Your inspection.

16       Because he conducted an inspection; correct?

17   A.  With his canine, yes.

18   Q.  With a canine.

19       Okay.  Now did that inspection finish before you

20   finished your inspection?

21   A.  I was still doing my inspection.

22   Q.  Okay.  So you're saying that his inspection -- that your

23   inspection was still ongoing when he finished his inspection?

24   A.  Yes, sir.

25   Q.  Okay.  And why isn't that specifically stated in your

Chris Brewer – Cross-Examination

1    report?

2    A.  I don't know, sir.

3    Q.  Okay.  You began working at 1:00 p.m.?

4    A.  That's when I arrived at the checkpoint, yes.

5    Q.  Okay.  And do you know when Agent Brewer began his shift?

6    A.  Agent Metheny?

7    Q.  I'm sorry, Agent Metheny.  I apologize.

8    A.  His shift started at 6:00 a.m.

9    Q.  At 6:00 a.m.

10   A.  Yes.

11   Q.  Do you know when his shift ended that day?

12   A.  Usually right around the time that we arrive is the time

13   that they leave.

14   Q.  Okay.  So his was going to finish at 1:00 p.m.?

15   A.  Around 1:30.

16   Q.  1:30.  Okay.

17          So you were both out there then by about half an hour?

18   A.  That's pretty regular, yes.

19   Q.  Was there another canine officer that was going to show up

20   at 1:30?

21   A.  That day I'm not sure.

22   Q.  Okay.  So not every day do you have a canine there working

23   all the time?

24   A.  Sometimes there's not a canine.

25   Q.  Okay.  How often is there a canine there?

1    A.  Most days, most shifts there are.  Occasionally once or

2    twice a week there's not.

3    Q.  Okay.  Do you know if Agent Metheny was at this checkpoint

4    the entire morning?

5    A.  I believe so.

6    Q.  Okay.  And you believe so or you know so?

7    A.  I mean, I wasn't there when he was there, so I don't know.

8    Q.  Okay.  But you say you believe so based on what?

9    A.  That's usually where the canines are when they're assigned

10   to checkpoint.

11   Q.  Okay.  When they're assigned to a checkpoint, do

12   they -- are they sent out to conduct investigations along a

13   particular route?

14   A.  Yes, sir.

15   Q.  Okay.  Do you know if this specific canine and his agent

16   was sent that morning to conduct an investigation?

17   A.  I don't know.

18   Q.  Are you aware of the fact that Miss McCowan was stopped

19   there that morning?

20   A.  She told me that she was, yes.

21   Q.  Okay.  But are you -- besides her telling you, were you

22   told that --

23   A.  No.

24   Q.  -- by someone else?

25   A.  No, sir.

─── **Chris Brewer – Cross-Examination** ───

1   Q.  Agent Metheny didn't tell you that?

2   A.  No.

3   Q.  No one told you that?

4   A.  No.

5   Q.  Are you aware of the fact that Agent Goodin stopped her

6   earlier?

7   A.  I've learned that after the fact, but I don't -- he's not

8   even from my station.  I don't know, that's from a neighboring

9   station.

10  Q.  Were you made -- were you aware of the fact that a canine

11  was called to search her car earlier that morning?

12  A.  I was told that after the fact.

13  Q.  Okay.  After what fact?

14  A.  After we had already taken her to our station and were

15  processing the narcotics.

16  Q.  Okay.  Do you know exactly what Jessy-A was called to

17  investigate when she or he -- I guess it's a she, the canine;

18  right?

19  A.  She.

20  Q.  -- was called to investigate on this vehicle?

21  A.  I don't understand your question.

22  Q.  Well, I mean, when a canine is used as part of your

23  investigation, what is it doing?

24  A.  I'm not a canine expert, but I know that their job is

25  concealed humans and narcotics.

1    Q.  And narcotics.  Okay.

2            MR. GONCALVES:  Can I have just one moment,

3    Your Honor?

4            THE COURT:  Sure.

5        (Discussion held off the record.)

6    BY MR. GONCALVES:

7    Q.  You said that the canine was in the car when you got there;

8    is that correct?

9    A.  When I got there?

10   Q.  Yes.

11   A.  Yes, sir.

12   Q.  Do you know what the canine was doing in the car?

13   A.  I don't.

14   Q.  Is it typically in a car during the day?

15   A.  In May when it's hot they're in and out of the vehicle a

16   lot.  They're not going to keep them outside for an hour

17   straight, it's just too hot for the canines.

18   Q.  Okay.  Was this the only canine that was there at the time?

19   A.  Yes, sir.

20   Q.  Aside from you and Agent Metheny, were there other agents

21   there at the time of this stop?

22   A.  Yes, sir, there were.

23   Q.  Do you recall who they were?

24   A.  Yes, sir.

25   Q.  Okay.  Who were they?

1    A.  Agent Daniel Kraft, Agent Jeff Douglas, and Agent Hermes, I

2    don't know his first name.

3            MR. GONCALVES:  Okay.  No further questions,

4    Your Honor.

5            THE COURT:  Thank you.

6            Any redirect?

7            MS. MALONEY:  No, thank you.

8            THE COURT:  Thank you, sir.  You may step down.

9            THE WITNESS:  Thank you, sir.

10           THE COURT:  So the Rule of Exclusion has been invoked,

11   so don't talk to anybody about your testimony other than the

12   attorneys.

13           THE WITNESS:  Okay, sir.  Thank you.

14           THE COURT:  Okay.  Thank you.

15           Okay.  Who is your next witness?

16           MS. MALONEY:  Border Patrol Agent Mark Metheny.

17           THE COURT:  Okay.  Agent Metheny, come on up to the

18   witness stand.

19           THE CLERK:  Please raise your right hand.

20        (MARK METHENY, GOVERNMENT WITNESS, SWORN.)

21           THE CLERK:  Thank you.

22                         DIRECT EXAMINATION

23   BY MS. MALONEY:

24   Q.  Good afternoon, Agent Metheny.

25           Would you spell your last name for the record, please?

UNITED STATES DISTRICT COURT

Mark Metheny - Direct Examination

1   A.   M-E-T-H-E-N-Y.

2   Q.   And how long have you worked with Border Patrol?

3   A.   It will be 15 years in January.

4   Q.   And before that were you a student?

5   A.   Yes, ma'am.

6   Q.   What degrees did you earn?

7   A.   Bachelor of Arts in political science and a master's in

8   public administration.

9   Q.   What school did you attend?

10  A.   West Virginia University.

11  Q.   In addition to your bachelor's and master's degrees, have

12  you received any special training to become a Border Patrol

13  Agent?  Did you go to the Border Patrol Academy?

14  A.   I attended the Border Patrol Academy in January of 2003,

15  yes.

16  Q.   And after you graduated the academy, where were you

17  assigned?

18  A.   The Casa Grande Station.

19  Q.   So have you spent all of your career at the Casa Grande

20  Station?

21  A.   Yes, ma'am.

22  Q.   What is your current duty assignment?

23  A.   I'm currently a canine handler at the Casa Grande Station.

24  Q.   And how long have you been a canine handler?

25  A.   A little over five-and-a-half years now.

Mark Metheny - Direct Examination

1   Q.  Did you receive specialized training to become a canine

2   handler?

3   A.  Yes, ma'am.

4   Q.  Can you just generally tell us what that was, give us an

5   overview?

6   A.  There was a seven-week academy in El Paso, Texas where we

7   went over canine law, canine handling basics, where they taught

8   us to work with the dogs, to read the alerts the dogs have, and

9   other things you're going to incur with working with a dog.

10  Q.  And was the training divided into two sections, an academic

11  section and a exercise section?

12  A.  Yes, ma'am.

13  Q.  Okay.  And you had to pass the academic test with a grade

14  of 80 percent or higher; correct?

15  A.  Yes, ma'am.

16  Q.  And then after that were you indeed paired up with a dog?

17  A.  Yes.

18  Q.  Okay.  And what dog did you receive?

19  A.  I received Jessy-A.

20  Q.  Would you spell that for the record, please?

21  A.  J-E-S-S-Y hyphen A.

22  Q.  And is Jessy-A a male or female?

23  A.  She's a female.

24  Q.  Now did you and Jessy-A go through the remainder of the

25  training together?

**Mark Metheny – Direct Examination**

1   A.   Yes, ma'am.

2   Q.   And were you scored on your performance with Jessy-A during

3   the training?

4   A.   Yes.

5   Q.   And was Jessy-A scored?

6   A.   Yes, she was.

7   Q.   And did you both pass the course?

8   A.   Yes, ma'am.

9   Q.   And did you become a certified training -- a certified

10  canine handler?

11  A.   Yes, ma'am.

12  Q.   And Jessy-A became a certified canine detection dog;

13  correct?

14  A.   Yes, ma'am.

15  Q.   And what year was that?

16  A.   That was in 2012.

17  Q.   Are you still working with Jessy-A now?

18  A.   Yes, ma'am.

19  Q.   So do you interact with Jessy-A on a daily basis since

20  2012?

21  A.   Yes, ma'am.

22  Q.   And would you characterize your relationship with Jessy-A

23  as knowing her well?

24  A.   Yes, ma'am.

25  Q.   And since your initial certification in 2012, were you

Mark Metheny – Direct Examination

1   required to recertify with Jessy-A?

2   A.  Yes, ma'am.

3   Q.  And is that an annual certification that's done once a

4   year?

5   A.  Yes, ma'am.

6   Q.  We've admitted into evidence an exhibit that shows that you

7   were certified from October 2016 through October 2017; is that

8   correct?  Is that accurate?

9   A.  Yes, ma'am.

10  Q.  And which means you must have gone through another annual

11  recertification recently.

12  A.  Yes, ma'am.

13  Q.  Did you and Jessy-A pass?

14  A.  Yes, ma'am.

15  Q.  I want to talk about some terms.

16          Can you tell us what a free air sniff is?

17  A.  A free air sniff is a search with a canine when we walk

18  around a vehicle or if we're doing a patrol route in the

19  desert, where Jessy is sniffing the free air around whatever

20  objects we're at, or using wind currents or temperature to her

21  advantage.

22  Q.  Okay.  And can you tell us what an alert is?

23  A.  An alert is a change in posture and increased respiration

24  when a dog first encounters the odors they've been trained to

25  detect.

Mark Metheny – Direct Examination

1   Q.  Is it a subconscious reaction of the dog or a biological

2   one?

3   A.  I believe it's a subconscious, it's something that they're

4   trained.

5   Q.  And is it something that she can control?

6   A.  No, it's not.

7   Q.  And what does the term "indicate" mean?

8   A.  An indicate is when a dog sits at the strongest

9   concentration of the trained odor.

10  Q.  Are you trained to be able to notice or interpret when

11  Jessy-A exhibits an alert behavior?

12  A.  Yes, ma'am.

13  Q.  And an indication behavior?

14  A.  Yes, ma'am.

15  Q.  What is Jessy-A's alert behavior?

16  A.  When Jessy-A alerts her mouth closes, her breathing gets

17  deeper, her back gets more rigid, her tail gets more rigid,

18  instead of wagging it gets more rigid and straight, and her

19  ears perk up.

20  Q.  And you're certified and you're trained with Jessy-A, and

21  it's your responsibility to recognize this behavior as an

22  alert; correct?

23  A.  Yes, ma'am.

24  Q.  Do you work with Jessy-A at the Federal Route 15

25  checkpoint?

UNITED STATES DISTRICT COURT

1   A.  Yes, ma'am.

2   Q.  How long does it take to do the free air sniff and run

3   Jessy-A around the car?

4   A.  Seconds, a matter of seconds.

5   Q.  And is the goal to conduct this free air sniff in about the

6   same time it takes to do an immigration inspection?

7   A.  Yes, ma'am.

8   Q.  What is Jessy-A's indication?

9   A.  Jessy-A usually indicates with a sit at the strongest

10  concentration of odors.

11  Q.  And that's what she's trained to do; correct?

12  A.  Yes, ma'am.

13  Q.  So generally speaking when you work at the Federal Route 15

14  checkpoint, what are your -- what are your duties?

15  A.  My duties are that I perform free air sniffs on the

16  vehicles that approach primary, and if agents have any

17  reasonable suspicion at secondary vehicle, for me to conduct a

18  free air sniff on the vehicles in secondary.

19  Q.  Okay.  And how do you do that -- can you just sort of

20  generally walk us through it -- when a car is approaching the

21  Federal Route 15 checkpoint?

22  A.  When a car approaches I'm generally standing on the east

23  side of the road to stay out of the oncoming lanes of traffic.

24  I will start -- when the vehicle comes to a complete stop I

25  will start on the passenger side front headlight, and I will

Mark Metheny – Direct Examination

1  walk Jessy around to the rear of the vehicle conducting the

2  free air sniff.

3  Q.  If it was warm outside, hot outside, would you be standing

4  on the side of the road if the traffic's very light?

5  A.  No.  Usually she'll be in an air conditioned kennel in the

6  back of my vehicle.

7  Q.  I am going to show you some photographs.

8          MS. MALONEY:  Your Honor, may I approach?

9          THE COURT:  Sure.

10  BY MS. MALONEY:

11  Q.  I'd like to draw your attention to Exhibit No. 4.

12          Is this a fair and accurate depiction as how the

13  Federal Route 15 checkpoint looks today?

14  A.  Yes, ma'am.

15  Q.  With the canopy and the working dog sign.

16          Can you describe, I guess, what you see in this

17  photograph?

18  A.  This is facing -- looking to the north through the Federal

19  Route 15 checkpoint.  You can see the divider -- plastic

20  divider barriers in the middle.  Some of them are filled with

21  water, some are not.  The agents' cars and the transport

22  vehicles are parked on the west side of the highway.  There's a

23  pursuit vehicle under the canopy, it's usually a Crown

24  Victoria.  On the right-hand side is typically the canine

25  parking under the canopy.  There's a grey F-150 parked there at

**Mark Metheny – Direct Examination**

1  the moment.  There's solar lighting and other things there at

2  the moment.

3  Q.  Okay.  And is where this -- where this grey F-150 is

4  parked, the canine vehicle, is that where you typically park

5  with -- when you work at the checkpoint?

6  A.  Yes, ma'am.

7  Q.  And on hot days Jessy-A will sit inside the air conditioned

8  car until a vehicle begins approaching and then you'll take her

9  out to run your free air sniff?

10  A.  Yes, ma'am.

11  Q.  Are any of the other agents who are working -- who are

12  working the checkpoint, are they allowed to park so close to

13  the primary lane?

14  A.  No, ma'am.

15  Q.  It's reserved for the canine --

16  A.  Yes, ma'am.

17  Q.  -- agent.

18          For the comfort and safety of the dog in between free

19  air sniffs; correct?

20  A.  Yes, ma'am.

21  Q.  So if you take a look at Exhibit 2.

22          Can you -- can you describe the view in this

23  photograph?

24  A.  This is a view looking to the south, of vehicles -- so you

25  can possibly see vehicles approaching the FR15 checkpoint.

122

1  Q.  And it's a pretty long view, isn't it?

2  A.  Yes, ma'am.

3  Q.  When you see vehicles approaching the checkpoint coming

4  northbound, do you have ample time to get out of the canine

5  vehicle and bring the dog around to run the free air sniff on

6  hot days?

7  A.  Yes, ma'am.

8  Q.  Now let's specifically talk about May 1st, 2017.

9      Was the checkpoint located exactly right here, what's

10  depicted in, for example, Exhibit 2?

11  A.  No, ma'am, it was not.

12  Q.  Where was it?

13  A.  It was approximately 500 yards up the highway north of this

14  location.

15  Q.  Just directly north.  But the primary officer stood in

16  between traffic just like here?

17  A.  Yes, ma'am.  And they had a makeshift primary setup at the

18  time.

19  Q.  And the canine vehicle was in a similar position?

20  A.  Yes, ma'am, parked on the east side of the road.

21  Q.  So May 1st, 2017, were you on duty that day?

22  A.  Yes, ma'am.

23  Q.  And were you assigned to the Route 15 checkpoint?

24  A.  Yes, ma'am.

25  Q.  Were you working as a handler with Jessy-A that day?

**Mark Metheny – Direct Examination**

1   A.  Yes, ma'am.

2   Q.  What shift were you working?

3   A.  I was on the 6:00 a.m. to 2:00 p.m. shift.

4   Q.  Okay.  Do you recall at approximately 1:30 p.m. a 2002

5   silver or grey Kia Optima approached the checkpoint?

6   A.  Yes, ma'am.

7   Q.  Can you tell us what you saw and what you did?

8   A.  As you can see in the pictures, we could see a long ways

9   down the highway.  We saw a vehicle coming north to our

10  location.  As the vehicle got closer I went to retrieve Jessy

11  out of her air conditioned kennel and brought her over to the

12  primary inspection on the east side of the road.

13         At the time I got her out of the vehicle to the front

14  bumper of the car as the vehicle was coming to a stop and

15  Supervisor Brewer began his immigration interview.  As I began

16  to run Jessy with a free air sniff around the vehicle, she

17  immediately alerted to an odor she's been trained to detect.

18  She continued around the car tracing that odor to the strongest

19  source of that trained odor, and she indicated with a sit at

20  the trunk.

21  Q.  And how long did that free air sniff take before the alert?

22  A.  A matter of seconds.

23  Q.  And how long did it take before the indication?

24  A.  It's almost immediate when she reaches the strongest odor.

25  Q.  So what did you do after you observed Jessy-A alert and

UNITED STATES DISTRICT COURT

1    indicate?

2    A.  I advised Supervisor Brewer that Jessy had alerted and

3    indicated at the trunk, and that there was something in the

4    trunk.

5    Q.  And what was he doing at the time?

6    A.  He was speaking with the defendant.

7    Q.  And then what happened?

8    A.  He asked the defendant if he could -- that he wanted -- or

9    that he would like to search the trunk, when she became irate

10   and started yelling and saying that she had already been

11   through this and she had already done this before and she

12   wasn't going to allow him to look in the trunk.

13   Q.  Were you aware at the time that the car rolled into the

14   checkpoint that another canine had been deployed earlier and

15   did a free air sniff of her car?

16   A.  No, ma'am, I had no knowledge.

17   Q.  When did you find out?

18   A.  Once we had pulled the vehicle into secondary we contacted

19   KK60, which is our dispatch, and they notified us after they

20   ran the vehicle registration.

21   Q.  Okay.  So after you notified Agent Brewer that Jessy-A had

22   alerted and indicated to an odor she was trained to detect,

23   and -- did you testify Agent Brewer asked her for her keys?

24        Well, I'll let you -- again, I'll let you just sort of

25   tell us what happened.

1    A.  Yes, at the time Agent Brewer asked her for her keys, she

2    refused at first.  Then I advised the defendant that my dog had

3    alerted to her vehicle, indicated at the trunk, and that we had

4    probable cause to search her trunk, that we needed her keys.

5    Q.  Okay.  And then what happened?

6    A.  And then she handed the keys to Supervisor Brewer.  He then

7    utilized them to open the trunk in the primary inspection lane,

8    which revealed eight bundles of what we suspected to be

9    marijuana at the time.

10   Q.  I want to draw your attention to Exhibit 1.

11            What does that photograph depict?

12   A.  That is a picture of the vehicle that is in the primary

13   inspection lane, with Jessy-A laying down behind the vehicle

14   after she had been rewarded with her toy.

15   Q.  Were you working at the -- at the Route 15 checkpoint all

16   day from 6:00 a.m. until -- until -- until the time of

17   this -- of this stop?  Strike that.

18            What was the traffic flow like that day?

19   A.  It was pretty slow that day.  I remember it was a shift

20   change, which it's kind of slow traffic anyway during shift

21   change.  And as you can see in this picture, that Jessy-A is

22   laying behind the vehicle with no vehicles in front or behind.

23   I mean, I would not leave my dog in a high volume traffic area

24   while we were doing this if there was traffic around.

25            So there was no traffic within the time we encountered

—Mark Metheny – Cross-Examination—

1   the vehicle until the picture was taken.

2           MS. MALONEY:  May I have a moment, Your Honor?

3           THE COURT:  Sure.

4           MS. MALONEY:  We have no further questions at this

5   time.

6           THE COURT:  Okay.  Thank you.

7           Cross-examination?

8                        CROSS-EXAMINATION

9   BY MR. GONCALVES:

10  Q.  So you had a chance to review your report before this

11  hearing?

12  A.  Yes, sir.

13  Q.  And you indicated in your report that -- and I'm reading

14  from your report -- as the vehicle got closer, the driver,

15  later identified as Janice McCowan, looked nervous; right?

16  A.  Yes, sir.

17  Q.  And you also stated that she was looking around as if she

18  was looking to see if the canine was out; right?

19  A.  Yes, sir.

20  Q.  That's what you put in your report?

21  A.  Yes, sir.

22  Q.  Okay.  And do you recall exactly when you typed this

23  report?

24  A.  Yes, sir, after we processed the seizure at the Casa Grande

25  Border Patrol Station.

1  Q.  Okay.  So approximately how much time after the incident
2  was that?
3  A.  Approximately an hour and a half, two hours.  I can't tell
4  you exact time.
5  Q.  Okay.  And you had a chance to speak with other agents
6  before you typed your report; correct?  About the incident.
7  A.  Yes, we had spoken to other agents.
8  Q.  Is it common for you to discuss the incident before you
9  write a report?
10  A.  No, usually we -- I'm usually -- since I'm with a canine
11  handler, canine handlers are generally the primary agents on
12  the case.  But since agent -- Supervisor Brewer was the primary
13  agent, he was the one that spoke to her in primary, I was able
14  to go ahead and process the seizure, the dope.  And while he
15  was working on his report I went ahead and typed out my report.
16  Q.  Okay.  Did you speak with him about your observations
17  regarding her demeanor before you typed your report?
18  A.  No, not at the moment.
19  Q.  Okay.
20  A.  We spoke about that later.
21  Q.  So you made these observations when you were looking at the
22  road?
23  A.  I made the observation as I was bringing my canine back to
24  the road, because you don't want to take a chance of having
25  somebody come up to the checkpoint too fast or too slow, or

1    swerving over, so you've got to be constantly vigilant of

2    what's coming into the oncoming traffic, because you're going

3    to put your -- my partner into harm's way.  So I must watch

4    what the driver's actions are and what they're going to do.

5    Q.  Okay.  So where exactly were you standing when you made

6    these observations?

7    A.  May I refer to Exhibit 1?

8    Q.  Yes, please.

9    A.  I was coming -- if you look in Exhibit 1, you'll see a

10   marked Border Patrol ride on the east side of the highway.

11   Directly north of that you will see a dark blue Ford F-150.

12   That is Jessy-A's assigned canine vehicle.

13   Q.  Okay.

14   A.  So I had retrieved Jessy-A from the vehicle, and as I was

15   walking back around the marked Border Patrol vehicle, I was

16   watching the traffic as it approached, because there's a

17   marked -- posted speed limit sign of 15 miles an hour.  So

18   while the vehicle was approaching at that approximate posted

19   speed I was able to make those observations.

20   Q.  Okay.  When you say that she looked nervous, your report is

21   silent about what that conclusion is based on; right?  I

22   mean -- well, let me rephrase that.

23        So you say that she was looking around as if she was

24   trying to see if there was a canine?

25   A.  Yes, sir.

Mark Metheny – Cross-Examination

1   Q.  Okay.  And how were you able to tell that she was looking

2   for a canine?  Isn't that very subjective?

3   A.  As she was approaching -- as she was approaching the

4   checkpoint she was looking around.

5           There was a primary agent standing directly in front

6   of her, in front of the vehicle in the inspection lane.  It

7   is -- it's common for vehicles to come directly up, stop at the

8   primary agent and speak directly to them, not search -- look

9   around the surroundings.

10          And my -- it's my -- I can't think of the word.

11  Through years of experience, my experience is when a vehicle

12  approaches and they're constantly looking around, they're

13  looking to see if either there's a way to escape or if there's

14  a way -- or if there's a canine out or if there's other agents

15  there for other means.

16  Q.  Okay.  But you really had no idea what she was looking at

17  though.  That's just based on your speculation at the time;

18  right?

19  A.  Based on experience.

20  Q.  Okay.  Your experience.

21          But you would agree that people look around for many

22  different reasons; right?  I mean, it's not only because of

23  she's looking for a canine, right, it could be because she's

24  interested in what the checkpoint looks like; correct?  Would

25  you agree with that?

Mark Metheny – Cross-Examination

1   A.   Possible.

2   Q.   It's possible that -- I mean, you've never seen her before;

3   isn't that true?

4   A.   Yes.

5   Q.   So you don't know if she's ever been to this checkpoint

6   before; correct?

7   A.   Correct.

8   Q.   And so you don't know if it's her first time driving in a

9   checkpoint; right?

10  A.   Correct.

11  Q.   Would you agree that if someone has never driven through a

12  checkpoint that it may be not out of the ordinary for someone

13  to look around?

14  A.   Correct.

15  Q.   And they may want to see if there is a canine; correct?

16  A.   Correct.

17  Q.   And they may want to see if there are other officers

18  around; right?

19  A.   Yes.

20  Q.   Or other people that they haven't seen before.

21  A.   Yes.

22  Q.   So would you agree that, because you haven't seen her

23  before, it may have been totally reasonable for her to be

24  looking around?

25  A.   Through her demeanor and the way she was looked around, I

Mark Metheny – Cross-Examination

1  believed in my experience that she was looking for other things

2  other than sight-seeing.

3  Q.  Right.  But in your experience as an agent, that's an

4  interpretation that you derived; correct?

5  A.  Through experience, yes.

6  Q.  But you would agree that there are other very reasonable

7  explanations for other interpretations of that action.

8        MS. MALONEY:  Objection, Your Honor, asked and

9  answered.

10        THE COURT:  Overruled.

11        Why don't you just answer that and we'll move on.

12        THE WITNESS:  Could you repeat the question, please?

13  BY MR. GONCALVES:

14  Q.  So you interpreted her demeanor as you stated in your

15  report; correct?

16  A.  Yes.

17  Q.  However, you would agree that there are other reasonable

18  explanations as to why somebody is looking around.

19  A.  I agree -- I believe I agreed to -- that there were other

20  reasons why people may look around.  But through my experience

21  the day that she approached the checkpoint she was not looking

22  around as if she was sight-seeing, she was -- in my experience

23  she was looking to see if there was an escape route or if there

24  was a canine out.

25  Q.  It's true that there is a sign at the checkpoint to

1    alert -- or tell drivers that there are canines working there;

2    correct?

3    A.  Yes, sir.

4    Q.  Okay.  Your report also says -- or states that when McCowan

5    stopped in primary, Agent Brewer began an immigration

6    interview; right?

7    A.  Yes, sir.

8    Q.  And you conducted an open air sniff with Jessy-A?

9    A.  Yes, sir.

10   Q.  Okay.  However, you agree that your report doesn't

11   specifically indicate when Agent Brewer ended his immigration

12   interview.  In other words, at some point you indicated -- or

13   you -- your dog, I guess, gave an indication; correct?

14   A.  Negative, my dog alerted.

15   Q.  Alerted, I'm sorry.

16   A.  Yes, sir.

17   Q.  At some point your dog alerted?

18   A.  Yes, my dog alerted -- when she began the free air sniff on

19   the vehicle, she immediately alerted.

20   Q.  Okay.  But your report isn't -- it doesn't say that; is

21   that true?

22   A.  I would have to --

23   Q.  Do you have a copy of your report?

24   A.  No, sir, I do not.

25        (Discussion held off the record.)

1          MR. GONCALVES:  Your Honor, may I approach?

2          THE COURT:  Yes.

3    BY MR. GONCALVES:

4    Q.  Okay.  So are you done?

5    A.  Yes, sir.

6    Q.  Thanks.

7          So your report says that -- just one second -- that he

8    began -- that Brewer began an immigration interview and I

9    conducted an open air sniff with Jessy-A; right?

10   A.  Yes, sir.

11   Q.  And then it says, as Jessy-A began walking around the car

12   she immediately alerted to an odor she was trained to detect.

13   A.  Yes, sir.

14   Q.  And then it says that -- traced the odor to the trunk of

15   the vehicle, indicated with a sit.

16   A.  Yes, sir.

17   Q.  And then it says that you told Agent Brewer that Jessy-A

18   had alerted.

19   A.  Yes, sir.

20   Q.  Okay.  But your report doesn't say when he was finished

21   with his immigration inspection, whether that was before or

22   after your dog alerted.

23   A.  I began my free air sniff with Jessy when he began his

24   immigration inspection when the vehicle stopped at primary.

25   Jessy immediately alerted before he was -- I believe that he

1    was -- she had alerted before he even finished his first

2    question.  Because as soon as the car was presented, Jessy-A

3    alerted and then traced it to the back of the vehicle.

4    Q.  Okay.  So you believe that's what happened?

5    A.  Yes, sir.

6    Q.  But your report doesn't specifically say that.

7    A.  My report says that when he began his immigration

8    inspection I began a free air sniff of the vehicle and Jessy-A

9    immediately alerted.

10   Q.  Do you conduct open air sniffs on all vehicles?

11   A.  Yes.

12   Q.  And Jessy-A is trained to also alert or indicate to

13   narcotics?

14   A.  Jessy is trained to alert to the odors of narcotics and the

15   derivatives.

16   Q.  Okay.  The odors of narcotics and its derivatives.

17   A.  Yes, sir.

18   Q.  Okay.  So when Jessy-A, I guess, alerted or indicated, you

19   did not know exactly what she had alerted to; correct?

20   A.  Jessy alerted -- Jessy-A alerted to the odors she's been

21   trained to detect.

22   Q.  Which includes a litany of --

23   A.  Which could be concealed humans or narcotics or their

24   derivatives -- the odors of narcotics or their derivatives.

25   Q.  Okay.  So why was she used in this case, Jessy-A?

1    A.   Jessy-A is a tool used by many law enforcement agencies to

2    detect concealed humans or the odors of narcotics or their

3    derivatives.

4    Q.   And that's why she was used in this case?

5    A.   She was used because that was her assignment for the day.

6    Q.   And that assignment is given to you?

7    A.   Yes, sir.

8    Q.   As her handler; right?

9    A.   As her handler, yes.

10   Q.   And who gives you that assignment?

11   A.   The supervisors at the Casa Grande Border Patrol Station.

12   Q.   And who is your supervisor?

13   A.   That day I could not tell you.

14   Q.   You were aware that Miss McCowan was stopped earlier that

15   morning?

16   A.   I was not aware of it at the time.

17   Q.   You were not aware that Agent Goodin had stopped her?

18   A.   No, sir.

19   Q.   You were not aware that she was detained for approximately

20   40 minutes?

21   A.   No, sir, I was not.

22   Q.   And that a canine went around her vehicle --

23   A.   Once again, no, sir.

24   Q.   Okay.  You were not aware that that canine did not alert?

25   A.   Once again, no, sir.

Mark Metheny – Cross-Examination

1   Q.  Okay.  And you've been with a canine for four years, you

2   said?

3   A.  Approximately five-and-a-half years as of now.  So at that

4   time five years.

5   Q.  And always with Jessy-A?

6   A.  Yes, sir.

7   Q.  Okay.  And you have -- are you updated on trainings with

8   Jessy?

9   A.  Yes, sir.

10  Q.  Okay.  Are you aware of any tests that show that almost all

11  U.S. currency is tainted with the odor of illegal drugs?

12  A.  No, sir.

13  Q.  Does Jessy-A alert to the odor of narcotics when there are

14  no narcotics in the car?

15  A.  Jessy-A alerts to the odors of narcotics and their

16  derivatives and concealed humans.

17  Q.  So if -- let me ask you a question.  Have you ever been in

18  a situation where your canine alerted to -- obviously because

19  there was some smell that she's trained to alert to and there

20  was nothing in the car?

21  A.  Jessy is trained to alert to the odors of the narcotics and

22  their derivatives.  We classify it as a nonproductive alert.

23  Jessy tells us that the odors of narcotics or their derivatives

24  or the concealed humans, the odor is there, but we may not be

25  able to produce that.  Maybe the odor -- maybe the narcotics or

UNITED STATES DISTRICT COURT

1    the concealed people have been removed, but those odors are

2    still there for the canine.

3    Q.  Okay.  So would you agree that it's impossible to know what

4    your canine is smelling then, before you open the trunk, for

5    example?

6    A.  When my canine alerts I know that she's alerting to the

7    odors she's been trained to detect.

8    Q.  Is it true that she can be alerting to dog food?

9    A.  No.

10   Q.  Okay.  Could she be alerting to what's called residual

11   odor?

12   A.  Those are the odors of the narcotics or of their

13   derivatives.

14   Q.  Okay.  So if there was packaging of narcotics but no

15   narcotics, she could be alerting to that if there were smells

16   from the narcotics?

17   A.  If the odors of the narcotics or their derivatives were on

18   the packaging, then she could alert to that.

19   Q.  Okay.  It's true that you can't read your dog's alert; is

20   that correct?

21   A.  I can read my dog's alert.

22   Q.  Okay.  Was there video of this particular alert?

23   A.  No, sir.

24   Q.  Is there ever video at any checkpoint?

25   A.  I believe some checkpoints have video cameras.

Mark Metheny – Cross-Examination

1   Q.  But not this checkpoint?

2   A.  We were in a temporary checkpoint at the moment while they

3   were constructing the canopy, so they'd moved it up the road so

4   they could construct the canopy.  At the site we were at prior

5   had the video cameras.

6   Q.  Okay.  Does Jessy receive a treat every time she alerts?

7   A.  No, sir.

8   Q.  Does she receive a toy every time she alerts?

9   A.  She receives the toy, yes.

10  Q.  Okay.  So she receives a toy but not a treat?

11  A.  When she -- when she has a productive alert.

12  Q.  Okay.  Do you know what the field detection rate is for the

13  canine, for Jessy-A?

14  A.  No, sir.

15  Q.  Does Jessy-A alert to receive praise?

16  A.  No.

17  Q.  Are you able to -- well, does Jessy alert -- inadvertently,

18  in other words, you don't intentionally do something -- but

19  unintentionally can you do something for her to alert?

20  A.  No, sir.

21         MR. GONCALVES:  Okay.  Could I have just one moment,

22  Your Honor?

23         THE COURT:  Sure.

24         MR. GONCALVES:  No further questions, Your Honor.

25         THE COURT:  Any redirect?

UNITED STATES DISTRICT COURT

───── **Mark Metheny – Redirect Examination** ─────

1          MS. MALONEY:  Yes, briefly.

2                     REDIRECT EXAMINATION

3    BY MS. MALONEY:

4    Q.  Agent Metheny, can you define a productive alert for us?

5    A.  A productive alert is where we are able to find the

6    narcotics or the concealed humans within the area where Jessy

7    alerted.

8    Q.  And is there any reason why you would give her a toy rather

9    than a treat when she -- when there is a productive alert?

10   A.  Jessy is trained to find the odors of the narcotics and

11   their derivatives or concealed humans.  She is, in turn,

12   looking for her toy to play.  And she only receives that toy

13   and her praise and her play when she has a productive alert,

14   when we find concealed humans or if we find the narcotics.

15   Q.  You testified that this -- that this event occurred at

16   shift -- at shift change.  In your experience do alien

17   smuggling organizations and drug trafficking organizations try

18   to exploit shift change by sending a load through?

19   A.  Yes, ma'am.

20   Q.  And do you see the driver of the vehicle at issue in this

21   case, do you see her in the courtroom today?

22   A.  Yes, ma'am.

23   Q.  Could you identify her by an article of clothing?

24   A.  She's wearing a red T-shirt.

25          MS. MALONEY:  And, Your Honor, may the record reflect

UNITED STATES DISTRICT COURT

─── **Mark Metheny – Cross-Examination** ───

1    that the witness identified the defendant?

2         THE COURT:  Yes, it will.

3         MS. MALONEY:  Thank you.  We have no further

4    questions.

5         THE COURT:  I had a question.

6                    CROSS-EXAMINATION

7    BY THE COURT:

8    Q.  You had mentioned when you do these open air or free air

9    sniffs you walk the dog around the vehicle, and I think you

10   said you start on the passenger side at the front headlight?

11   A.  Yes, ma'am -- yes, sir.  I'm sorry.

12   Q.  Why do you do it that method?

13   A.  As you can see in the pictures, we have minimal protection

14   on the center of the highway.  Those plastic barriers, three

15   quarters of them are not even filled with water, they're just

16   very lightweight plastic barriers.  The other agent is standing

17   there in that small gap, it's what we call a reactionary gap to

18   be able to get out of the way if a driver were to come into

19   close proximity to them.

20         To put a canine over there or try to bring it in

21   between the barriers and that other agent, or even get out of

22   the way of oncoming traffic, would be almost impossible.  So

23   for her safety I start her on the passenger side and walk

24   around, and never walk her in front of the vehicle unless she

25   traces an odor to the front.

1   Q.  Okay.  So I guess that was my question.  So I guess my

2   question was, why not just start in the back where things would

3   most likely be found?

4   A.  You could find the narcotics or concealed humans anywhere

5   in the vehicle.  This way she gets a free air sniff on almost

6   the whole vehicle by starting on the front headlight and walk

7   around, as to not interfere with the primary inspection agent

8   as well.

9   Q.  But -- well, maybe I'm -- I don't realize the intricacies

10  of human smuggling, but are there -- in a vehicle like this,

11  isn't the only place to hide somebody in the trunk?

12  A.  You could hide them in seats, cushions.  You could hide

13  them in the dashboard.  You could hide them numerous places in

14  a vehicle, in any voids.  I've seen people use humans as seats

15  in the vehicle, the front seat will be sitting on a person

16  covered with a blanket.  They remove the seats out and -- the

17  bottom parts of the seat, and they're actually sitting on the

18  smuggled subject.

19  Q.  Then how would you -- well, I'm just curious, how would you

20  distinguish -- how would the dog distinguish, maybe you can't

21  answer it, between the person who is driving and the person

22  who's under the seat cushions?

23  A.  That's a question nobody really knows an answer to.

24          THE COURT:  Only the dog knows.  Okay.  Okay.  Thank

25  you.

1          All right.  Thanks very much.

2          MS. MALONEY:  Your Honor, may I ask a follow-up

3    question?

4          THE COURT:  Sure.  I'm sorry, I should have asked

5    that.

6       (Discussion held off the record.)

7                    RE-REDIRECT EXAMINATION

8    BY MS. MALONEY:

9    Q.  Agent Metheny, does Jessy-A alert to every vehicle that

10   comes through the checkpoint?

11   A.  No, ma'am.

12   Q.  Is that one way you know that she -- that she's trained not

13   to alert to visible humans?

14   A.  Yes.

15   Q.  And in your experience if the canines weren't able to

16   distinguish between concealed humans and visible humans, would

17   most if not all vehicles going -- these thousands of vehicles

18   going through the checkpoints, would the -- would the dog alert

19   and they would -- and they would be stopped?  Would the dog

20   alert, I guess, to all these thousands of vehicles?

21   A.  Yes.

22          MS. MALONEY:  Okay.  Thanks.

23          Nothing further.

24          THE COURT:  Do you have any questions?

25          MR. GONCALVES:  No, Your Honor.

Mark Metheny – Re-Redirect Examination

1          THE COURT:  Okay.  Okay.  Thank you, Agent.

2          And again, the Rule of Exclusion has been invoked,

3   which means that you can't talk to anybody about your testimony

4   except the lawyers.  And you can take off.

5          THE WITNESS:  Thank you.

6          THE COURT:  Okay.  So you have Mr. McLaughlin as your

7   final agent?

8          MS. HEPFORD:  Yes, Your Honor.  And we anticipate he

9   might take a while.  This might be a good time to take a break

10  for the afternoon.

11         THE COURT:  Great.  That would be good.

12         The other thing is, I probably need to end for my

13  purposes, and frankly the marshals' purpose in transport, at

14  4:30 today.  So if we're not going to get done by 4:30, Silvia

15  gave me some dates, we could finish this Thursday afternoon.

16  That was a date that worked for everybody?

17         MS. HEPFORD:  That's right, Your Honor.

18         MR. GONCALVES:  That works for me, Your Honor.

19         THE COURT:  Okay.  So why don't we just plan on that

20  if we don't get done this afternoon, is we'll come back on

21  Thursday afternoon to finish it up.

22         But let's take an afternoon break right now.

23         MS. HEPFORD:  Thank you, Your Honor.

24      (Recess taken.)

25         THE COURT:  All right.  Well, let's get started.  Are

UNITED STATES DISTRICT COURT

─────────── **John McLaughlin – Direct Examination** ───────────

1    you all ready?

2              MR. GONCALVES:  Yeah.

3              THE COURT:  Okay.

4              MS. HEPFORD:  Yes.  The Government calls John

5    McLaughlin to the stand.

6              THE COURT:  Okay.  Come on forward, sir.

7              We are recording; right?

8         (JOHN MCLAUGHLIN, GOVERNMENT WITNESS, SWORN.)

9              THE CLERK:  Thank you.

10             MS. HEPFORD:  I believe there's water and cups up

11   there if you need it.

12             THE WITNESS:  Okay.

13                       DIRECT EXAMINATION

14   BY MS. HEPFORD:

15   Q.  Would you please state your name and spell it for the

16   record?

17   A.  Special Agent John McLaughlin, M-C-L-A-U-G-H-L-I-N.

18   Q.  Where are you employed, Special Agent McLaughlin?

19   A.  With Homeland Security Investigations in Sells, Arizona.

20   Q.  How long have you -- well, first of all, how long have you

21   been a Special Agent with Homeland Security?

22   A.  Since February of 2016.

23   Q.  And you said you're assigned to Sells?

24   A.  That's correct.

25   Q.  Have you been assigned to Sells the entirety of your time

1    with Homeland Security Investigations?

2    A.  Yes.

3    Q.  And what did you do prior to working with -- if I can call

4    it HSI?

5    A.  I was a deportation officer with Immigration and Customs

6    Enforcement for about eight years.  And prior to that I was

7    with the United States Border Patrol for about eight-and-a-half

8    years.

9    Q.  And where were you assigned during each of those

10   employments?

11   A.  With ERO I was a deportation officer in Florence and

12   Tucson, and with the Border Patrol in Douglas and in Naco.

13   Q.  Have you conducted criminal investigations in the course of

14   your law enforcement career?

15   A.  I have.

16   Q.  And what types of investigations have you conducted?

17   A.  Human smuggling, arms trafficking, narcotics smuggling,

18   immigration violations, fugitives.

19   Q.  Tell us briefly about your training to become a law

20   enforcement -- law enforcement agent?

21   A.  I graduated from the criminal investigator training program

22   at Glynco at the Federal Law Enforcement Training Center, as

23   well as the HSI Special Agent Basic Training.  And I also

24   attended the Border Patrol Academy.

25   Q.  And how many weeks of training are each of those?

John McLaughlin – Direct Examination

1   A.   The HSI, between the criminal investigator school and the

2   HSI school is 26 weeks.  And the Border Patrol Academy was

3   about 20 weeks.

4   Q.   You mentioned some of the types of crimes you've

5   investigated.  Have you been involved in the seizures of

6   illegal narcotics?

7   A.   Yes.

8   Q.   And through your work have you become familiar with modes

9   and methods used by drug trafficking organizations?

10  A.   Yes.

11  Q.   In particular, in the area around Sells, and even to

12  include the Tohono O'odham Nation?

13  A.   Yes.

14  Q.   I'd like to direct your attention to May 1st of this year.

15  Were you on duty that day?

16  A.   I was.

17  Q.   And were you contacted by Border Patrol about a marijuana

18  seizure on that date at the Federal Route 15 checkpoint?

19  A.   Yes.

20  Q.   And did you respond?

21  A.   I did.

22  Q.   And where did you respond to?

23  A.   The Casa Grande Border Patrol Station.

24  Q.   Did you have to drive in from another location?

25  A.   Yes, I was, I believe, coming from the Sells office.

UNITED STATES DISTRICT COURT

John McLaughlin – Direct Examination

1   Q.   So about how long of a drive is that?

2   A.   Probably anywhere between an hour and 15 minutes and an

3   hour and a half.

4   Q.   Did it take approximately that long to get there on that

5   date?

6   A.   Yes.

7   Q.   And had someone been arrested in connection with that

8   marijuana seizure?

9   A.   Yes.

10   Q.   Who?

11   A.   The defendant, Janice McCowan.

12   Q.   Was anyone else with you when you responded to the

13   Casa Grande Station?

14   A.   Special Agent Justin Edgecombe and Special Agent Eric Ford.

15   Q.   And are they both with HSI as well?

16   A.   Yes.

17   Q.   Why were there three agents that responded on that

18   particular day?

19   A.   If I remember correctly I was the duty agent, but Special

20   Agent Edgecombe was new to the office.  And frequently they'll

21   -- supervisors will assign a new agent to accompany other

22   agents to go learn how to do investigations.

23   Q.   And when you say "duty agent," what does that mean?

24   A.   Basically if any narcotics calls come in from either Border

25   Patrol or, you know, Tohono O'odham PD, or anything within our

John McLaughlin – Direct Examination

1  area of responsibility, I'll be the one that takes the phone

2  call for it.

3  Q.  And does your duty time cover a particular period of time?

4  A.  It's usually about -- it's usually a week at a time.

5  Q.  Okay.  So did you and Agents Ford and Edgecombe conduct an

6  interview of the defendant Janice McCowan on May 1st, 2017?

7  A.  Yes, we did.

8  Q.  And did that interview take place at the Casa Grande Border

9  Patrol Station?

10  A.  It did.

11  Q.  Do you see the person you know as Janice McCowan that you

12  interviewed on that date here in court today?

13  A.  Yes.

14  Q.  Would you please point her out by an article of clothing

15  she's wearing?

16  A.  She's wearing red.

17  Q.  Where is she seated?

18  A.  At the defense table.

19      MS. HEPFORD:  Would the record reflect the witness has

20  identified the defendant?

21      THE COURT:  Yes.

22  BY MS. HEPFORD:

23  Q.  Agent McLaughlin, approximately what time did you initiate

24  the interview with the defendant?

25  A.  I'm not sure.  I know it was in the afternoon.

1   Q.  Do you happen to know how long after her arrest you

2   interviewed the defendant?

3   A.  I believe it was within a couple of hours.

4   Q.  And what was the purpose of the interview with the

5   defendant?

6   A.  Well, my group investigates narcotics smuggling primarily

7   on the Tohono O'odham Nation, so basically to find out why she

8   picked up it, who she was working for, if there was a certain

9   organization.  We generally respond to the checkpoint calls for

10  Border Patrol to further our investigations, because they're

11  usually related to many of the investigations we have on the

12  Tohono O'odham Nation.

13  Q.  So is it fair to say you were there to gather facts --

14  A.  Yes.

15  Q.  -- surrounding this seizure?

16  A.  Yes.

17  Q.  And all three of you -- you, Agents Ford and Edgecombe --

18  were present with the defendant at the interview?

19  A.  Correct.

20  Q.  Did you record the interview?

21  A.  Yes.

22  Q.  Audio or video or both?

23  A.  It was audio.

24  Q.  And was a transcript prepared of that audio recording?

25  A.  For today, yes.

─── **John McLaughlin – Direct Examination** ───

1          MS. HEPFORD:  Your Honor, may I approach the witness?

2          THE COURT:  Sure.

3   BY MS. HEPFORD:

4   Q.  Sir, handing you Government's Exhibits 10 and 11.  Do you

5   recognize those items?

6   A.  Yes.

7   Q.  What is Exhibit 10?

8   A.  Exhibit 10 is a CD of the interview.

9   Q.  And have you -- is it on disk?

10  A.  Yes, it's on a CD.

11  Q.  Well, if it does say CD, my apologies.

12  A.  DVD, I'm sorry.

13  Q.  And have you had the opportunity to listen to the recording

14  on that disk?

15  A.  I have.

16  Q.  Prior to coming to court today?

17  A.  Yes.

18  Q.  And how do you know you've listened to that particular

19  disk?

20  A.  Because my initials and date are on it.

21  Q.  Did you also have the opportunity to review the transcript

22  that's in Exhibit 11?

23  A.  I did.

24  Q.  And were you able to review that while listening to the

25  interview recording?

1   A.  Yes.

2   Q.  Now did you yourself prepare the transcript in Exhibit 11?

3   A.  No.

4   Q.  Nevertheless, is Exhibit 11 a fair and accurate rendition

5   of the recording in Exhibit 10?

6   A.  Yes.

7   Q.  And is Exhibit 10 a fair and accurate recording of the

8   interview with the defendant that took place between her and

9   Agents Ford, Edgecombe, and yourself on May 1st of this year?

10  A.  Yes.

11          MS. HEPFORD:  Your Honor, the Government moves to

12  admit Exhibits 10 and 11 into evidence.

13          THE COURT:  Any objection?

14          MR. GONCALVES:  No, Your Honor.

15          THE COURT:  Okay.  So 10 and 11 will be admitted.

16      (Exhibit Nos. 10 and 11 admitted into evidence.)

17          MS. HEPFORD:  And, Your Honor, at this time I would

18  like to play the recording of the defendant's interview in

19  Exhibit 10.

20          THE COURT:  Okay.

21      (Exhibit 10 played.)

22          MS. HEPFORD:  Are you able to hear that okay,

23  Your Honor?

24          THE COURT:  Yes.

25          MS. HEPFORD:  Thank you.

1        (Exhibit 10 played.)

2        THE COURT:  I think this will conclude our broadcast

3   day.  And we will reconvene Monday, which I understand is good

4   for you all, at 1:30.  I have all afternoon.  Which is next

5   Monday, I guess, a week from today at 1:30.  And that will be

6   in courtroom 3A.

7        That work for you, sir?

8        THE WITNESS:  Yes, sir.

9        THE COURT:  Okay.

10        MS. HEPFORD:  Thank you for your time.

11        THE COURT:  Hopefully there's one less electronic

12   device you have to bring on Monday, since we got the recording

13   done.

14        Okay.  Miss McCowan, it's been a long day for you.  I

15   know you were woken up early to be transported, so let's get

16   you back and we'll -- I'll see you next Monday.  Okay?

17        All right.  Thank you.

18        MS. HEPFORD:  Thank you.

19

20                              -oOo-

21

22

23

24

25

CR-17-839-TUC-CKJ-EJM – December 11, 2017

1

2

3

4                    C E R T I F I C A T E

5

6        I, CANDY L. POTTER, court-approved transcriber,

7   certify that the foregoing is a correct transcript from the

8   official electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11        DATED at Phoenix, Arizona, this 15th day of December,

12   2017.

13

14

15

16                              s/Candy L. Potter__
                                Candy L. Potter
17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT