IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | ) | CR 17-00839-TUC-CKJ(EJM) |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| Janice Ann McCowan, | ) | |
| Defendant. | ) | |
| | ) | |

Pending before the Court are the defendant's Motion to Suppress Evidence obtained in violation of the Fourth Amendment [Doc. 58.] and Motion to Suppress Statements obtained in violation of the Fifth Amendment. [Doc. 59.]   The defendant argues that the narcotics found in her vehicle at a United States Border Patrol checkpoint should be suppressed for three reasons: (1) the checkpoint's primary purpose was not related to immigration inspections; (2) the canine that detected the narcotics was not reliable; and (3) the defendant was detained longer than necessary to conduct an immigration inspection for the sole and unlawful purpose of utilizing the canine to detect for drugs.  The defendant argues that her statements were involuntary and should be suppressed because they were obtained based on inducements and promises made to her by law enforcement.  For the reasons detailed below, it is recommended that the District Court deny both motions.

## FACTUAL BACKGROUND

On May 1, 2017, the defendant, Janice McCowan, was arrested for possessing with the intent to distribute marijuana.   A criminal complaint dated May 2, 2017 details the circumstances that led for her arrest.   At approximately 1:30 p.m. on May 1, 2017, the

defendant arrived in her vehicle at the Border Patrol Checkpoint located on Federal Route 15 near North Komelik, Arizona, which is on the Tohono O'odham Indian Reservation. When the defendant handed the Border Patrol agent her identification, he noticed that her hand was shaking and she spoke rapidly. The agent attributed those actions to nervousness. A service canine conducted a sniff of the defendant's vehicle and alerted to an odor in the trunk of the vehicle. The defendant was instructed to open the trunk. She provided her keys to an agent who opened the trunk and discovered bundles of marijuana.

In a post-*Miranda* interview, the defendant stated that she was visiting an elderly man that she cares for and had no knowledge of the marijuana in her car. The interview concluded when the defendant requested to have an attorney present. The defendant reinitiated the interview, and waived her right to have an attorney present, while she was being transported to the Federal Correctional Institution in Tucson, Arizona. The defendant then admitted that she agreed to pick up and transport the marijuana in exchange for payment.

The defendant had her initial appearance on May 2, 2017, and was temporarily detained until her formal detention hearing. On May 30, 2017, the defendant was released from custody pursuant to pretrial conditions, including residing at a drug treatment facility. The defendant violated her release conditions when she used drugs prior to being admitted to the treatment facility. She has remained in custody since that violation.

## EVIDENTIARY HEARING

As noted above, the defendant has filed motions to suppress evidence seized from her vehicle and statements she made to law enforcement. An evidentiary hearing on the motions was held on December 11, 2017 and December 18, 2017. The government called five witnesses: (1) Raleigh Leonard, Division Chief, Border Patrol; (2) Paul Du Bois, Special Operations Supervisor/Canine Coordinator, Border Patrol; (3) Chris Brewer, Border Patrol Agent; (4) Mark Metheny, Border Patrol Agent; and (5) John McLaughlin, Special Agent, Homeland Security Investigations. The defense called one witness: the defendant, Janice

McCowan.   The testimony of the witnesses is set forth below.[1]

**1.      Raleigh Leonard**

Raleigh Leonard is employed by the United States Border Patrol, which is an agency within the Department of Homeland Security Customs and Border Protection. (12/11/17 Tr. at 7.)   Agent Leonard began his career with the Border Patrol in 1991 in San Diego, California. (*Id*.)  During his time in San Diego, he was a line Border Patrol Agent (assigned to different tactical groups), a Senior Patrol Agent, the Public Information Officer, and a Supervisory Border Patrol Agent. (*Id*. at 8.)  In 2007, he transferred to the Yuma Sector as an Assistant Chief Patrol Agent. (*Id*.)  He then transferred to the Tucson Sector in 2008 as an Associate Chief and was later promoted to Division Chief in 2010 or 2011. (*Id*. at 8-9.)  He is currently the Acting Deputy Chief Patrol Agent of the El Centro Sector in El Centro, California. (*Id*. at 7.)  In that position, he oversees tactical infrastructure (*e.g*., fencing), technology – such as fixed towers, sensors, and remote video surveillance systems – and the prosecutions department. (*Id*. at 9-10.)

Agent Leonard testified that the Border Patrol's mission is to patrol the lands and coastal borders of the United States to prevent the unlawful entry of people and contraband. (*Id*. at 10.) He explained that the Tucson Sector is responsible for 262 linear miles of border, which amounts to 90,000 square miles of surrounding territory. (*Id*. at 11.)  Within that area of responsibility, there are nine Border Patrol stations, eleven Border Patrol checkpoints, and five forward operating bases. (*Id*.)

Every checkpoint is located on major routes of egress leading away from the border with Mexico, and all checkpoints are within 100 air miles of the border. (*Id*. at 12.)  The checkpoints are one tool utilized to deter and prevent the unlawful entry of people and contraband into the United States. (*Id*. at 13-14.)  Agent Leonard explained that the checkpoints were not built simultaneously; rather, they were built in response to the

---

[1] Citations to "12/11/17 Tr." and "12/18/17 Tr." followed by the page number are to the transcript of the suppression hearing held on December 11, 2017 and December 18, 2017.

- 3 -

movement of transnational criminal organizations to deter illegal activity. (*Id*. at 15.) Thus, the checkpoints are located at strategic locations that benefit the Border Patrol. (*Id*.) But the community impacted by a checkpoint plays a major role in the precise location of a checkpoint. (*Id*. at 16-17.) He further explained that the checkpoints are "all connected" and have "an interdependent relationship with one another." (*Id*. at 15.)

With respect to the checkpoint on Federal Route 15, Agent Leonard testified that it is located on the Tohono O'odham Nation, which presents a sensitive situation for the Border Patrol. (*Id.* at 15-16.) There are sacred sites on this land and cultural sensitivities in that tribal members do not recognize "the border" because the Nation extends to the Sea of Cortez in Mexico. (*Id*. at 15.) Tribal members travel across the border routinely and there is no Port of Entry or fencing. (*Id.* at 15-16.) Thus, the concerns of the Nation played a role in the location of the FR 15 checkpoint in the Village of North Komelik. (*Id*. at 16-19.) The intent of the FR 15 checkpoint was to block off traffic that is coming across the border within the Nation. (*Id*. at 18.)

The FR 15 checkpoint is rudimentary in that there are no utilities, water, or sewage. (*Id.* at 19.) There is now a canopy over both lanes of travel and a metal box, known as a Conex box, off to the east side of the road that has an air conditioner. (*Id*. at 19-20.) There are generators to power lights for the agents at night. (Id. at 20.) The checkpoint is operational 24 hours a day, 7 days a week. (*Id*.) Agent Leonard testified that approximately 200 vehicles (containing approximately 400 people) pass through the FR 15 checkpoint each day. (*Id*. at 20-21.)

When a vehicle approaches the FR 15 checkpoint, the driver would see signs that say "slow down" and that a Border Patrol checkpoint is ahead. (*Id*. at 22.) The speed limit gradually drops as the vehicle gets closer to the checkpoint. (*Id*.) There may be a line of vehicles waiting to clear the checkpoint as the Border Patrol agent does his/her immigration inspection of the occupants of the vehicle. (*Id*.) And there is usually a service canine in and around the vehicles waiting at the checkpoint. (*Id*.) Once the immigration inspection is completed and it is determined that all occupants are legally in the United States, the vehicle

and its occupants are allowed to go on their way.  (*Id*. at 22-23.)  However, if the Border Patrol agent doing the immigration inspection develops a suspicion of criminal activity or further questioning is necessary, a vehicle would be referred to a secondary inspection area for further examination of the vehicle and/or its occupants.  (*Id*. at 22.)  The goal is for all vehicles traveling northbound on FR 15 to be stopped and the occupants inspected.  (*Id.* at 23.)  The only exception is where a public safety issue -- like where traffic is backed up near a curve in the road that creates a blind spot -- requires vehicles simply to be waved through the checkpoint.  (*Id*.)

With respect to the use of canines at a checkpoint, Agent Leonard testified that there are 14 service canines assigned to the Casa Grande station that operates the FR 15 checkpoint.  (*Id*. at 24.)  The canines are trained to detect the odors of concealed humans, narcotics, and their derivatives.  (*Id*.)  Some of these canines are also tracking and trailing canines.  (*Id*. at 25.)  He explained that the canines are multi-disciplined for economy of purpose – there are a finite number of canines and they work at areas other than the checkpoint.  (*Id*.)

Notwithstanding the use of canines, alien smuggling organizations still try to get illegal aliens through the checkpoint in vehicles.  (*Id*.)  Agent Leonard testified that two to three times per week illegal aliens will be found in vehicles at the various checkpoints, often times in the trunk of the vehicle.  (*Id*.)  With respect to the FR 15 checkpoint specifically, Agent Leonard requested statistics from the Office of Chief Counsel regarding immigration and narcotic events/arrests at this checkpoint for a six-month period before and after the defendant's arrest on May 1, 2017.  (*Id*. at 28-29.)  For the six-month period prior to the defendant's arrest (11/1/16 to 5/1/17), there were four immigration-related events and 14 immigration-related offenses as a result of those four events; there were 9 narcotic events and 13 narcotic arrests resulting from those events.  (*Id*. at 30.)  For the six-month period after the defendant's arrest (5/1/17 to 11/1/17), there were four immigration-related events and 8 immigration-related arrests resulting from those events; there were three narcotic events and 6 narcotic arrests resulting from those events.  (*Id*. at 32.)  Agent Leonard explained that the

narcotic event/arrests are classified as non-immigration related when the people arrested are either United States citizens or Legal Permanent Residents. (*Id*. at 32-33.)

Although the number of immigration and narcotic events/arrests during this one-year time period are almost equal, Agent Leonard testified that the statistics do not alter the purpose and objective of the checkpoint, which is to conduct immigration inspections. (*Id*. at 33-34.) Agent Leonard acknowledged that Border Patrol agents are trained in conducting narcotic investigations and have the authority to make narcotics-related arrests. (*Id*. at 47-48.) But he explained that "anything that happens after that immigration inspection is incidental to the primary purpose, intent and objective of the checkpoint." (*Id*. at 34.) He further explained that the checkpoints "have an interdependent relationship with our technology, our tactical infrastructure, and the immediate border." (*Id*. at 35.) The Border Patrol does not have enough resources to keep everyone from entering the United States illegally, so layers of enforcement activities are used to apprehend people who have crossed the border illegally. (*Id*.) In addition to deterrence, the checkpoints push alien smuggling into other areas where it can be more easily detected by other Border Patrol resources. (*Id*. at 35-36.)

There was no cross-examination of Agent Leonard.

**2.      Paul Du Bois**

Paul Du Bois started with the Border Patrol in 1999 in the Tucson Sector. (*Id.* at 53.) In 2002, he was selected for the Search Trauma and Rescue Team and became the supervisor of that team in 2008. (*Id.*) He was promoted to the Supervisor Canine Coordinator for the Tucson Sector in 2009. In terms of his experience in working in the canine unit, he explained that he started in the canine program in 2004, first as a search and rescue handler, and then in 2007 he became a search and rescue tracking and trailing canine instructor. (*Id*.) In 2008, he became a human remains detection instructor, and in 2010 became a detection certified instructor for the Border Patrol. (*Id*.) He has taught canine training programs to instructors as well as canine handlers, and has received a number of different certifications related to canine training. (*Id*.) He still has his own canine and works with his canine in addition to

his supervisory responsibilities. (*Id*. at 54.)

His day-to-day duties involve program management, specifically, oversight of all the canine teams operating within the Tucson Sector of the Border Patrol. (*Id*.) He has oversight over the training of the canine teams, and estimates that there are over 100 teams in the Tucson Sector (divided up among the nine Border Patrol stations). (*Id*.) Agent Du Bois testified that it is a rigorous process for an agent to become a canine handler. (*Id*. at 55.) If an agent makes it through the two-tier interview process, s/he attends a national training, which is a seven-week course. (*Id*. at 55-56.) There is an academic portion and a psychomotor portion where the handler is performing exercises with the canine and is evaluated. (*Id*. at 56.) If the agent successfully completes the training, s/he is certified as a canine handler. (*Id.*) However, the handler still has to engage in regular or maintenance training (16 hours per month) with the Border Patrol. (*Id*. at 60-61.)

Agent Du Bois's testimony turned to the Performance Standard Score Sheets, commonly referred to as "Green Sheets," that are created for the bi-weekly training sessions at the Border Patrol. (*Id*. at 62.) Both the canine and the handler are graded, individually and as a team, and a numerical score is assigned to various categories (*e.g.*, search skills, voice tone, speed, communication skills, problem solving, presentation, control, competence). (*Id.* at 64-66.) The grades range from 1 (good) to 6 (bad). (*Id*. at 69.) The canine team is required to obtain a total score of 3.5 or less to continue in service. (*Id*. at 69.) Basically, the Green Sheets are used to score the team's proficiency in search scenarios; they are reviewed quarterly. (*Id*. at 66, 70.)

Agent Du Bois was asked to review the Green Sheets for Agent Metheny and canine Jessy-A, the canine team involved in the case at hand. (*Id.* at 62; Ex. 9.) The team obtained a score lower than the 3.5 required for their yearly certification. (12/11/17 Tr. at 69, 71, Ex. 8; Ex. 9.) Based on his review of the Green Sheets for this team over the course of a year, Agent Du Bois is of the opinion that the team is credible and reliable. (12/11/17 Tr. at 71-72, 79.)

Finally, Agent Du Bois testified as to the difference between an alert and an indication

by a canine. (12/11/17 Tr. at 73.) He described an alert as a reflex or involuntary response, such as a change of body posture and increased respiration, when the canine first encounters an odor it is trained to detect. (*Id*.) An indication is a trained voluntary behavior that pinpoints the source of the odor. (*Id*.) Generally, there are three accepted indications for a Border Patrol canine, which are all considered passive. (*Id*. at 75.) The canine could sit, lay down, and/or point to the source of the odor. (*Id.*) Agent Du Bois also described "cuing," which can occur if the canine handler knows the outcome of the scenario (*i.e.,* where something is hidden) and consciously or subconsciously cues the dog into an indication (usually sitting). (*Id*. at 80.) Conversely, a handler cannot cue if s/he has no knowledge of where an item is hidden or concealed. (*Id*. at 80-81.) Agent Du Bois explained that handlers are sensitive to and trained to avoid cuing behavior. (*Id*. at 80.) Agent Du Bois also explained that all Border Patrol canines are cross-trained to detect the odor of narcotics and concealed humans. (*Id*. at 82.) As Agent Leonard explained, the reason for cross-certification is "economy of purpose" - *i.e.*, there are a finite number of service canines. (*Id*. at 82-83.)

On cross-examination, Agent Du Bois was asked if a handler could command a canine to only alert to a particular odor. (*Id*. at 84-85.) Agent Du Bois explained that a handler cannot command a dog to alert because it is an involuntary behavior. (*Id*. at 85.) If a dog does alert, it is not specific to drugs or a concealed human; rather, the alert is to an odor the dog was trained to detect (again, usually drugs or concealed humans). (*Id*. at 86.)

**3.      Chris Brewer**

Chris Brewer is a Supervisory Border Patrol Agent at the Casa Grande station. (*Id*. at 88.) He has worked for the Border Patrol for over 16 years. (*Id*.) He has worked at various Border Patrol checkpoints over the course of his career, including the FR 15 checkpoint. (*Id*. at 89-90.) When working as the primary inspector at a checkpoint, an agent watches vehicles as they approach the checkpoint and then questions the vehicle's occupants regarding immigration status. (*Id*. at 91.) If Agent Brewer is handed an identification document by an individual, he examines the document to ensure it is valid. (*Id*. at 92.)

- 8 -

Because the FR 15 checkpoint is on tribal land, he may also question the individuals about where they were and where they are headed. (*Id.*) Agent Brewer testified that canine free air sniffs are done simultaneous with the immigration inspection. (*Id.* at 93.)

On May 1, 2017, Agent Brewer was supervising and working at the FR 15 checkpoint. (*Id.* at 97.) He started his shift around noon and arrived at the checkpoint around 1:00 p.m. (*Id.*) When he arrived, he assumed primary inspection duties. (*Id.*) Agent Brewer saw the defendant's vehicle as she approached the checkpoint. (*Id.*) Traffic was very light that day, and there were no vehicles behind the defendant's vehicle. (*Id.* at 100.) Agent Metheny, a canine handler, was also working at the checkpoint. (*Id.*) As the defendant's vehicle was approaching, Agent Metheny got his canine out of his vehicle to conduct a free air sniff while Agent Brewer conducted the primary inspection. (*Id.* at 97-98.)

When the defendant arrived at the primary inspection area, she handed Agent Brewer a Colorado River Indian identification. (*Id.* at 98.) He testified that her hand was shaking as she handed him the identification document and she was speaking rapidly. (*Id.*) Agent Brewer testified that most people he encounters at that checkpoint are local residents or people who work on the reservation, and it is rare when United States citizens provide agents with identification documents. (*Id.* at 101.) Agent Brewer did not recognize the defendant as a local resident so he asked her where she was coming from and what she was doing in this area. (*Id.* at 101.) As Agent Brewer was speaking with the defendant, Agent Metheny indicated to him that the canine alerted to the rear part of the vehicle. (*Id.* at 99.) As a result, Agent Brewer asked the defendant to open the trunk. (*Id.*) The defendant told Agent Brewer that she had been stopped earlier that day and agents had already inspected her. Agent Brewer told the defendant that he still needed to look in the trunk because the dog had alerted to her vehicle. (*Id.*) Agent Brewer believes that Agent Metheny also told the defendant the dog had alerted. (*Id.*) The defendant ultimately handed her keys to Agent Brewer, who opened the trunk and found eight bundles of marijuana. (*Id.*)

On cross-examination, defense counsel pointed out that Agent Brewer's report noted that he thought the defendant was nervous because her hand was shaking and she was

- 9 -

speaking rapidly. (*Id*. at 101-102.) Agent Brewer acknowledged that he had never seen the defendant prior to May 1, 2017, and did not know her mannerisms. (*Id*. at 104.) He also acknowledged that many people who are not doing anything illegal get nervous when talking with law enforcement. (*Id*. at105.) Agent Brewer conceded that his report does not specify when the canine team began their inspection of the defendant's car or when the canine alerted. (*Id*. at 108.) However, Agent Brewer reiterated that the canine alerted while he was conducting his primary immigration inspection of the defendant. (*Id*.)

Agent Brewer testified that he was not aware that the defendant had been stopped by law enforcement earlier that day until she told him she had been stopped. (*Id*. at 110.) After he had arrested the defendant and taken her to the station, he learned that she had been stopped earlier that day by a Border Patrol agent and that a canine was called to search her vehicle. (*Id*. at 111.)

**4.    Mark Metheny**

Agent Metheny has been a Border Patrol agent for almost 15 years and has spent his entire career at the Casa Grande station. (*Id*. at 114.) He has been a certified canine handler for the past five-and-a-half years. (*Id*.) The training he received to become a canine handler is consistent with the testimony of Agent Du Bois. (*Id*. at 115-116.) Agent Metheny has been working with his canine, Jessy-A, on a daily basis since 2012. (*Id*. at 116.) Agent Metheny and Jessy-A are required to obtain a yearly certification, and they have always obtained the required certification. (*Id*. at 116-117.)

Agent Metheny explained how a free air sniff of a vehicle is conducted and how the canine can respond. (*Id*. at 117.) The canine team walks around a vehicle and then sniffs the free air around the vehicle. (*Id*.) Agent Metheny starts the free air sniff at the front passenger side headlight and walks toward the rear of the vehicle and around to the other side of the vehicle. (*Id*. at 119.) This process takes a matter of seconds and the goal is to conduct the free air sniff in about the same time it takes for another agent to conduct the primary immigration inspection. (*Id*.) An "alert" by a canine is a change in the canine's posture and increased respiration when the canine first encounters an odor s/he has been trained to detect.

(*Id*. at 117.)  Agent Metheny described an alert as a subconscious reaction that a properly trained canine cannot control.  (*Id*. at 118.)  When Jessy-A alerts, her mouth closes, her breathing gets deeper, her back and tail get more rigid, and her ears perk up. (*Id*.)  An "indication" is when the canine sits (in the case of Jessy-A) at the strongest concentration of the trained odor.  (*Id*. at 118-119.)

Agent Metheny and Jessy-A were working at the FR 15 checkpoint on May 1, 2017. (*Id*. at 122.)   Their assignment was to perform free air sniffs on the vehicles as they approached the primary inspection area; also, free air sniffs would be performed at the secondary inspection area if a vehicle is referred to that area because of some suspicion of illegal activity. (*Id*. at 119.)  When Agent Metheny saw the defendant's vehicle approaching the checkpoint, he got Jessy-A out of her air-conditioned kennel in his vehicle and brought her over to the primary inspection area.  (*Id*. at 123.)   He described the traffic at the checkpoint as very slow that day.  (*Id*. at 125.)   As Agent Brewer began his immigration inspection, Agent Metheny and Jessy-A started the free air sniff of the vehicle. (*Id*. at 123.) Jessy-A almost immediately alerted to an odor she was trained to detect and then indicated at the strongest source the odor, which was the trunk of the vehicle.  (*Id*.)  The free air sniff, the alert, and the indication took a matter of seconds.  (*Id*.)  Agent Metheny advised Agent Brewer, who was speaking with the defendant, that Jessy-A had alerted and indicated at the trunk.  (*Id*. at 123-124.)

When Agent Brewer told the defendant he needed to search the trunk, she became irate and started yelling that she had already been through this and was not going to let him look in the trunk.  (*Id*. at 124.)   At that time, Agent Metheny did not know that the defendant's vehicle had previously been stopped and searched.  (*Id*.)  Agent Metheny told the defendant the canine alerted and indicated to the trunk and, as such, agents had probable cause to search and needed her keys.  (*Id*. at 125.)  The defendant provided the keys to Agent Brewer who opened the trunk and found eight bundles of marijuana.  (*Id*.)

On cross-examination, defense counsel pointed out that Agent Metheny put in his report that the defendant looked nervous and was looking around as if she was looking to see

if the canine was out. (*Id*. at 126.)  Agent Metheny testified that he made note of those facts because he has to be constantly vigilant and watch a driver's actions when bringing his canine into the traffic lane at the primary inspection area. (*Id*. at 127-128.)  He did acknowledge that his comment that the defendant appeared to be looking to see if the canine was out was his subjective interpretation of her actions, but added that he drew that conclusion based on his experience working at the checkpoint. (*Id*. at 128-129, 131.)  He also acknowledged that his report does not specify whether Agent Brewer had finished his immigration inspection before or after Jessy-A alerted. (*Id*. at 132-133.)  However, he testified that he began his free air sniff when Agent Brewer began his immigration inspection. (*Id*. at 133.)  In fact, he believes that Jessy-A alerted before Agent Brewer even finished his first question put to the defendant. (*Id*. at 134.)  Agent Metheny testified that Jessy-A is cross-trained to alert and indicate to narcotics and concealed humans; thus, her alert and indication were to one of those trained odors. (*Id*. at 134.)

**5.    John McLaughlin**

Agent McLaughlin has been employed with Homeland Security Investigations since February 2016, and is assigned to  Sells, Arizona. (*Id*. at 144-145.)  One of his responsibilities is to respond to drug seizures made by Border Patrol agents. (*Id*. at 145-147.) He was contacted by Border Patrol agents on May 1, 2017, after the defendant's arrest and the seizure of marijuana from her vehicle. (*Id*. at 146.)  In response, Agent McLaughlin went to the Casa Grande Border Patrol station to conduct an investigation, which included attempting to interview the defendant. (*Id*. at 146-148.)

Agent McLaughlin recorded his interview of the defendant at the station.  That recording and a transcript of the recording were admitted into evidence. (Ex. 10 and Ex. 11.) A summary of that recorded interview follows.

Agent McLaughlin advised the defendant of her *Miranda* rights and had the defendant read the rights form out loud.  (5/1/17 Tr. at 12-13.)  The defendant stated that she understood her rights and waived her right to counsel and agreed to speak with Agent McLaughlin and his colleagues. (*Id*. at 12-13)  She also initialed and signed a waiver of

- 12 -

rights form. (Ex. 12; 5/1/17 Tr. at 13.)  After waiving her right to counsel, the defendant asked "how likely is it that I'm going to go home today?" (5/1/17 Tr. at 13.)  Agent Edgecomb responded: "[t]hat's why we're here. We want to talk to you and get your side of everything, what's going on." (*Id.*)  Agent McLaughlin added: "Well, what I can tell you is, if you don't talk to us, your chances of going home are zero." (*Id.*)

The defendant maintained that she did not know that her vehicle contained narcotics. (*Id.* at 14.)  She told agents that she was on the Tohono O'odham Reservation because she cares for an elderly man. (*Id.* 14-24.)  She then told agents about being pulled over by Border Patrol agents earlier in the day and having her car searched. (*Id.* at 24.)  She found that irritating because her car is frequently searched when she is near the border and nothing illegal has ever been found. (*Id.* at 24-25.)

She testified that when she arrived at the checkpoint, she handed the agent her tribal identification card. (*Id.* at 30.) The agent asked her where she was coming from and she told him Meneger's Dam. (*Id.*)  She testified that the agent asked her if she would open the trunk. (*Id.* at 31.)  She told the agent that "we just did this" and refused to open the trunk because it is an illegal search and seizure. (*Id.* at 31-32.)  At that point the agent called the dog over. (*Id.* at 31)  Agents told her that "the dog's indicating" and she needed to open the trunk. (*Id.* at 33.)  Again, she stated that she did not know drugs were in the trunk of her car. (*Id.* at 32.)

Agents told the defendant they did not believe her story. (*Id.* at 40, 47.)  Specifically, Agent McLaughlin stated: "The blind mule bit never works.  People don't have hundreds of pounds of marijuana in the trunk of a car and not know it." (*Id.* at 44.)  Agents explained that they knew this was not her marijuana, that she was not running a drug organization, and that she was only tasked with picking it up and transporting it to someone else. (*Id.* at 44-45.) Agents urged her to be forthright and honest and tell them what they are probably going to find out anyway. (*Id.* at 45.)  Agents also mentioned that they had her phone and could get a warrant to search it. (*Id.*)  The agents told the defendant that they could not make her any promises, and it was ultimately up to the prosecutors to decide whether to charge her or

give her any type of deal. (*Id*. at 45-46.) But the only way to help herself was to tell the truth because the people who sent her to get the marijuana "would sell her down the river in two seconds." (*Id*. at 46.)

The defendant stated that she "need[s] to talk to a lawyer or something" and does not want to make a statement. (*Id*. at 48-49.) The agents told her "that's your choice." (*Id*. at 49.) Agents asked her if she was sure about that decision, and told her that if she changed her mind, they would be around for a few more minutes. (*Id*.) The defendant said, "I don't wish to make a statement at all whatsoever" and "I withdraw anything I said." (*Id*. at 49.) As a result, the interview concluded. (*Id*.)

Agent McLaughlin testified that the defendant was relaxed during the interview and very talkative. (12/18/17 Tr. at 157-158.) He also testified that she appeared to understand her *Miranda* rights and waived them voluntarily. (*Id*.) Agent McLaughlin testified that after the interview, he transported the defendant to the Federal Correctional Institution in Tucson, Arizona. (*Id*. at 161-162.) That trip took between an hour and an hour-and-a-half. (*Id*. at 162.) Within the first few minutes of the drive to FCI, the defendant initiated a conversation with Agent McLaughlin. (*Id*. at 163.) Specifically, she asked what was going to happen to her. (*Id*. at 164.) Agent McLaughlin explained that she would be booked into FCI Tucson for the night and would be picked up the next day and taken to court for her initial appearance in the afternoon. (*Id*.) The defendant asked "if it was still too late for her to go to jail." (*Id*.) When Agent McLaughlin told her it was "too late," she asked why that was the case. (*Id*.) Agent McLaughlin explained that during the interview she had asked for a lawyer, and therefore, he could not ask her any more questions. (*Id*.) Nevertheless, the defendant continued to speak with him and again asked if it was too late for her to tell the truth. (*Id*.) Agent McLaughlin again explained that he could not initiate a conversation with her because she asked for a lawyer. (*Id*. at 165.) The defendant acknowledged that she was initiating the conversation; she also stated that she understood that the *Miranda* rights still applied and anything she said could be used against her. (*Id*.) At that point, the defendant told Agent McLaughlin that she had been hired to transport the marijuana, and she did not

- 14 -

tell agents that at the station because she thought her boyfriend would be mad if he found out she talked to law enforcement. (*Id*.) She then explained the arrangements that were made for her to pick up and deliver the marijuana. (*Id*. at 165-166.)

Agent McLaughlin testified that his conversation with the defendant on the drive to Tucson was not recorded because he did not have a recorder handy. (*Id*. at 169.) He explained that he had no intention of speaking with the defendant while he transported her to FCI. (*Id*.) He further explained that for safety reasons (for himself and the defendant), he decided not to pull over to the side of the road and get a recording device. (*Id*.) During his conversation with the defendant in the vehicle, he does not recall discussing "snitches" or "male and female politics in prison" as the defendant claims in her motion to suppress. (*Id*.) In fact, he testified that he does not "know anything about male and female politics in prison." (*Id*.) The defendant was not in distress or confused during either interview. (*Id*. at 170.) Agent McLaughlin did not make any promises to the defendant during this interview or the interview at the Border Patrol station. (*Id*. at 180-181.)

On cross-examination, defense counsel focused initially on the failure to record the interview during the drive to FCI. (*Id*. at 171.) Agent McLaughlin acknowledged that he did have a recording device with him and could have pulled to the side of the road to get the device. (*Id*. 171-172.) Agent McLaughlin may have stopped to get gas in his vehicle, but that would have been before he got on the freeway and after the defendant initiated the conversation discussed above. (*Id*. at 172-173.) Agent McLaughlin again testified that he was not going to stop on the side of the freeway to get a recording device because it was "dangerous for both of us to stop by the side of I-10 where traffic is going by at 75 miles an hour." (*Id.* at 174-175.) He acknowledged that he could have exited the freeway to a safer location, but explained that he does not stop when transporting a prisoner unless there is an emergency for the transportee. (*Id.*) That said, there is no formal policy prohibiting an agent from stopping while transporting a prisoner. (*Id*. at 176.) Agent McLaughlin also testified that this was the first time that a prisoner initiated a conversation about the offense after the prisoner had requested an attorney. (*Id*. at 175.)

**6.      Janice McCowan**

Ms. McCowan is originally from Parker, Arizona and is a member of the Colorado River Indian Tribe. (*Id*. at 182.)  She now lives in Phoenix, Arizona. (*Id*.)  After graduating from high school, she obtained a degree from Mesa Community College. (*Id*. at 229.)  Ms. McCowan first testified about being stopped by a Border Patrol agent on SR 86 near milepost 69, while she was heading northbound. (*Id*. at 183.)  When the agent arrived at her vehicle, she asked if there was a problem and why she was stopped. (*Id*. at 184.)  The agent told her that she was going kind of slow and that he was conducting an immigration inspection. (*Id*.)  The agent took her identification and went back to his vehicle. (*Id*.)  Ms. McCowan had to use the restroom so she got the agent's attention. (*Id*.)  When the agent returned to her vehicle, he told her he was conducting an immigration inspection and asked her to open the trunk; she refused to do so. (*Id*.)  The agent told her that she could go once his friend arrived. (*Id*.)  Eventually, a canine unit arrived and the handler asked Ms. McCowan if she objected to him using the canine on the vehicle; she told him she did object. (*Id*.)  The canine agent asked Ms. McCowan to exit the vehicle while the canine sniffed around the vehicle. (*Id*. at 184-185.)  She testified that the canine went around the vehicle three times. (*Id*. at 185.)  She was told that she was free to leave and asked the agent to return her identification document. (*Id*.)  She estimates that she was detained for about 45 minutes. (*Id*.)

Ms. McCowan then testified about her interactions with agents at the checkpoint. (*Id*. at 186.)  She testified that when she first arrived at the checkpoint, there was a green sedan in front of her vehicle and multiple (5 to 6) Border Patrol agents. (*Id*. at 187-187.)   There were vehicles parked on both sides of the road. (*Id*. at 186.)  She testified that on her way up to the checkpoint she saw a sign that said "working dog." (*Id*.)  She testified that Agent Brewer was checking the green sedan, but a canine did not go around this vehicle. (*Id*.)  Ms. McCowan was reminded that an agent had previously testified that she appeared to be looking around for a canine. (*Id*. at 187.)  She testified that she was looking at agents who were laughing and  joking around, as well as the whole setup of the checkpoint because it

- 16 -

looked differently than when she crossed through it on prior occasions. (*Id*. at 187, 189-190.) She did notice a canine laying on the ground in front of a truck, but she did not know who the handler was at that point. (*Id*. at 188.) She believes the handler was one of the agents who were joking around. (*Id*.)

After the green sedan cleared the checkpoint, she pulled her vehicle up to Agent Brewer. (*Id*.) She had her identification document ready based on her experience at other checkpoints and because the individuals in the green sedan provided documents to Agent Brewer. (*Id*.) Ms. McCowan testified that she was relaxed and not nervous as she approached the checkpoint, and Agent Brewer could not have seen whether her hand was shaking because he took her identification immediately. (*Id*. at 190-191.) Agent Brewer asked her if she was a United States citizen, where she was headed, and where she was coming from. (*Id*. at 189.) Ms. McCowan testified that while she does speak rapidly, she felt as though she was speaking normally to the agent. (*Id*. at 191.) Agent Brewer did a visual inspection of the vehicle and asked her to open the trunk. (*Id*. at 189.) She testified that the request to open the trunk was before the dog alerted. (*Id*.) Ms. McCowan did not see a canine sniffing her car as she was answering Agent Brewer's questions. (*Id*. at 192.) She told Agent Brewer that she would rather not open the trunk because she would have to get out of the vehicle and open it with the key. (*Id*.)

After she refused to open the trunk, Agent Brewer held up his finger as if to say "hold on," and then motioned to Agent Metheny to come over with his canine. (*Id*.) She testified that Agent Brewer met with Agent Metheny at the passenger side headlight and they conferred about something. (*Id*. at 193.) Agent Metheny then went around her car with the canine and Agent Brewer followed him. (*Id*.) With respect to her demeanor during the canine sniff, Ms. McCowan testified that she was "rather confident because . . . the canine sniff earlier in the day was negative," and she believed it would be negative again and that she did not "really have anything to worry about." (*Id*. at 194.) She testified that when she saw the handler and the canine coming toward her vehicle, she tried to exit the car because that is what the agents had her do earlier that day. (*Id*.) But Agent Brewer told her to stay

in the car.  (*Id*.)

When Agent Brewer returned to the driver's side window, he told Ms. McCowan they needed her to open the trunk because the dog was indicating that something was in the trunk. (*Id*. at 193.)  Ms. McCowan explained that her car had just been searched and she was detained for 45 minutes. (*Id*.)  Agent Brewer said that they still needed her to open the trunk. (*Id*.)  She testified that Agent Metheny started yelling at her to open the trunk, which she thought was disrespectful. (*Id*. at 194-195.)  At that point, she provided the agents with the key from the ignition. (*Id*. at 193-195.)  After the agents opened the trunk, they asked her to exit the vehicle, put handcuffs on her, and escorted her to a Border Patrol vehicle. (*Id*. at 195.)

The defendant was transported to the Casa Grande Border Patrol station where she was questioned by law enforcement officers. (*Id*. at 196.) She testified that prior to the interview, she was provided with crackers and water because she is a diabetic. (*Id*. at 196-198.) Ms. McCowan testified that she was advised of her *Miranda* rights and agreed to speak with law enforcement. (*Id*. at 198.) She also testified that during the interview, she invoked her right to counsel and the interview concluded. (*Id*.)

After about two-and-a-half hours, she was removed from a holding cell and put into Agent McLaughlin's vehicle. (*Id*.)  The defendant asked Agent McLaughlin what was going to happen to her and that led to the following conversation. (*Id*. 218.)   She testified that Agent McLaughlin told her she was "a lucky girl" because she was going to FCI Tucson, and not to Pima County; he told her they have the best food and that it's like a country club there. (*Id*. at 199.)  She testified that this conversation occurred before Agent McLaughlin stopped to get gas and that he pulled off I-10 to get gas at a Shell Station. (*Id*. at 200.)  When Agent McLaughlin got back in his vehicle, she asked him "so what's going to happen now?" (*Id*.) Again, Agent McLaughlin explained that she would spend the night at FCI, and would be taken to court the next morning. (*Id*.)  Agent McLaughlin told her not to worry because it's not like in a men's prison; he told her that he knew she was worried about being a snitch and that "men and women's facilities have totally different politics." (*Id*. at 200-201.)

Agent McLaughlin also told her that he knew that she did not want to say anything more, but he knew it was not her dope and he could not believe she was going to take the fall for the dope. (*Id*. at 201.) He told her that law enforcement want the people above you, and that her boyfriend would not want her to give up years of her life. (*Id*.) She told Agent McLaughlin that she's been told that if you snitch on somebody, it is going to follow you for the rest of your life. (*Id*.) Agent McLaughlin told her that he could make sure that did not happen; her name would never be in print because she could be listed as a confidential informant. (*Id*.) He further said that if she talked with law enforcement, they could make it so you do not even have to go to prison; "[y]ou can be home tomorrow night with your family if you just let us know what's going on." (*Id*.) In response to that statement, she asked Agent McLaughlin what would happen if she "hypothetically" wanted to talk to him. (*Id*. at 203.) He told her that she should have talked earlier during the interview, but that he could amend his report to include her statements and let the prosecutor know she is cooperating. (*Id*.) Ms. McCowan testified that because she thought she would get out of custody the next day if she cooperated, she decided to tell Agent McLaughlin what she knew about the marijuana. (*Id*. at 204, 206.) Ms. McCowan testified that Agent McLaughlin never told her "*Miranda* is still in effect" or that "if you decide to talk to us, it's because you're waiving your right to a lawyer." (*Id*. at 202-203.)

On cross-examination, Ms. McCowan acknowledged that at the checkpoint, she did not see the Border Patrol agents who had pulled her over earlier in the day. (*Id*. at 208-209.) She maintained that Agent Brewer asked her to open the trunk prior to the canine sniff of her vehicle. (*Id*. at 211.) But she acknowledged that she never told Agent McLaughlin about that first request to open the trunk during her interview at the Border Patrol station. (*Id*. at 212.). She testified that she refused to open the trunk because it was her right to refuse to do so, and not because there was marijuana in the trunk. (*Id*. at 213.) She also testified that the marijuana was already in her trunk when she was stopped earlier in the day by Border Patrol agents and the canine performed the free air sniff of her vehicle. (*Id*.)

Ms. McCowan agreed that she was advised of and waived her *Miranda* rights prior

to her interview at the Border Patrol Station, and that she signed the waiver of rights form. (*Id*. at 214-215.) She maintained that Agent McLaughlin promised that she would go home to her children the next day if she cooperated. (*Id*. at 216.) But she acknowledged that purported promise was not made during the recorded interview at the station, as well as that she does not have custody of her children. (*Id*. at 216, 223.) She also maintained that Agent McLaughlin never reminded her that she invoked her right to counsel during the drive to FCI. (*Id*. at 220-221.)

## DISCUSSION

### A.      Motion to Suppress Evidence

####      1.      Primary Purpose of the Checkpoint

It has been long established, in the context of immigration control, that "stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment" even in the absence of a search warrant or individualized suspicion that the particular vehicle contains illegal aliens. *United States v. Martinez-Fuerte*, 428 U.S. 543, 566 (1976). However, it is also well established that checkpoints with the principal purpose of thwarting ordinary criminal activity–as opposed to purposes of policing the border–do not comport with the Fourth Amendment. *City of Indianapolis v. Edmond*, 531 U.S. 32, 38 (2000). More recently, in *United States v. Soto-Zuniga*, 837 F.3d 992, 999-1000 (9th Cir. 2016), the Ninth Circuit recognized that the constitutionality of an immigration checkpoint turns on "whether its 'primary purpose' is to control immigration, ..., or rather is to interdict drug trafficking and other 'ordinary criminal wrongdoing.'" If a checkpoint's primary purpose is to detect evidence of drug trafficking, then the initial seizure of the vehicle and occupant would violate the Fourth Amendment and require suppression of drug evidence as fruit of the poisonous tree. *Id.*

The defendant argues that the marijuana discovered in her vehicle should be suppressed because the primary purpose of the FR 15 checkpoint is not immigration-related. As discussed below, there is ample and undisputed evidence that the primary purpose of the FR 15 checkpoint is immigration-related.

Agent Leonard gave detailed testimony about the purpose of checkpoints and their closely connected relationship with other resources used by the Border Patrol to prevent unlawful immigration.  Specifically, he testified that there are eleven Border Patrol checkpoints in the Tucson Sector, which is responsible for 262 linear miles of border. (12/11/17 Tr. at 11.) Each checkpoint is located on major routes of egress leading away from the border with Mexico. (*Id*. at 12.) The checkpoints are one tool utilized to deter and prevent the unlawful entry of people and contraband into the United States.  (*Id*. at 13-14.) The checkpoints were not built simultaneously; rather, they were built in response to the movement of transnational criminal organizations to deter illegal activity. (*Id*. at 15.)  Thus, the checkpoints are located at strategic locations that benefit the Border Patrol and have "an interdependent relationship with one another."  (*Id*.)

Canine teams are present at the checkpoints to search for concealed humans as well as narcotics, and canines are cross-trained to detect both odors.  (*Id*. at 82.) Free air sniffs are generally performed during the immigration inspection of the vehicle's occupants. (*Id*. at 93.) However, a free air sniff may be conducted after the immigration inspection if agents have some suspicion of illegal activity, such as nervousness.  (*Id*. at 22.)

The statistics of events/arrests at the FR 15 checkpoint over the one-year time frame that encompassed the date of the defendant's arrest also support Agent Leonard's testimony about the primary purpose of this checkpoint.  While the immigration-related events/arrests and narcotic-related events/arrests are fairly even, the statistics do not alter or change the checkpoint's primary purpose.   Rather, as Agent Leonard testified, the primary purpose of the checkpoint is to conduct immigration inspections, and  "anything that happens after that immigration inspection is incidental to the primary purpose, intent and objective of the checkpoint."  (*Id*. at 34.)  The narcotic-related events/arrests at the FR 15 checkpoint are significant, but the Court concludes that they are incidental to and a product of the immigration inspections performed at the checkpoint.

There was no cross-examination of Agent Leonard or evidence presented by the defense to undercut Agent Leonard's testimony or the statistical evidence about the primary

purpose of the checkpoint. In fact, during argument on this point, defense counsel conceded that Agent Leonard testified that the primary purpose of the checkpoint is immigration-related, and anything that happens as a result of an immigration inspection – like a drug seizure – is secondary. (12/18/17 Tr. at 233.) Defense counsel also conceded that the statistics discussed above, while "very close," do not establish that the primary purpose of the checkpoint is not immigration-related. (*Id.*) In fact, counsel stated it would be "extremely difficult for us . . .to show you or to demonstrate that" the primary purpose of the checkpoint is not immigration-related unless there is a document out there that shows otherwise. (*Id*. at 234.)

Because there is no such "smoking gun" and the government has demonstrated that the primary purpose of the FR 15 checkpoint is immigration-related, it is recommended that the motion to suppress evidence on this ground be denied.

### 2.    The Reliability of the Canine

In her motion to suppress, the defendant asserted that the canine involved in the marijuana seizure was not reliable.   As discussed below, this argument is without merit.

The Supreme Court has held that the reliability of a canine used in a sniff for concealed persons or narcotics is not determined by a strict or inflexible evidentiary checklist because that would be the "antithesis of a totality-of-the-circumstances analysis." *Florida v. Harris*, 568 U.S. 237, 244-245 (2013). The reliability of a canine can be established in several ways. For example, "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his [/her] alert." *Harris*, 548 U.S. at 246. Additionally, "[i]f a bona fide organization has certified a dog after testing his[/her] reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. *Id.*   The same is true even absent a formal certification "if the dog has recently and successfully completed a training program that evaluated his [/her] proficiency in locating" the source of the trained odor. *Id.*

In the case at hand, the government presented witnesses and documentation that

demonstrate the canine's reliability in each of the ways suggested above by the Supreme Court. Specifically, Agent Du Bois gave detailed testimony about the training that a canine team received before they can become nationally certified. (12/11/17 Tr. at 55-56.) He also described the bi-weekly training of the canine team conducted by the Border Patrol and the yearly certification requirement. (*Id*. at 57-59.) Agent Du Bois also reviewed the Green Sheets for Agent Metheny and Jessy-A (*Id*. at 62; Ex. 9), which show that they received grades sufficient to qualify the team for yearly certification. (*Id*. at 69, 71; Ex. 8; Ex. 9.) Based on his review of the Green Sheets, he is of the opinion that this canine team is reliable. (*Id*. at 71-72.)

Likewise, Agent Metheny described the training he received to become a canine handler. (*Id*. at 115-116.)   Both he and Jessy-A successfully completed their national training and obtained their yearly certification to work as a canine team for Border Patrol. He has been working with Jessy-A since 2012 (*Id*. at 116.) and is attuned to her physical responses that signal an alert and an indication.  He testified that she alerted immediately to the defendant's vehicle and ultimately indicated at the trunk of the vehicle.  The alert and indication were both to an odor that Jessy-A has been trained to detect, specifically, concealed humans or narcotics.    (*Id*. at 123.)

The Supreme Court has made clear that a defendant must have an opportunity to challenge evidence of a canine's reliability, whether by cross-examining the testifying officer and/or by introducing his/her own fact or expert witnesses. *Harris*, 548 U.S. at 246.  Here, the defendant certainly had that opportunity, but she offered no evidence to rebut or undercut the testimony and/or evidence as to the reliability of the canine.  Indeed, as defense counsel acknowledged, "there was very little cross-examination on the canine."  (12/18/17 Tr. at 234.)  For these reasons, it is recommended that the motion to suppress evidence on this ground be denied.

**3.	The Length of the Immigration Inspection**

"A stop at a permanent U.S. Border patrol checkpoint constitutes a 'seizure' within the meaning of the Fourth Amendment." *United States v. Taylor*, 934 F.2d 218, 220 (9th Cir.

1991).  However, "[s]uch a stop is reasonable per se, so long as the scope of the detention remains confined" to determining immigration status; for instance, a few brief questions, production of an identification document, and "'a visual inspection of the vehicle . . . limited to what can be seen without a search.'" *Taylor*, 934 F.2d at 220 (*quoting United States v. Martinez-Fuerte*, 428 U.S. 543, 558, 562 (1976).   The "'principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop.'" *Id.* (*quoting Martinez-Fuerte,* 428 U.S. at 566-67).

The defendant argues that she was detained longer than necessary for an immigration inspection in order for the canine to perform the free air sniff of her vehicle for narcotics. The defendant testified that the canine did not start its free air sniff until after she refused Agent Brewer's request that she open her trunk and after he had finished with his immigration inspection.  (12/18/17 Tr. at 189, 192.)   For the reasons discussed below, the Court finds the testimony of Agent Brewer and Agent Metheny more credible than the defendant's testimony as to when the free air sniff occurred.

Both Agent Metheny and Agent Brewer testified that the canine performed the free air sniff during the immigration inspection of the defendant.  Agent Metheny testified that he got the canine from its air conditioned kennel in his vehicle when he saw the defendant's car coming toward the checkpoint.  (12/11/17 Tr. at 123.)  He recalls traffic being very light that day.  (*Id.* at 125.)   He further testified that as Agent Brewer began his immigration inspection, Jessy-A started the free air sniff of the vehicle; she alerted to the defendant's vehicle before Agent Brewer had even finished the first question he put to the defendant. (*Id.* at 123, 133.)  Similarly, Agent Brewer testified that as the defendant's vehicle was approaching, Agent Metheny got his canine out of his vehicle to conduct a free air sniff while Agent Brewer conducted the primary inspection.  (*Id.* at 97-98.)  He also testified that the canine alerted while he was conducting his primary immigration inspection of the defendant. (*Id.* at 99.)  Based on this credible testimony, the Court concludes that the free air sniff occurred during the immigration inspection.

Even if the Court were to credit the defendant's testimony that the canine sniff

occurred after the immigration inspection was completed, the search was still lawful because of the signs of nervousness noted by Agent Brewer and Agent Metheny. *See Taylor*, 934 F.2d at 220-221 (9th Cir. 1991) (defendant's nervousness was sufficient basis to delay car at a checkpoint for a dog sniff). Agent Metheny testified that as the defendant was approaching the checkpoint, he noticed that the defendant was looking around. (*Id.* at 126.) Based on his experience, he believed the defendant was trying to see if the canine was out and working. (*Id.* at 128-129, 131.) The defendant testified that she was not looking for a canine; she was looking at the setup of the checkpoint and a group of agents who were joking around and laughing. (12/18/17 Tr. at 187, 189-190.) Even if that is true, it was fair for Agent Metheny to conclude, based on his experience, that the defendant was nervously looking around for the canine.

Agent Brewer testified that the defendant appeared nervous because her hand was shaking when she presented her identification document, and she was speaking rapidly. (12/11/17 Tr. at 98.) Even though the defendant believes she was speaking normally to Agent Brewer, she acknowledged that she does speak rapidly. (12/18/17 Tr. at 191.) And while this rapid speech may have been normal to the defendant, it was still a valid indicator of nervousness for Agent Brewer.

The defendant testified that she was not nervous as she approached the checkpoint, and Agent Brewer could not have seen if her hand was shaking because he took her identification document immediately. (*Id.* at 190-191.) The testimony that she was not nervous is incredible given that she knew her vehicle contained a large amount of marijuana. Moreover, Agent Brewer has been working checkpoints for many years and is attuned to identifying signs of nervousness, such as a driver's hands shaking. Thus, the Court credits his testimony regarding the defendant's nervous behavior.

In summary, the Court finds that the canine's free air sniff was lawful because it occurred during the immigration inspection, and that the defendant's nervous behavior would have justified a free air sniff after the completion of the immigration inspection. Accordingly, it is recommended that the motion to suppress on this ground be denied.

**B.      Motion to Suppress Statements**

In the motion to suppress her statements, the defendant argues that her statements made both at the Border Patrol station and in Agent McLaughlin's vehicle during the ride to FCI should be suppressed because they were the product of an improper inducement which overbore her free will.  However, at the evidentiary hearing, defense counsel conceded that the defendant "knowingly and intelligently waived her rights" prior to being interviewed at the station.  (12/18/17 Tr. at 241-242.)  Defense counsel argued that "[t]he problem is that sometime later" during the ride to FCI,  Agent McLaughlin never re-advised the defendant of her *Miranda* rights and made improper inducements which overbore the defendant's free will in order to extract a confession.  (*Id.* at 242.)

The defendant claims that the failure to record the interview in Agent McLaughlin's vehicle supports her argument that she was never re-advised of her right to counsel and was coerced into admitting her knowledge of the marijuana.  Specifically, the defendant points out that Agent McLaughlin had a recording device in the backseat of his vehicle and could have pulled to the side of the road to record the interview.  (*Id.* at 243.)  For that reason, the defense argues, or at least insinuates, that the interview during the ride to FCI was not recorded so there would be no independent evidence of the pressure applied by Agent McLaughlin to get the defendant to confess.

In *Edwards v. Arizona*, the Supreme Court held that after a suspect invokes the right to counsel, further interrogation without counsel is impermissible unless the suspect initiates further communications with law enforcement and the suspect is again advised of and waives the right to counsel.   451 U.S. 477, 484-485 (1981).  A suspect "initiates" a conversation with authorities by asking "questions which 'evinced a willingness and a desire for a generalized discussion about the investigation[.]'"  *United States v. Velasquez*, 885 F.2d 1076, 1086-1087 (3$^d$ Cir. 1989) (*quoting Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983)).  There are some routine inquiries, such as a request for a drink of water or to use the telephone, that "cannot be fairly said to represent a desire on the part of the accused to open up a more generalized discussion relating directly or indirectly to the investigation."

*Bradshaw*, 462 U.S. at 1045. However, a suspect can initiate a conversation with law enforcement which evinces a willingness and desire to discuss the investigation by asking a question as simple as: "[w]ell, what is going to happen to me now?" *Id.*

In *Bradshaw*, the Supreme Court reaffirmed *Edwards,* but clarified that the "initiation" of a conversation by a suspect does not amount to a waiver of a previously invoked right to counsel.   462 U.S. at 1044. The Court held that these were separate inquiries, and articulated a two-part test to determine whether a suspect in custody may be subjected to further interrogation after s/he has requested an attorney: (1) the suspect must initiate the conversation with authorities, not vice versa; and (2) after the suspect initiates the conversation, the waiver of the right to counsel and the right to silence must be knowing and voluntary. *Id.* at 1045-46 (1983); *see Smith v. Illinois*, 469 U.S. 91, 95 (1984) (per curiam) (recognizing two-step analysis of initiation and waiver); *Rodriguez v. McDonald*, 872 F.3d 908, 921 (9th Cir. 2017) (recognizing two-step analysis of initiation and waiver.)

The Court further held that the voluntariness of a statement must be independently determined by looking at "the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Bradshaw*, 462 U.S. at 1045-1046.

> Before a criminal defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence.   An inculpatory statement is voluntary only when it is the product of a rational intellect and a free will. The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.  A statement is involuntary if it is 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'   This broadly-stated rule has not been applied to invalidate, per se, all statements made by a suspect in response to a promise made by law enforcement personnel.  The promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances.

*United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)*; see also United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003); *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993).

The defendant testified that during the ride to FCI, Agent McLaughlin never brought up *Miranda* or that it still applied, and he promised her she would go home the next day to her kids if she cooperated and told them what she knew about the marijuana. (12/18/17 Tr. at 202-204, 206, 216.)  She also testified that Agent McLaughlin talked to her about the politics in prison and assured her that he could keep her cooperation confidential. (*Id.* at 200-201, 203.)  Because of all of these assurances, the defendant testified that she agreed to talk with Agent McLaughlin about her role in the transportation of the marijuana. (*Id*. at 204, 206.)

Agent McLaughlin testified that early on during the ride to FCI, the defendant asked him what was going to happen to her. (*Id.* at 163-164.)  He explained that she would spend the night at FCI and would be picked up the next morning and taken to court for her initial appearance. (*Id.* at 164.)  She asked whether it was too late for her to avoid going to jail. Agent McLaughlin told her it was too late. (*Id.*)  When the defendant questioned why that was the case,  Agent McLaughlin reminded the defendant that she invoked her right to counsel. (*Id.*)  He told her that he could not speak with her unless she was initiating the conversation and again waived her right to counsel. (*Id.* at 165.)  He testified that the defendant agreed to do so and that he made no promises or assurances to the defendant during the ride to FCI. (*Id.*)

With respect to the failure to record the interview, Agent McLaughlin testified that he did not have a recording device readily available for the interview in his vehicle because he never expected to talk with the defendant about her arrest and/or the marijuana. (*Id.* at 169.)  Indeed, this was the first time that a prisoner had ever initiated a conversation (about the offense) with Agent McLaughlin after the prisoner had requested an attorney. (*Id.* at 175.)  He also testified that he was not going to pull over on the side of the road to get a recording device for the interview because of the danger it posed to him and the defendant. (*Id.* at 169, 174-175.)  He acknowledged that he could have gotten off the interstate and parked at a safe place, but it was his practice not to stop during the transport of a prisoner (other than to obtain gas, which he may have done before he got on the interstate). (*Id.* at

174-175.)

As discussed below, the Court finds Agent McLaughlin's testimony credible regarding: (1) who initiated the conversation during the ride to FCI and the substance of that conversation (including any purported promises); and (2) the re-advisal of *Miranda* rights to the defendant and her knowing and voluntary waiver of those rights. The Court also finds that Agent McLaughlin's explanation for the failure to the record the interview is credible and reasonable, and not sinister as the defense contends.

### 1. Initiation of the conversation during the ride to FCI

The defendant's testimony about who initiated the conversation during the ride to FCI and why she agreed to speak to Agent McLaughlin at that time is not credible for several reasons. The defendant is very talkative and relaxed during the interview at the Border Patrol station; indeed, she jokes around with the agents. While the defendant does not admit to knowing the marijuana was in her trunk, agents hardly had to pull teeth to get her to talk. She repeatedly goes on long narratives about caring for the elderly man, her prior travel to the TO Reservation to visit a man she was dating, and her boyfriend and his legal situation. She also talks at length about what happens to "snitches" in prison. The thrust of that conversation is that being labeled a "snitch" is why she was not willing to tell agents what she knew about the marijuana. She also asks the agents several questions, albeit sometimes rhetorical ones.

Against this backdrop, it is not hard to imagine the defendant asking Agent McLaughlin questions during the ride to FCI, including the natural question of where she was going and what would happen to her, as well as the hypothetical question she admits that she asked about what would happen if she decides to cooperate. *See Bradshaw*, 462 U.S. at 1045 (defendant's question "well, what is going to happen to me now?" evinced a willingness and a desire for a generalized discussion about the investigation.)[2] Based on the

---

[2]    The court notes that there was no reason for Agent McLaughlin to initiate a conversation with the defendant (or make her any promises) during the ride to FCI in order

conversation between the defendant and the agents at the Border Patrol station, the defendant's general demeanor (both at the station and on the witness stand), and Agent McLaughlin's credible testimony, the Court concludes that the defendant initiated a conversation during the ride to FCI that "evinced a willingness and a desire for a generalized discussion about the investigation." *Velasquez*, 885 F.2d at 1086-1087 (*quoting Bradshaw*, 462 U.S. at 1046.)

*2. The defendant was re-advised of her Miranda rights and she knowingly and voluntarily waived her rights.*

The Court concludes that Agent McLauglin re-advised the defendant of her right to counsel after she initiated the conversation with him during the ride to FCI. Agent McLaughlin is an experienced agent who carefully followed the requirements of *Miranda* at the Border Patrol station. Specifically, he advised the defendant of her *Miranda* rights, had the defendant read the *Miranda* rights form out loud, had her sign and initial the form when she stated that she wanted to waive her right to counsel, and terminated the interview when the defendant invoked her right to counsel. In light of Agent McLaughlin's knowledge of and compliance with *Miranda* at the station, as well as his testimony regarding the re-advisal of *Miranda* rights, the Court concludes that the defendant's claim that she was never re-advised of her right to counsel during the ride to FCI is not credible.

The Court also concludes that the defendant's waiver of her right to counsel was knowing and voluntary, and not the result of any promises or inducements. The defendant argues that Agent McLaughlin's statement during the interview at the station that she definitely would not get to go home today if she did not talk with him was an inducement that caused her to speak with agents, both at the station and during the ride to FCI. However, on cross-examination the defendant acknowledged that the recorded interview does not

to extract a confession. The case against the defendant was already strong. She was found with a large amount of marijuana in her vehicle; and although she denied knowledge of the marijuana during the recorded interview at the station, she provided no explanation as to how the marijuana got in her vehicle.

reflect a promise made by Agent McLaughlin that she would go home if she cooperated with law enforcement. (12/18/17 Tr. at 216, 223.) Rather, she drew that conclusion at that time, and presumably drew the same conclusion during the ride to FCI after initiating the conversation with Agent McLaughlin. Her wishful thinking was not caused by any promise or inducement made by Agent McLaughlin.

The Court finds that Agent McLaughlin's comment regarding whether or not the defendant would be going home, viewed in the context of the entirety of the interview, was not a promise or inducement that was sufficient to overbear the defendant's free will. *See Leon Guerrero*, 847 F.2d at 1366-1367 (prosecutor telling suspect a lengthy prison sentence could be avoided if he cooperated did not render the confession involuntary); *Martin v. Wainright*, 770 F.2d 918, 924-927 (11th Cir. 1985) (confession during five-hour interrogation in which the prosecutor participated in was voluntary even though police refused to postpone the interrogation, police used a "good guy, bad guy technique," police falsely represented that co-defendant had confessed, the prosecutor promised to get the suspect psychiatric help, and the prosecutor told the suspect that while a confession would hurt him in the guilt phase it may help him at sentencing); *United States v. Watson*, 591 F.2d 1058, 1061 (5th Cir. 1979) (confession voluntary where state prosecutor told suspect that he would consider dropping state charges if he cooperated with FBI). In *Leon Guerrero*, the Ninth Circuit found that the prosecutor's statement to the defendant that his "cooperation would be taken into consideration in any future handling of cases involving him was not sufficiently compelling to overbear his free will and rational intellect." 847 F.2d at 1367. The court reasoned that the defendant was not promised any tangible benefit, and was told he had the right not to cooperate and it was his decision. *Id.* The court also noted that the defendant was an educated businessman with three years of college and one year of law school.

Here, like in *Leon Guerrero*, Agent McLaughlin never promised the defendant a tangible benefit. Specifically, he did not tell her that she would go home if she cooperated with law enforcement or that she would not be charged with a crime. To the contrary, he makes it clear to the defendant he could not make her any promises, let alone a promise to

get her out of jail the next day.  He also tells her that it is up to the prosecutors, and not him, to determine whether to charge her with a crime or offer her any plea deal.  Moreover, as in *Leon Guerrero*, the defendant is a smart and educated woman: she testified that she graduated from college; she told agents during her interview (quite correctly) that it was her legal right to refuse a consent search of her trunk; and she refused to give consent to search the trunk on two separate occasions.

Additionally, the defendant is not emotional or distraught at any point during the recorded interview; rather, she is chatty, relaxed, and jokes around with the agents.  The defendant was told that it was her choice whether to tell the truth and cooperate or end the interview.  She stands her ground when agents tell her that they do not believe her story, and ultimately invokes her right to counsel and terminates the interview.  Those are not the actions of someone whose free will is overborne.  Thus, in light of the recorded interview at the Border Patrol Station as well as Agent McLauglin's credible testimony regarding what transpired during the ride to FCI, it is simply not believable that while transporting the defendant to prison, Agent McLaughlin promised that he could get her out of prison the next day if she spoke with him.

Based on the credible testimony of Agent McLaughlin, it is recommended that the defendant's motion to suppress her statements be denied.

Pursuant to 28 U.S.C. § 636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  No reply shall be filed unless leave is granted from the District Court.  If  objections are filed, the parties should use the following case number:  **CR 17-00839-TUC-CKJ.**

///

///

- 32 -

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

DATED this 1st day of February, 2018.

Eric J. Markovich
United States Magistrate Judge